# FURMAN *v.* GEORGIA

No. 69–5003. Argued January 17, 1972—Decided June 29, 1972*

*Anthony G. Amsterdam* argued the cause for petitioner in No. 69–5003. With him on the brief were *B. Clarence Mayfield, Michael Meltsner, Jack Greenberg, James M. Nabrit III, Jack Himmelstein,* and *Elizabeth B. DuBois. Mr. Greenberg* argued the cause for petitioner in No. 69–5030. With him on the brief were *Messrs. Meltsner, Amsterdam, Nabrit, Himmelstein,* and *Mrs. DuBois. Melvyn Carson Bruder* argued the cause and filed a brief for petitioner in No. 69–5031.

*Dorothy T. Beasley,* Assistant Attorney General of Georgia, argued the cause for respondent in Nos. 69–5003 and 69–5030. With her on the briefs were *Arthur K. Bolton,* Attorney General, *Harold N. Hill, Jr.,* Executive Assistant Attorney General, *Courtney Wilder Stanton,* Assistant Attorney General, and *Andrew J. Ryan, Jr. Charles Alan Wright* argued the cause for respondent in No. 69–5031. With him on the brief were *Crawford C. Martin,* Attorney General of Texas, *Nola White,* First Assistant Attorney General, *Alfred Walker,* Executive Assistant Attorney General, and *Robert C. Flowers* and *Glenn R. Brown,* Assistant Attorneys General.

---

*Together with No. 69–5030, *Jackson* v. *Georgia,* on certiorari to the same court, and No. 69–5031, *Branch* v. *Texas,* on certiorari to the Court of Criminal Appeals of Texas.

*Theodore L. Sendak,* Attorney General, and *David O. Givens,* Deputy Attorney General, filed a brief for the State of Indiana as *amicus curiae* urging affirmance in No. 69–5003. *Paul Raymond Stone* filed a brief for the West Virginia Council of Churches et al. as *amici curiae* urging reversal in Nos. 69–5003 and 69–5030. *John E. Havelock,* Attorney General, filed a brief for the State of Alaska as *amicus curiae* in Nos. 69–5003 and 69–5030. Briefs of *amici curiae* in all three cases were filed by *Gerald H. Gottlieb, Melvin L. Wulf,* and *Sanford Jay Rosen* for the American Civil Liberties Union; by *Leo Pfeffer* for the Synagogue Council of America et al.; by *Chauncey Eskridge, Mario G. Obledo, Leroy D. Clark, Nathaniel R. Jones,* and *Vernon Jordan* for the National Association for the Advancement of Colored People et al.; by *Michael V. DiSalle* for Edmund G. Brown et al.; and by *Hilbert P. Zarky* and *Marc I. Hayutin* for James V. Bennett et al.

PER CURIAM.

Petitioner in No. 69–5003 was convicted of murder in Georgia and was sentenced to death pursuant to Ga. Code Ann. § 26–1005 (Supp. 1971) (effective prior to July 1, 1969). 225 Ga. 253, 167 S. E. 2d 628 (1969). Petitioner in No. 69–5030 was convicted of rape in Georgia and was sentenced to death pursuant to Ga. Code Ann. § 26–1302 (Supp. 1971) (effective prior to July 1, 1969). 225 Ga. 790, 171 S. E. 2d 501 (1969). Petitioner in No. 69–5031 was convicted of rape in Texas and was sentenced to death pursuant to Tex. Penal Code, Art. 1189 (1961). 447 S. W. 2d 932 (Ct. Crim. App. 1969). Certiorari was granted limited to the following question: "Does the imposition and carrying out of the death penalty in [these cases] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?" 403 U. S. 952 (1971). The Court holds that the imposi-

tion and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings.

*So ordered.*

MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL have filed separate opinions in support of the judgments. THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST have filed separate dissenting opinions.

MR. JUSTICE DOUGLAS, concurring.

In these three cases the death penalty was imposed, one of them for murder, and two for rape. In each the determination of whether the penalty should be death or a lighter punishment was left by the State to the discretion of the judge or of the jury. In each of the three cases the trial was to a jury. They are here on petitions for certiorari which we granted limited to the question whether the imposition and execution of the death penalty constitute "cruel and unusual punishment" within the meaning of the Eighth Amendment as applied to the States by the Fourteenth.[1] I vote to vacate each judgment, believing that the exaction of the death penalty does violate the Eighth and Fourteenth Amendments.

---

[1] The opinion of the Supreme Court of Georgia affirming Furman's conviction of murder and sentence of death is reported in 225 Ga. 253, 167 S. E. 2d 628, and its opinion affirming Jackson's conviction of rape and sentence of death is reported in 225 Ga. 790, 171 S. E. 2d 501. The conviction of Branch of rape and the sentence of death were affirmed by the Court of Criminal Appeals of Texas and reported in 447 S. W. 2d 932.

That the requirements of due process ban cruel and unusual punishment is now settled. *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 463, and 473–474 (Burton, J., dissenting); *Robinson* v. *California,* 370 U. S. 660, 667. It is also settled that the proscription of cruel and unusual punishments forbids the judicial imposition of them as well as their imposition by the legislature. *Weems* v. *United States,* 217 U. S. 349, 378–382.

Congressman Bingham, in proposing the Fourteenth Amendment, maintained that "the privileges or immunities of citizens of the United States" as protected by the Fourteenth Amendment included protection against "cruel and unusual punishments:"

> "[M]any instances of State injustice and oppression have already occurred in the State legislation of this Union, of flagrant violations of the guarantied privileges of citizens of the United States, for which the national Government furnished and could furnish by law no remedy whatever. Contrary to the express letter of your Constitution, 'cruel and unusual punishments' have been inflicted under State laws within this Union upon citizens, not only for crimes committed, but for sacred duty done, for which and against which the Government of the United States had provided no remedy and could provide none." Cong. Globe, 39th Cong., 1st Sess., 2542.

Whether the privileges and immunities route is followed, or the due process route, the result is the same.

It has been assumed in our decisions that punishment by death is not cruel, unless the manner of execution can be said to be inhuman and barbarous. *In re Kemmler,* 136 U. S. 436, 447. It is also said in our opinions

that the proscription of cruel and unusual punishments "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States, supra,* at 378. A like statement was made in *Trop* v. *Dulles,* 356 U. S. 86, 101, that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

The generality of a law inflicting capital punishment is one thing. What may be said of the validity of a law on the books and what may be done with the law in its application do, or may, lead to quite different conclusions.

It would seem to be incontestable that the death penalty inflicted on one defendant is "unusual" if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices.

There is evidence that the provision of the English Bill of Rights of 1689, from which the language of the Eighth Amendment was taken, was concerned primarily with selective or irregular application of harsh penalties and that its aim was to forbid arbitrary and discriminatory penalties of a severe nature: [2]

"Following the Norman conquest of England in 1066, the old system of penalties, which ensured equality between crime and punishment, suddenly disappeared. By the time systematic judicial records were kept, its demise was almost complete. With the exception of certain grave crimes for which the punishment was death or outlawry, the arbitrary fine was replaced by a discretionary

[2] Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 845–846 (1969).

amercement. Although amercement's discretionary character allowed the circumstances of each case to be taken into account and the level of cash penalties to be decreased or increased accordingly, the amercement presented an opportunity for excessive or oppressive fines.

"The problem of excessive amercements became so prevalent that three chapters of the Magna Carta were devoted to their regulation. Maitland said of Chapter 14 that 'very likely there was no clause in the Magna Carta more grateful to the mass of the people.' Chapter 14 clearly stipulated as fundamental law a prohibition of excessiveness in punishments:

" 'A free man shall not be amerced for a trivial offence, except in accordance with the degree of the offence; and for a serious offence he shall be amerced according to its gravity, saving his livelihood; and a merchant likewise, saving his merchandise; in the same way a villein shall be amerced saving his wainage; if they fall into our mercy. And none of the aforesaid amercements shall be imposed except by the testimony of reputable men of the neighborhood.' "

The English Bill of Rights, enacted December 16, 1689, stated that "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." [3] These were the words chosen for our Eighth Amendment. A like provision had been in Virginia's Constitution of 1776 [4] and in the constitutions

[3] 1 W. & M., Sess. 2, c. 2; 8 English Historical Documents, 1660–1714, p. 122 (A. Browning ed. 1953).

[4] 7 F. Thorpe, Federal & State Constitutions 3813 (1909).

of seven other States.[5] The Northwest Ordinance, enacted under the Articles of Confederation, included a prohibition of cruel and unusual punishments.[6] But the debates of the First Congress on the Bill of Rights throw little light on its intended meaning. All that appears is the following: [7]

> "Mr. SMITH, of South Carolina, objected to the words 'nor cruel and unusual punishments;' the import of them being too indefinite.
>
> "Mr. LIVERMORE: The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary. What is meant by the terms excessive bail? Who are to be the judges? What is understood by excessive fines? It lies with the court to determine. No cruel and unusual punishment is to be inflicted; it is sometimes necessary to hang a man, villains often deserve whipping, and perhaps having their ears cut off; but are we in future to be prevented from inflicting these punishments because they are cruel? If a more lenient mode of correcting vice and deterring others from the commission of it could be invented, it would be very prudent in the Legislature to adopt it; but until we have some security that this will be done, we ought not to be restrained from making necessary laws by any declaration of this kind."

The words "cruel and unusual" certainly include pen-

---

[5] Delaware, Maryland, New Hampshire, North Carolina, Massachusetts, Pennsylvania, and South Carolina. 1 Thorpe, *supra*, n. 4, at 569; 3 *id.*, at 1688, 1892; 4 *id.*, at 2457; 5 *id.*, at 2788, 3101; 6 *id.*, at 3264.

[6] Set out in 1 U. S. C. XXXIX–XLI.

[7] 1 Annals of Cong. 754 (1789).

alties that are barbaric. But the words, at least when read in light of the English proscription against selective and irregular use of penalties, suggest that it is "cruel and unusual" to apply the death penalty—or any other penalty—selectively to minorities whose numbers are few, who are outcasts of society, and who are unpopular, but whom society is willing to see suffer though it would not countenance general application of the same penalty across the board.[8] Judge Tuttle, indeed, made abundantly clear in *Novak* v. *Beto,* 453 F. 2d 661, 673–679 (CA5) (concurring in part and dissenting in part), that solitary confinement may at times be "cruel and unusual" punishment. Cf. *Ex parte Medley,* 134 U. S. 160; *Brooks* v. *Florida,* 389 U. S. 413.

The Court in *McGautha* v. *California,* 402 U. S. 183, 198, noted that in this country there was almost from the beginning a "rebellion against the common-law rule imposing a mandatory death sentence on all convicted

---

[8] "When in respect of any class of offenses the difficulty of obtaining convictions is at all general in England, we may hold it as an axiom, that the law requires amendment. Such conduct in juries is the silent protest of the people against its undue severity. This was strongly exemplified in the case of prosecutions for the forgery of bank-notes, when it was a capital felony. It was in vain that the charge was proved. Juries would not condemn men to the gallows for an offense of which the punishment was out of all proportion to the crime; and as they could not mitigate the sentence they brought in verdicts of Not Guilty. The consequence was, that the law was changed; and when secondary punishments were substituted for the penalty of death, a forger had no better chance of an acquittal than any other criminal. Thus it is that the power which juries possess of refusing to put the law in force has, in the words of Lord John Russell, 'been the cause of amending many bad laws which the judges would have administered with professional bigotry, and above all, it has this important and useful consequence, that laws totally repugnant to the feelings of the community for which they are made, can not long prevail in England.'" W. Forsyth, History of Trial by Jury 367–368 (2d ed. 1971).

murderers." The first attempted remedy was to re-
strict the death penalty to defined offenses such as
"premeditated" murder.[9] *Ibid.* But juries "took the

---

[9] This trend was not universally applauded. In the early 1800's,
England had a law that made it possible to impose the death
sentence for stealing five shillings or more. 3 W. & M., c. 9,
§ 1. When a bill for abolishing that penalty (finally enacted in
1827, 7 & 8 Geo. 4, c. 27) was before the House of Lords in 1813,
Lord Ellenborough said:

"If your Lordships look to the particular measure now under
consideration, can it, I ask, be seriously maintained, that the most
exemplary punishment, and the best suited to prevent the com-
mission of this crime, ought not to be a punishment which might
in some cases be inflicted? How, but by the enactments of the
law now sought to be repealed, are the cottages of industrious
poverty protected? What other security has a poor peasant, when
he and his wife leave their home for their daily labours, that on
their return their few articles of furniture or of clothes which they
possess besides those which they carry on their backs, will be
safe? . . . [B]y the enacting of the punishment of death, and leav-
ing it to the discretion of the Crown to inflict that punishment
or not, as the circumstances of the case may require, I am satisfied,
and I am much mistaken if your Lordships are not satisfied, that
this object is attained with the least possible expenditure. That
the law is, as it has been termed, a bloody law, I can by no means
admit. Can there be a better test than by a consideration of the
number of persons who have been executed for offences of the
description contained in the present Bill? Your Lordships are
told, what is extremely true, that this number is very small; and
this very circumstance is urged as a reason for a repeal of the
law; but, before your Lordships are induced to consent to such
repeal, I beg to call to your consideration the number of innocent
persons who might have been plundered of their property or
destroyed by midnight murderers, if the law now sought to be
repealed had not been in existence:—a law upon which all the
retail trade of this commercial country depends; and which I for
one will not consent to be put in jeopardy." Debate in House of
Lords, Apr. 2, 1813, pp. 23–24 (Longman, Hurst, Rees, Orme, &
Brown, Paternoster-Row, London 1816).

law into their own hands" and refused to convict on the capital offense. *Id.*, at 199.

> "In order to meet the problem of jury nullification, legislatures did not try, as before, to refine further the definition of capital homicides. Instead they adopted the method of forthrightly granting juries the discretion which they had been exercising in fact." *Ibid.*

The Court concluded: "In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution." *Id.*, at 207.

The Court refused to find constitutional dimensions in the argument that those who exercise their discretion to send a person to death should be given standards by which that discretion should be exercised. *Id.*, at 207–208.

A recent witness at the Hearings before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 2d Sess., Ernest van den Haag, testifying on H. R. 8414 et al.,[10] stated:

> "Any penalty, a fine, imprisonment or the death penalty could be unfairly or unjustly applied. The

---

[10] H. R. 3243, 92d Cong., 1st Sess., introduced by Cong. Celler, would abolish all executions by the United States or by any State.

H. R. 8414, 92d Cong., 1st Sess., introduced by Cong. Celler, would provide an interim stay of all executions by the United States or by any State and contains the following proposed finding:

"Congress hereby finds that there exists serious question—

"(a) whether the infliction of the death penalty amounts to cruel and unusual punishment in violation of the eighth and fourteenth amendents to the Constitution; and

"(b) whether the death penalty is inflicted discriminatorily upon

vice in this case is not in the penalty but in the process by which it is inflicted. It is unfair to inflict unequal penalties on equally guilty parties, or on any innocent parties, *regardless of what the penalty is.*" *Id.*, at 116–117. (Emphasis supplied.)

But those who advance that argument overlook *McGautha, supra.*

We are now imprisoned in the *McGautha* holding. Indeed the seeds of the present cases are in *McGautha.* Juries (or judges, as the case may be) have practically untrammeled discretion to let an accused live or insist that he die.[11]

members of racial minorities, in violation of the fourteenth amendment to the Constitution,

"and, in either case, whether Congress should exercise its authority under section 5 of the fourteenth amendment to prohibit the use of the death penalty."

There is the naive view that capital punishment as "meted out in our courts, is the antithesis of barbarism." See Henry Paolucci, New York Times, May 27, 1972, p. 29, col. 1. But the Leopolds and Loebs, the Harry Thaws, the Dr. Sheppards and the Dr. Finchs of our society are never executed, only those in the lower strata, only those who are members of an unpopular minority or the poor and despised.

[11] The tension between our decision today and *McGautha* highlights, in my view, the correctness of MR. JUSTICE BRENNAN's dissent in that case, which I joined. 402 U. S., at 248. I should think that if the Eighth and Fourteenth Amendments prohibit the imposition of the death penalty on petitioners because they are "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed," opinion of MR. JUSTICE STEWART, *post*, at 309–310, or because "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," opinion of MR. JUSTICE WHITE, *post*, at 313, statements with which I am in complete agreement—then the Due Process Clause of the Fourteenth Amendment would render unconstitutional "capital sentencing procedures that are purposely

Mr. Justice Field, dissenting in *O'Neil* v. *Vermont*, 144 U. S. 323, 340, said, "The State may, indeed, make the drinking of one drop of liquor an offence to be punished by imprisonment, but it would be an unheard-of cruelty if it should count the drops in a single glass and make thereby a thousand offences, and thus extend the punishment for drinking the single glass of liquor to an imprisonment of almost indefinite duration." What the legislature may not do for all classes uniformly and systematically, a judge or jury may not do for a class that prejudice sets apart from the community.

There is increasing recognition of the fact that the basic theme of equal protection is implicit in "cruel and unusual" punishments. "A penalty . . . should be considered 'unusually' imposed if it is administered arbitrarily or discriminatorily." [12] The same authors add that "[t]he extreme rarity with which applicable death penalty provisions are put to use raises a strong inference of arbitrariness." [13] The President's Commission on Law Enforcement and Administration of Justice recently concluded: [14]

"Finally there is evidence that the imposition of the death sentence and the exercise of dispensing power by the courts and the executive follow discriminatory patterns. The death sentence is disproportionately imposed and carried out on the

---

constructed to allow the maximum possible variation from one case to · the next, and [that] provide no mechanism to prevent that consciously maximized variation from reflecting merely random or arbitrary choice." *McGautha* v. *California,* 402 U. S. 183, 248 (BRENNAN, J., dissenting).

[12] Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1790.

[13] *Id.,* at 1792.

[14] The Challenge of Crime in a Free Society 143 (1967).

poor, the Negro, and the members of unpopular groups."

A study of capital cases in Texas from 1924 to 1968 reached the following conclusions: [15]

"Application of the death penalty is unequal: most of those executed were poor, young, and ignorant.

. . . . .

---

[15] Koeninger, Capital Punishment in Texas, 1924–1968, 15 Crime & Delin. 132, 141 (1969).

In H. Bedau, The Death Penalty in America 474 (1967 rev. ed.), it is stated:

RACE OF THE OFFENDER BY FINAL DISPOSITION

| Final Disposition | Negro N | % | White N | % | Total N | % |
|---|---|---|---|---|---|---|
| Executed | 130 | 88.4 | 210 | 79.8 | 340 | 82.9 |
| Commuted | 17 | 11.6 | 53 | 20.2 | 70 | 17.1 |
| Total | 147 | 100.0 | 263 | 100.0 | 410 | 100.0 |

$X^2=4.33$; P less than .05. (For discussion of statistical symbols, see Bedau, *supra*, at 469.)

"Although there may be a host of factors other than race involved in this frequency distribution, something more than chance has operated over the years to produce this racial difference. On the basis of this study it is not possible to indict the judicial and other public processes prior to the death row as responsible for the association between Negroes and higher frequency of executions; nor is it entirely correct to assume that from the time of their appearance on death row Negroes are discriminated against by the Pardon Board. Too many unknown or presently immeasurable factors prevent our making definitive statements about the relationship. Nevertheless, because the Negro/high-execution association is statistically present, some suspicion of racial discrimination can hardly be avoided. If such a relationship had not appeared, this kind of suspicion could have been allayed; the existence of the relationship, although not 'proving' differential bias by the Pardon Boards over the years since 1914, strongly suggests that such bias has existed."

The latter was a study in Pennsylvania of people on death row between 1914 and 1958, made by Wolfgang, Kelly, & Nolde and printed

"Seventy-five of the 460 cases involved co-defendants, who, under Texas law, were given separate trials. In several instances where a white and a Negro were co-defendants, the white was sentenced to life imprisonment or a term of years, and the Negro was given the death penalty.

"Another ethnic disparity is found in the type of sentence imposed for rape. The Negro convicted of rape is far more likely to get the death penalty than a term sentence, whereas whites and Latins are far more likely to get a term sentence than the death penalty."

Warden Lewis E. Lawes of Sing Sing said: [16]

"Not only does capital punishment fail in its justification, but no punishment could be invented with so many inherent defects. It is an unequal punishment in the way it is applied to the rich and to the poor. The defendant of wealth and position never goes to the electric chair or to the gallows. Juries do not intentionally favour the rich, the law is theoretically impartial, but the defendant with ample means is able to have his case presented with every favourable aspect, while the poor defendant often has a lawyer assigned by the court. Sometimes such assignment is considered part of political patronage; usually the lawyer assigned has had no experience whatever in a capital case."

Former Attorney General Ramsey Clark has said, "It is the poor, the sick, the ignorant, the powerless and the hated who are executed." [17] One searches our chron-

---

in 53 J. Crim. L. C. & P. S. 301 (1962). And see Hartung, Trends in the Use of Capital Punishment, 284 Annals 8, 14–17 (1952).

[16] Life and Death in Sing Sing 155–160 (1928).

[17] Crime in América 335 (1970).

icles in vain for the execution of any member of the afflu-
ent strata of this society. The Leopolds and Loebs are
given prison terms, not sentenced to death.

Jackson, a black, convicted of the rape of a white
woman, was 21 years old. A court-appointed psychiatrist
said that Jackson was of average education and average
intelligence, that he was not an imbecile, or schizophrenic,
or psychotic, that his traits were the product of environ-
mental influences, and that he was competent to stand
trial. Jackson had entered the house after the husband
left for work. He held scissors against the neck of the
wife, demanding money. She could find none and a
struggle ensued for the scissors, a battle which she lost;
and she was then raped, Jackson keeping the scissors
pressed against her neck. While there did not appear
to be any long-term traumatic impact on the victim, she
was bruised and abrased in the struggle but was not
hospitalized. Jackson was a convict who had escaped
from a work gang in the area, a result of a three-year
sentence for auto theft. He was at large for three days
and during that time had committed several other of-
fenses—burglary, auto theft, and assault and battery.

Furman, a black, killed a householder while seeking
to enter the home at night. Furman shot the deceased
through a closed door. He was 26 years old and had
finished the sixth grade in school. Pending trial, he was
committed to the Georgia Central State Hospital for a
psychiatric examination on his plea of insanity tendered
by court-appointed counsel. The superintendent re-
ported that a unanimous staff diagnostic conference
had concluded "that this patient should retain his
present diagnosis of Mental Deficiency, Mild to Moder-
ate, with Psychotic Episodes associated with Convul-
sive Disorder." The physicians agreed that "at present
the patient is not psychotic, but he is not capable
of cooperating with his counsel in the preparation of his

defense"; and the staff believed "that he is in need of further psychiatric hospitalization and treatment."

Later, the superintendent reported that the staff diagnosis was Mental Deficiency, Mild to Moderate, with Psychotic Episodes associated with Convulsive Disorder. He concluded, however, that Furman was "not psychotic at present, knows right from wrong and is able to cooperate with his counsel in preparing his defense."

Branch, a black, entered the rural home of a 65-year-old widow, a white, while she slept and raped her, holding his arm against her throat. Thereupon he demanded money and for 30 minutes or more the widow searched for money, finding little. As he left, Jackson said if the widow told anyone what happened, he would return and kill her. The record is barren of any medical or psychiatric evidence showing injury to her as a result of Branch's attack.

He had previously been convicted of felony theft and found to be a borderline mental deficient and well below the average IQ of Texas prison inmates. He had the equivalent of five and a half years of grade school education. He had a "dull intelligence" and was in the lowest fourth percentile of his class.

We cannot say from facts disclosed in these records that these defendants were sentenced to death because they were black. Yet our task is not restricted to an effort to divine what motives impelled these death penalties. Rather, we deal with a system of law and of justice that leaves to the uncontrolled discretion of judges or juries the determination whether defendants committing these crimes should die or be imprisoned. Under these laws no standards govern the selection of the penalty. People live or die, dependent on the whim of one man or of 12.

Irving Brant has given a detailed account of the Bloody Assizes, the reign of terror that occupied the

closing years of the rule of Charles II and the opening years of the regime of James II (the Lord Chief Justice was George Jeffreys):

"Nobody knows how many hundreds of men, innocent or of unproved guilt, Jeffreys sent to their deaths in the pseudo trials that followed Monmouth's feeble and stupid attempt to seize the throne. When the ordeal ended, scores had been executed and 1,260 were awaiting the hangman in three counties. To be absent from home during the uprising was evidence of guilt. Mere death was considered much too mild for the villagers and farmers rounded up in these raids. The directions to a high sheriff were to provide an ax, a cleaver, 'a furnace or cauldron to boil their heads and quarters, and soil to boil therewith, half a bushel to each traitor, and tar to tar them with, and a sufficient number of spears and poles to fix their heads and quarters' along the highways. One could have crossed a good part of northern England by their guidance.

"The story of The Bloody Assizes, widely known to Americans, helped to place constitutional limitations on the crime of treason and to produce a bar against cruel and unusual punishments. But in the polemics that led to the various guarantees of freedom, it had no place compared with the tremendous thrust of the trial and execution of Sidney. The hundreds of judicial murders committed by Jeffreys and his fellow judges were totally inconceivable in a free American republic, but any American could imagine himself in Sidney's place—executed for putting on paper, in his closet, words that later on came to express the basic principles of republican government. Unless barred by fundamental law, the legal rulings that permitted this

result could easily be employed against any person whose political opinions challenged the party in power." The Bill of Rights 154–155 (1965).

Those who wrote the Eighth Amendment knew what price their forebears had paid for a system based, not on equal justice, but on discrimination. In those days the target was not the blacks or the poor, but the dissenters, those who opposed absolutism in government, who struggled for a parliamentary regime, and who opposed governments' recurring efforts to foist a particular religion on the people. *Id.*, at 155–163. But the tool of capital punishment was used with vengeance against the opposition and those unpopular with the regime. One cannot read this history without realizing that the desire for equality was reflected in the ban against "cruel and unusual punishments" contained in the Eighth Amendment.

In a Nation committed to equal protection of the laws there is no permissible "caste" aspect [18] of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position. In ancient Hindu law a Brahman was exempt from capital punishment,[19] and under that law, "[g]enerally, in the law books, punishment increased in severity as social status diminished." [20] We have, I fear, taken in practice the same position, partially as a result of making the death pen-

---

[18] See Johnson, The Negro and Crime, 217 Annals 93 (1941).

[19] See J. Spellman, Political Theory of Ancient India 112 (1964).

[20] C. Drekmeier, Kingship and Community in Early India 233 (1962).

alty discretionary and partially as a result of the ability of the rich to purchase the services of the most respected and most resourceful legal talent in the Nation.

The high service rendered by the "cruel and unusual" punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are even-handed, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.

A law that stated that anyone making more than $50,000 would be exempt from the death penalty would plainly fall, as would a law that in terms said that blacks, those who never went beyond the fifth grade in school, those who made less than $3,000 a year, or those who were unpopular or unstable should be the only people executed. A law which in the overall view reaches that result in practice [21] has no more sanctity than a law which in terms provides the same.

Thus, these discretionary statutes are unconstitutional

---

[21] Cf. B. Prettyman, Jr., Death and The Supreme Court 296–297 (1961).

"The disparity of representation in capital cases raises doubts about capital punishment itself, which has been abolished in only nine states. If a James Avery [345 U. S. 559] can be saved from electrocution because his attorney made timely objection to the selection of a jury by the use of yellow and white tickets, while an Aubry Williams [349 U. S. 375] can be sent to his death by a jury selected in precisely the same manner, we are imposing our most extreme penalty in an uneven fashion.

"The problem of proper representation is not a problem of money, as some have claimed, but of a lawyer's ability, and it is not true that only the rich have able lawyers. Both the rich and the poor usually are well represented—the poor because more often than not the best attorneys are appointed to defend them. It is the middle-class defendant, who can afford to hire an attorney but not a very good one, who is at a disadvantage. Certainly William Fikes [352 U. S. 191], despite the anomalous position in which he finds himself

in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on "cruel and unusual" punishments.

Any law which is nondiscriminatory on its face may be applied in such a way as to violate the Equal Protection Clause of the Fourteenth Amendment. *Yick Wo* v. *Hopkins,* 118 U. S. 356. Such conceivably might be the fate of a mandatory death penalty, where equal or lesser sentences were imposed on the elite, a harsher one on the minorities or members of the lower castes. Whether a mandatory death penalty would otherwise be constitutional is a question I do not reach.

I concur in the judgments of the Court.

Mr. Justice Brennan, concurring.

The question presented in these cases is whether death is today a punishment for crime that is "cruel and unusual" and consequently, by virtue of the Eighth and Fourteenth Amendments, beyond the power of the State to inflict.[1]

today, received as effective and intelligent a defense from his court-appointed attorneys as he would have received from an attorney his family had scraped together enough money to hire.

"And it is not only a matter of ability. An attorney must be found who is prepared to spend precious hours—the basic commodity he has to sell—on a case that seldom fully compensates him and often brings him no fee at all. The public has no conception of the time and effort devoted by attorneys to indigent cases. And in a first-degree case, the added responsibility of having a man's life depend upon the outcome exacts a heavy toll."

[1] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis added.) The Cruel and Unusual Punishments Clause is fully applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Robinson* v. *Cali-*

Almost a century ago, this Court observed that "[d]ifficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted." *Wilkerson* v. *Utah,* 99 U. S. 130, 135–136 (1879). Less than 15 years ago, it was again noted that "[t]he exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court." *Trop* v. *Dulles,* 356 U. S. 86, 99 (1958). Those statements remain true today. The Cruel and Unusual Punishments Clause, like the other great clauses of the Constitution, is not susceptible of precise definition. Yet we know that the values and ideals it embodies are basic to our scheme of government. And we know also that the Clause imposes upon this Court the duty, when the issue is properly presented, to determine the constitutional validity of a challenged punishment, whatever that punishment may be. In these cases, "[t]hat issue confronts us, and the task of resolving it is inescapably ours." *Id.,* at 103.

I

We have very little evidence of the Framers' intent in including the Cruel and Unusual Punishments Clause among those restraints upon the new Government enumerated in the Bill of Rights. The absence of such a restraint from the body of the Constitution was alluded to, so far as we now know, in the debates of only two of the state ratifying conventions. In the Massachusetts convention, Mr. Holmes protested:

"What gives an additional glare of horror to these gloomy circumstances is the consideration, that Congress have to ascertain, point out, and deter-

---

*fornia,* 370 U. S. 660 (1962); *Gideon* v. *Wainwright,* 372 U. S. 335, 342 (1963); *Malloy* v. *Hogan,* 378 U. S. 1, 6 n. 6 (1964); *Powell* v. *Texas,* 392 U. S. 514 (1968).

mine, what kind of punishments shall be inflicted on persons convicted of crimes. They are nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that *racks* and *gibbets* may be amongst the most mild instruments of their discipline." 2 J. Elliot's Debates 111 (2d ed. 1876).

Holmes' fear that Congress would have unlimited power to prescribe punishments for crimes was echoed by Patrick Henry at the Virginia convention:

". . . Congress, from their general powers, may fully go into business of human legislation. They may legislate, in criminal cases, from treason to the lowest offence—petty larceny. They may define crimes and prescribe punishments. In the definition of crimes, I trust they will be directed by what wise representatives ought to be governed by. But when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives. What says our [Virginia] bill of rights?— 'that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' Are you not, therefore, now calling on those gentlemen who are to compose Congress, to . . . define punishments without this control? Will they find sentiments there similar to this bill of rights? You let them loose; you do more—you depart from the genius of your country. . . .

"In this business of legislation, your members of Congress will loose the restriction of not imposing excessive fines, demanding excessive bail, and inflicting cruel and unusual punishments. These are prohibited by your [Virginia] declaration of rights. What has distinguished our ancestors?—

That they would not admit of tortures, or cruel and barbarous punishment." 3 *id.*, at 447.[2]

These two statements shed some light on what the Framers meant by "cruel and unusual punishments." Holmes referred to "the most cruel and unheard-of punishments," Henry to "tortures, or cruel and barbarous punishment." It does not follow, however, that the Framers were exclusively concerned with prohibiting torturous punishments. Holmes and Henry were objecting to the absence of a Bill of Rights, and they cited to support their objections the unrestrained legislative power to prescribe punishments for crimes. Certainly we may suppose that they invoked the specter of the most drastic punishments a legislature might devise.

In addition, it is quite clear that Holmes and Henry focused wholly upon the necessity to restrain the legislative power. Because they recognized "that Congress have to ascertain, point out, and determine, what kinds of punishments shall be inflicted on persons convicted of crimes," they insisted that Congress must be limited in its power to punish. Accordingly, they

---

[2] Henry continued:

"But Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of France, Spain, and Germany—of torturing, to extort a confession of the crime. They will say that they might as well draw examples from those countries as from Great Britain, and they will tell you that there is such a necessity of strengthening the arm of government, that they must have a criminal equity, and extort confession by torture, in order to punish with still more relentless severity. We are then lost and undone." 3 J. Elliot's Debates 447–448 (2d ed. 1876).

Although these remarks have been cited as evidence that the Framers considered only torturous punishments to be "cruel and unusual," it is obvious that Henry was referring to the use of torture for the purpose of eliciting confessions from suspected criminals. Indeed, in the ensuing colloquy, see n. 3, *infra*, George Mason responded that the use of torture was prohibited by the right against self-incrimination contained in the Virginia Bill of Rights.

called for a "constitutional check" that would ensure that "when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives." [3]

The only further evidence of the Framers' intent appears from the debates in the First Congress on the adoption of the Bill of Rights.[4] As the Court noted in *Weems* v. *United States,* 217 U. S. 349, 368 (1910),

---

[3] It is significant that the response to Henry's plea, by George Nicholas, was simply that a Bill of Rights would be ineffective as a means of restraining the legislative power to prescribe punishments:

"But the gentleman says that, by this Constitution, they have power to make laws to define crimes and prescribe punishments; and that, consequently, we are not free from torture. . . . If we had no security against torture but our [Virginia] declaration of rights, we might be tortured to-morrow; for it has been repeatedly infringed and disregarded." 3 J. Elliot's Debates, *supra,* at 451.

George Mason misinterpreted Nicholas' response to Henry:

"Mr. GEORGE MASON replied that the worthy gentleman was mistaken in his assertion that the [Virginia] bill of rights did not prohibit torture; for that one clause expressly provided that no man can give evidence against himself; and that the worthy gentleman must know that, in those countries where torture is used, evidence was extorted from the criminal himself. Another clause of the bill of rights provided that no cruel and unusual punishments shall be inflicted; therefore, torture was included in the prohibition." *Id.,* at 452.

Nicholas concluded the colloquy by making his point again:

"Mr. NICHOLAS acknowledged the [Virginia] bill of rights to contain that prohibition, and that the gentleman was right with respect to the practice of extorting confession from the criminal in those countries where torture is used; but still he saw no security arising from the bill of rights as separate from the Constitution, for that it had been frequently violated with impunity." *Ibid.*

There was thus no denial that the legislative power should be restrained; the dispute was whether a Bill of Rights would provide a realistic restraint. The Framers, obviously, believed it would. .

[4] We have not been referred to any mention of the Cruel and Unusual Punishments Clause in the debates of the state legislatures on ratification of the Bill of Rights.

the Cruel and Unusual Punishments Clause "received very little debate." The extent of the discussion, by two opponents of the Clause in the House of Representatives, was this:

> "Mr. SMITH, of South Carolina, objected to the words 'nor cruel and unusual punishments;' the import of them being too indefinite.

> "Mr. LIVERMORE.—The [Eighth Amendment] seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary. . . . No cruel and unusual punishment is to be inflicted; it is sometimes necessary to hang a man, villains often deserve whipping, and perhaps having their ears cut off; but are we in future to be prevented from inflicting these punishments because they are cruel? If a more lenient mode of correcting vice and deterring others from the commission of it could be invented, it would be very prudent in the Legislature to adopt it; but until we have some security that this will be done, we ought not to be restrained from making necessary laws by any declaration of this kind.

> "The question was put on the [Eighth Amendment], and it was agreed to by a considerable majority." 1 Annals of Cong. 754 (1789).[5]

Livermore thus agreed with Holmes and Henry that the Cruel and Unusual Punishments Clause imposed a limitation upon the legislative power to prescribe pun-

---

[5] The elided portion of Livermore's remarks reads: "What is meant by the terms excessive bail? Who are to be the judges? What is understood by excessive fines? It lies with the court to determine." Since Livermore did not ask similar rhetorical questions about the Cruel and Unusual Punishments Clause, it is unclear whether he included the Clause in his objection that the Eighth Amendment "seems to have no meaning in it."

ishments. However, in contrast to Holmes and Henry, who were supporting the Clause, Livermore, opposing it, did not refer to punishments that were considered barbarous and torturous. Instead, he objected that the Clause might someday prevent the legislature from inflicting what were then quite common and, in his view, "necessary" punishments—death, whipping, and earcropping.[6] The only inference to be drawn from Livermore's statement is that the "considerable majority" was prepared to run that risk. No member of the House rose to reply that the Clause was intended merely to prohibit torture.

Several conclusions thus emerge from the history of the adoption of the Clause. We know that the Framers' concern was directed specifically at the exercise of legislative power. They included in the Bill of Rights a prohibition upon "cruel and unusual punishments" precisely because the legislature would otherwise have had the unfettered power to prescribe punishments for crimes. Yet we cannot now know exactly what the Framers thought "cruel and unusual punishments" were. Certainly they intended to ban torturous punishments, but the available evidence does not support the further conclusion that *only* torturous punishments were to be outlawed. As Livermore's comments demonstrate, the Framers were well aware that the reach of the Clause was not limited to the proscription of unspeakable atrocities. Nor did they intend simply to forbid punishments considered "cruel and unusual" at the time. The "import" of the Clause is, indeed, "indefinite," and for good reason. A constitutional provision "is enacted, it is true, from an experience of evils, but its general lan-

---

[6] Indeed, the first federal criminal statute, enacted by the First Congress, prescribed 39 lashes for larceny and for receiving stolen goods, and one hour in the pillory for perjury. Act of Apr. 30, 1790, §§ 16–18, 1 Stat. 116.

guage should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems* v. *United States,* 217 U. S., at 373.

It was almost 80 years before this Court had occasion to refer to the Clause. See *Pervear* v. *The Commonwealth,* 5 Wall. 475, 479–480 (1867). These early cases, as the Court pointed out in *Weems* v. *United States, supra,* at 369, did not undertake to provide "an exhaustive definition" of "cruel and unusual punishments." Most of them proceeded primarily by "looking backwards for examples by which to fix the meaning of the clause," *id.,* at 377, concluding simply that a punishment would be "cruel and unusual" if it were similar to punishments considered "cruel and unusual" at the time the Bill of Rights was adopted.[7] In *Wilkerson* v. *Utah,* 99 U. S., at 136, for instance, the Court found it "safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden." The "punishments of torture," which the Court labeled "atrocities," were cases where the criminal "was embowelled alive, beheaded, and quartered," and cases "of public dissection . . . and burning alive." *Id.,* at 135. Similarly, in *In re Kemm-*

---

[7] Many of the state courts, "feeling constrained thereto by the incidences of history," *Weems* v. *United States,* 217 U. S. 349, 376 (1910), were apparently taking the same position. One court "expressed the opinion that the provision did not apply to punishment by 'fine or imprisonment or both, but such as that inflicted at the whipping post, in the pillory, burning at the stake, breaking on the wheel,' etc." *Ibid.* Another court "said that ordinarily the terms imply something inhuman and barbarous, torture and the like. . . . Other cases . . . selected certain tyrannical acts of the English monarchs as illustrating the meaning of the clause and the extent of its prohibition." *Id.,* at 368.

*ler,* 136 U. S. 436, 446 (1890), the Court declared that "if the punishment prescribed for an offence against the laws of the State were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition." The Court then observed, commenting upon the passage just quoted from *Wilkerson* v. *Utah, supra,* and applying the "manifestly cruel and unusual" test, that "[p]unishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life." 136 U. S., at 447.

Had this "historical" interpretation of the Cruel and Unusual Punishments Clause prevailed, the Clause would have been effectively read out of the Bill of Rights. As the Court noted in *Weems* v. *United States, supra,* at 371, this interpretation led Story to conclude "that the provision 'would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct.'" And Cooley in his book, Constitutional Limitations, said the Court, "apparently in a struggle between the effect to be given to ancient examples and the inconsequence of a dread of them in these enlightened times, . . . hesitate[d] to advance definite views." *Id.,* at 375. The result of a judicial application of this interpretation was not surprising. A state court, for example, upheld the constitutionality of the whipping post: "In comparison with the 'barbarities of quartering, hanging in chains, castration, etc.,' it was easily reduced to insignificance." *Id.,* at 377.

But this Court in *Weems* decisively repudiated the "historical" interpretation of the Clause. The Court, returning to the intention of the Framers, "rel[ied] on the conditions which existed when the Constitution was adopted." And the Framers knew "that government by the people instituted by the Constitution would not imitate the conduct of arbitrary monarchs. The abuse of power might, indeed, be apprehended, but not that it would be manifested in provisions or practices which would shock the sensibilities of men." *Id.*, at 375. The Clause, then, guards against "[t]he abuse of power"; contrary to the implications in *Wilkerson* v. *Utah, supra,* and *In re Kemmler, supra,* the prohibition of the Clause is not "confine[d] . . . to such penalties and punishment as were inflicted by the Stuarts." 217 U. S., at 372. Although opponents of the Bill of Rights "felt sure that the spirit of liberty could be trusted, and that its ideals would be represented, not debased, by legislation," *ibid.,* the Framers disagreed:

> "[Patrick] Henry and those who believed as he did would take no chances. Their predominant political impulse was distrust of power, and they insisted on constitutional limitations against its abuse. But surely they intended more than to register a fear of the forms of abuse that went out of practice with the Stuarts. Surely, their [jealousy] of power had a saner justification than that. They were men of action, practical and sagacious, not beset with vain imagining, and it must have come to them that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation. With power in a legislature great, if not unlimited, to give criminal character to the actions of men, with power unlimited to fix terms of imprisonment with what accompaniments they

might, what more potent instrument of cruelty could be put into the hands of power? And it was believed that power might be tempted to cruelty. This was the motive of the clause, and if we are to attribute an intelligent providence to its advocates we cannot think that it was intended to prohibit only practices like the [Stuarts',] or to prevent only an exact repetition of history. We cannot think that the possibility of a coercive cruelty being exercised through other forms of punishment was overlooked." *Id.*, at 372–373.

The Court in *Weems* thus recognized that this "restraint upon legislatures" possesses an "expansive and vital character" that is " 'essential . . . to the rule of law and the maintenance of individual freedom.' " *Id.*, at 376–377. Accordingly, the responsibility lies with the courts to make certain that the prohibition of the Clause is enforced.[8] Referring to cases in which "prominence [was] given to the power of the legislature to define crimes and their punishment," the Court said:

"We concede the power in most of its exercises. We disclaim the right to assert a judgment

[8] The Court had earlier emphasized this point in *In re Kemmler*, 136 U. S. 436 (1890), even while stating the narrow, "historical" interpretation of the Clause:

"This [English] Declaration of Rights had reference to the acts of the *executive* and *judicial* departments of the government of England; but the language in question as used in the constitution of the State of New York was intended particularly to operate upon the *legislature* of the State, to whose control the punishment of crime was almost wholly confided. So that, if the punishment prescribed for an offence against the laws of the State were manifestly cruel and unusual, . . . it would be the duty of the *courts* to adjudge such penalties to be within the constitutional prohibition. And we think this equally true of the [Clause], in its application to *Congress.*" *Id.*, at 446–447 (emphasis added).

against that of the legislature of the expediency of the laws or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition. In such case not our discretion but our legal duty, strictly defined and imperative in its direction, is invoked." *Id.*, at 378.[9]

In short, this Court finally adopted the Framers' view of the Clause as a "constitutional check" to ensure that "when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives." That, indeed, is the only view consonant with our constitutional form of government. If the judicial conclusion that a punishment is "cruel and unusual" "depend[ed] upon virtually unanimous condemnation of the penalty at issue," then, "[l]ike no other constitutional provision, [the Clause's] only function would be to legitimize advances already made by the other departments and opinions already the conventional wisdom." We know that the Framers did not envision "so narrow a role for this basic guaranty of human rights." Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1782 (1970). The right to be free of cruel and unusual punishments, like the other guarantees of the Bill of Rights, "may not be submitted to vote; [it] depend[s] on the outcome of no elections." "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied

---

[9] Indeed, the Court in *Weems* refused even to comment upon some decisions from state courts because they were "based upon sentences of courts, not upon the constitutional validity of laws." 217 U. S., at 377.

by the courts." *Board of Education* v. *Barnette,* 319 U. S. 624, 638 (1943).

Judicial enforcement of the Clause, then, cannot be evaded by invoking the obvious truth that legislatures have the power to prescribe punishments for crimes. That is precisely the reason the Clause appears in the Bill of Rights. The difficulty arises, rather, in formulating the "legal principles to be applied by the courts" when a legislatively prescribed punishment is challenged as "cruel and unusual." In formulating those constitutional principles, we must avoid the insertion of "judicial conception[s] of . . . wisdom or propriety," *Weems* v. *United States,* 217 U. S., at 379, yet we must not, in the guise of "judicial restraint," abdicate our fundamental responsibility to enforce the Bill of Rights. Were we to do so, the "constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality." *Id.,* at 373. The Cruel and Unusual Punishments Clause would become, in short, "little more than good advice." *Trop* v. *Dulles,* 356 U. S., at 104.

II

Ours would indeed be a simple task were we required merely to measure a challenged punishment against those that history has long condemned. That narrow and unwarranted view of the Clause, however, was left behind with the 19th century. Our task today is more complex. We know "that the words of the [Clause] are not precise, and that their scope is not static." We know, therefore, that the Clause "must draw its meaning from the evolving standards of decency that mark the prog-

ress of a maturing society." *Id.*, at 100–101.[10] That knowledge, of course, is but the beginning of the inquiry.

In *Trop* v. *Dulles, supra*, at 99, it was said that "[t]he question is whether [a] penalty subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the [Clause]." It was also said that a challenged punishment must be examined "in light of the basic prohibition against inhuman treatment" embodied in the Clause. *Id.*, at 100 n. 32. It was said, finally, that:

> "The basic concept underlying the [Clause] is nothing less than the dignity of man. While the State has the power to punish, the [Clause] stands to assure that this power be exercised within the limits of civilized standards." *Id.*, at 100.

At bottom, then, the Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments. The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings. A punishment is "cruel and unusual," therefore, if it does not comport with human dignity.

This formulation, of course, does not of itself yield principles for assessing the constitutional validity of particular punishments. Nevertheless, even though "[t]his Court has had little occasion to give precise content to the [Clause]," *ibid.*, there are principles recognized in our cases and inherent in the Clause sufficient to permit a judicial determination whether a challenged punishment comports with human dignity.

---

[10] The Clause "may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States*, 217 U. S., at 378.

The primary principle is that a punishment must not be so severe as to be degrading to the dignity of human beings. Pain, certainly, may be a factor in the judgment. The infliction of an extremely severe punishment will often entail physical suffering. See *Weems* v. *United States*, 217 U. S., at 366.[11] Yet the Framers also knew "that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation." *Id.*, at 372. Even though "[t]here may be involved no physical mistreatment, no primitive torture," *Trop* v. *Dulles, supra,* at 101, severe mental pain may be inherent in the infliction of a particular punishment. See *Weems* v. *United States, supra,* at 366.[12] That, indeed, was one of the conclusions underlying the holding of the plurality in *Trop* v. *Dulles* that the punishment of expatriation violates the Clause.[13] And the

---

[11] "It may be that even the cruelty of pain is not omitted. He must bear a chain night and day. He is condemned to painful as well as hard labor. What painful labor may mean we have no exact measure. It must be something more than hard labor. It may be hard labor pressed to the point of pain."

[12] "His prison bars and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicil without giving notice to the 'authority immediately in charge of his surveillance,' and without permission in writing. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty."

[13] "This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banish-

physical and mental suffering inherent in the punishment of *cadena temporal,* see nn. 11–12, *supra,* was an obvious basis for the Court's decision in *Weems* v. *United States* that the punishment was "cruel and unusual." [14]

More than the presence of pain, however, is comprehended in the judgment that the extreme severity of a punishment makes it degrading to the dignity of human beings. The barbaric punishments condemned by history, "punishments which inflict torture, such as the rack, the thumbscrew, the iron boot, the stretching of limbs and the like," are, of course, "attended with acute pain and suffering." *O'Neil* v. *Vermont,* 144 U. S. 323, 339 (1892) (Field, J., dissenting). When we consider why they have been condemned, however, we realize that the pain involved is not the only reason. The true significance of these punishments is that they treat

ment, a fate universally decried by civilized people. He is stateless, a condition deplored in the international community of democracies. It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious." *Trop* v. *Dulles,* 356 U. S. 86, 102 (1958). Cf. *id.,* at 110–111 (BRENNAN, J., concurring):

"[I]t can be supposed that the consequences of greatest weight, in terms of ultimate impact on the petitioner, are unknown and unknowable. Indeed, in truth, he may live out his life with but minor inconvenience. . . . Nevertheless it cannot be denied that the impact of expatriation—especially where statelessness is the upshot—may be severe. Expatriation, in this respect, constitutes an especially demoralizing sanction. The uncertainty, and the consequent psychological hurt, which must accompany one who becomes an outcast in his own land must be reckoned a substantial factor in the ultimate judgment."

[14] "It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation of the bill of rights, both on account of their degree and kind." *Weems* v. *United States,* 217 U. S., at 377.

members of the human race as nonhumans, as objects to be toyed with and discarded. They are thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity.

The infliction of an extremely severe punishment, then, like the one before the Court in *Weems* v. *United States,* from which "[n]o circumstance of degradation [was] omitted," 217 U. S., at 366, may reflect the attitude that the person punished is not entitled to recognition as a fellow human being. That attitude may be apparent apart from the severity of the punishment itself. In *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947), for example, the unsuccessful electrocution, although it caused "mental anguish and physical pain," was the result of "an unforeseeable accident." Had the failure been intentional, however, the punishment would have been, like torture, so degrading and indecent as to amount to a refusal to accord the criminal human status. Indeed, a punishment may be degrading to human dignity solely because it *is* a punishment. A State may not punish a person for being "mentally ill, or a leper, or . . . afflicted with a venereal disease," or for being addicted to narcotics. *Robinson* v. *California,* 370 U. S. 660, 666 (1962). To inflict punishment for having a disease is to treat the individual as a diseased thing rather than as a sick human being. That the punishment is not severe, "in the abstract," is irrelevant; "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.,* at 667. Finally, of course, a punishment may be degrading simply by reason of its enormity. A prime example is expatriation, a "punishment more primitive than torture," *Trop* v. *Dulles,* 356 U. S., at 101, for it necessarily involves a

denial by society of the individual's existence as a member of the human community.[15]

In determining whether a punishment comports with human dignity, we are aided also by a second principle inherent in the Clause—that the State must not arbitrarily inflict a severe punishment. This principle derives from the notion that the State does not respect human dignity when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others. Indeed, the very words "cruel and unusual punishments" imply condemnation of the arbitrary infliction of severe punishments. And, as we now know, the English history of the Clause[16] reveals a particular concern with the establishment of a safeguard against arbitrary punishments. See Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 857–860 (1969).[17]

---

[15] "There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless. Furthermore, his enjoyment of even the limited rights of an alien might be subject to termination at any time by reason of deportation. In short, the expatriate has lost the right to have rights." *Trop* v. *Dulles*, 356 U. S., at 101–102.

[16] "The phrase in our Constitution was taken directly from the English Declaration of Rights of [1689] . . . ." *Id.*, at 100.

[17] The specific incident giving rise to the provision was the perjury trial of Titus Oates in 1685. "None of the punishments inflicted upon Oates amounted to torture. . . . In the context of the Oates'

This principle has been recognized in our cases.[18] In *Wilkerson* v. *Utah,* 99 U. S., at 133—134, the Court reviewed various treatises on military law in order to demonstrate that under "the custom of war" shooting was a common method of inflicting the punishment of death. On that basis, the Court concluded:

> "Cruel and unusual punishments are forbidden by the Constitution, but the authorities referred to [treatises on military law] are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that

case, 'cruel and unusual' seems to have meant a severe punishment unauthorized by statute and not within the jurisdiction of the court to impose." Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 859 (1969). Thus, "[t]he irregularity and anomaly of Oates' treatment was extreme." Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1789 n. 74 (1970). Although the English provision was intended to restrain the judicial and executive power, see n. 8, *supra,* the principle is, of course, fully applicable under our Clause, which is primarily a restraint upon the legislative power.

[18] In a case from the Philippine Territory, the Court struck down a punishment that "ha[d] no fellow in American legislation." *Weems* v. *United States,* 217 U. S., at 377. After examining the punishments imposed, under both United States and Philippine law, for similar as well as more serious crimes, *id.,* at 380–381, the Court declared that the "contrast" "exhibit[ed] a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice," *id.,* at 381. And in *Trop* v. *Dulles, supra,* in which a law of Congress punishing wartime desertion by expatriation was held unconstitutional, it was emphasized that "[t]he civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime." *Id.,* at 102. When a severe punishment is not inflicted elsewhere, or when more serious crimes are punished less severely, there is a strong inference that the State is exercising arbitrary, "unrestrained power."

category, within the meaning of the [Clause]. Soldiers convicted of desertion or other capital military offenses are in the great majority of cases sentenced to be shot, and the ceremony for such occasions is given in great fulness by the writers upon the subject of courts-martial." *Id.*, at 134–135.

The Court thus upheld death by shooting, so far as appears, solely on the ground that it was a common method of execution.[19]

As *Wilkerson* v. *Utah* suggests, when a severe punishment is inflicted "in the great majority of cases" in which it is legally available, there is little likelihood that the State is inflicting it arbitrarily. If, however, the infliction of a severe punishment is "something different from that which is generally done" in such cases, *Trop* v. *Dulles*, 356 U. S., at 101 n. 32,[20] there is a sub-

---

[19] In *Weems* v. *United States, supra,* at 369–370, the Court summarized the holding of *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), as follows:

"The court pointed out that death was an usual punishment for murder, that it prevailed in the Territory for many years, and was inflicted by shooting, also that that mode of execution was usual under military law. It was hence concluded that it was not forbidden by the Constitution of the United States as cruel or unusual."

[20] It was said in *Trop* v. *Dulles, supra,* at 100–101, n. 32, that "[o]n the few occasions this Court has had to consider the meaning of the [Clause], precise distinctions between cruelty and unusualness do not seem to have been drawn. . . . If the word 'unusual' is to have any meaning apart from the word 'cruel,' however, the meaning should be the ordinary one, signifying something different from that which is generally done." There are other statements in prior cases indicating that the word "unusual" has a distinct meaning:

"We perceive nothing . . . unusual in this [punishment]." *Pervear* v. *The Commonwealth,* 5 Wall. 475, 480 (1867). "[T]he judgment of mankind would be that the punishment was not only an unusual but a cruel one . . . ." *O'Neil* v. *Vermont,* 144 U. S. 323, 340 (1892) (Field, J., dissenting). "It is unusual in its character." *Weems* v. *United States, supra,* at 377. "And the punishment

stantial likelihood that the State, contrary to the requirements of regularity and fairness embodied in the Clause, is inflicting the punishment arbitrarily. This principle is especially important today. There is scant danger, given the political processes "in an enlightened democracy such as ours," *id.*, at 100, that extremely severe punishments will be widely applied. The more significant function of the Clause, therefore, is to protect against the danger of their arbitrary infliction.

A third principle inherent in the Clause is that a severe punishment must not be unacceptable to contemporary society. Rejection by society, of course, is a strong indication that a severe punishment does not comport with human dignity. In applying this principle, however, we must make certain that the judicial determination is as objective as possible.[21]

inflicted . . . is certainly unusual." *United States ex rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson,* 255 U. S. 407, 430 (1921) (Brandeis, J., dissenting). "The punishment inflicted is not only unusual in character; it is, so far as known, unprecedented in American legal history." *Id.,* at 435. "There is no precedent for it. What then is it, if it be not cruel, unusual and unlawful?" *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 479 (1947) (Burton, J., dissenting). "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual." *Robinson* v. *California,* 370 U. S., at 667.

It is fair to conclude from these statements that "[w]hether the word 'unusual' has any qualitative meaning different from 'cruel' is not clear." *Trop* v. *Dulles, supra,* at 100 n. 32. The question, in any event, is of minor significance; this Court has never attempted to explicate the meaning of the Clause simply by parsing its words.

[21] The danger of subjective judgment is acute if the question posed is whether a punishment "shocks the most fundamental instincts of civilized man," *Louisiana ex rel. Francis* v. *Resweber, supra,* at 473 (Burton, J., dissenting), or whether "any man of right feeling and heart can refrain from shuddering," *O'Neil* v. *Vermont, supra,* at 340 (Field, J., dissenting), or whether "a cry of horror would rise from every civilized and Christian community of the country," *ibid.* Mr. Justice Frankfurter's concurring opinion in

Thus, for example, *Weems* v. *United States*, 217 U. S., at 380, and *Trop* v. *Dulles*, 356 U. S., at 102–103, suggest that one factor that may be considered is the existence of the punishment in jurisdictions other than those before the Court. *Wilkerson* v. *Utah, supra,* suggests that another factor to be considered is the historic usage of the punishment.[22] *Trop* v. *Dulles, supra,* at 99, combined present acceptance with past usage by observing that "the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." In *Robinson* v. *California,* 370 U. S., at 666, which involved the infliction of punishment for narcotics addiction, the Court went a step further, concluding simply that "in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment."

The question under this principle, then, is whether there are objective indicators from which a court can conclude that contemporary society considers a severe punishment unacceptable. Accordingly, the judicial

---

*Louisiana ex rel. Francis* v. *Resweber, supra,* is instructive. He warned "against finding in personal disapproval a reflection of more or less prevailing condemnation" and against "enforcing . . . private view[s] rather than that consensus of society's opinion which, for purposes of due process, is the standard enjoined by the Constitution." *Id.,* at 471. His conclusions were as follows: "I cannot bring myself to believe that [the State's procedure] . . . offends a principle of justice 'rooted in the traditions and conscience of our people.' " *Id.,* at 470. ". . . I cannot say that it would be 'repugnant to the conscience of mankind.' " *Id.,* at 471. Yet nowhere in the opinion is there any explanation of how he arrived at those conclusions.

[22] Cf. *Louisiana ex rel. Francis* v. *Resweber, supra,* at 463: "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence."

task is to review the history of a challenged punishment and to examine society's present practices with respect to its use. Legislative authorization, of course, does not establish acceptance. The acceptability of a severe punishment is measured, not by its availability, for it might become so offensive to society as never to be inflicted, but by its use.

The final principle inherent in the Clause is that a severe punishment must not be excessive. A punishment is excessive under this principle if it is unnecessary: The infliction of a severe punishment by the State cannot comport with human dignity when it is nothing more than the pointless infliction of suffering. If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, cf. *Robinson* v. *California, supra,* at 666; *id.,* at 677 (DOUGLAS, J., concurring); *Trop* v. *Dulles, supra,* at 114 (BRENNAN, J., concurring), the punishment inflicted is unnecessary and therefore excessive.

This principle first appeared in our cases in Mr. Justice Field's dissent in *O'Neil* v. *Vermont,* 144 U. S., at 337.[23] He there took the position that:

"[The Clause] is directed, not only against punishments of the character mentioned [torturous punishments], but against all punishments which by

---

[23] It may, in fact, have appeared earlier. In *Pervear* v. *The Commonwealth,* 5 Wall., at 480, the Court stated:

"We perceive nothing excessive, or cruel, or unusual in this [punishment]. The object of the law was to protect the community against the manifold evils of intemperance. The mode adopted, of prohibiting under penalties the sale and keeping for sale of intoxicating liquors, without license, is the usual mode adopted in many, perhaps, all of the States. It is wholly within the discretion of State legislatures." This discussion suggests that the Court viewed the punishment as reasonably related to the purposes for which it was inflicted.

their excessive length or severity are greatly dispro-
portioned to the offences charged. The whole inhi-
bition is against that which is excessive either in the
bail required, or fine imposed, or punishment in-
flicted." *Id.*, at 339–340.

Although the determination that a severe punishment
is excessive may be grounded in a judgment that it is
disproportionate to the crime,[24] the more significant
basis is that the punishment serves no penal purpose
more effectively than a less severe punishment. This
view of the principle was explicitly recognized by the
Court in *Weems* v. *United States, supra.* There the
Court, reviewing a severe punishment inflicted for the
falsification of an official record, found that "the highest
punishment possible for a crime which may cause the
loss of many thousand[s] of dollars, and to prevent
which the duty of the State should be as eager as to
prevent the perversion of truth in a public document,
is not greater than that which may be imposed for
falsifying a single item of a public account." *Id.*, at
381. Stating that "this contrast shows more than dif-
ferent exercises of legislative judgment," the Court con-
cluded that the punishment was unnecessarily severe
in view of the purposes for which it was imposed. *Ibid.*[25]

---

[24] Mr. Justice Field apparently based his conclusion upon an intui-
tive sense that the punishment was disproportionate to the criminal's
moral guilt, although he also observed that "the punishment was
greatly beyond anything required by any humane law for the of-
fences," *O'Neil* v. *Vermont*, 144 U. S., at 340. Cf. *Trop* v. *Dulles*,
356 U. S., at 99: "Since wartime desertion is punishable by death,
there can be no argument that the penalty of denationalization is
excessive in relation to the gravity of the crime."

[25] "The State thereby suffers nothing and loses no power. The
purpose of punishment is fulfilled, crime is repressed by penalties of
just, not tormenting, severity, its repetition is prevented, and hope
is given for the reformation of the criminal." *Weems* v. *United
States*, 217 U. S., at 381.

See also *Trop* v. *Dulles,* 356 U. S., at 111–112 (BRENNAN, J., concurring).[26]

There are, then, four principles by which we may determine whether a particular punishment is "cruel and unusual." The primary principle, which I believe supplies the essential predicate for the application of the others, is that a punishment must not by its severity be degrading to human dignity. The paradigm violation of this principle would be the infliction of a torturous punishment of the type that the Clause has always prohibited. Yet "[i]t is unlikely that any State at this moment in history," *Robinson* v. *California,* 370 U. S., at 666, would pass a law providing for the infliction of such a punishment. Indeed, no such punishment has ever been before this Court. The same may be said of the other principles. It is unlikely that this Court will confront a severe punishment that is obviously inflicted in wholly arbitrary fashion; no State would engage in a reign of blind terror. Nor is it likely that this Court will be called upon to review a severe punishment that is clearly and totally rejected throughout society; no legislature would be able even to authorize the infliction of such a punishment. Nor, finally, is it likely that this Court will have to consider a severe punishment that is patently unnecessary; no State today would inflict a severe punishment knowing that there was no reason whatever for doing so. In short, we are unlikely to have occasion to determine that a punishment is fatally offensive under any one principle.

---

[26] The principle that a severe punishment must not be excessive does not, of course, mean that a severe punishment is constitutional merely because it is necessary. A State could not now, for example, inflict a punishment condemned by history, for any such punishment, no matter how necessary, would be intolerably offensive to human dignity. The point is simply that the unnecessary infliction of suffering is also offensive to human dignity.

Since the Bill of Rights was adopted, this Court has adjudged only three punishments to be within the prohibition of the Clause. See *Weems* v. *United States,* 217 U. S. 349 (1910) (12 years in chains at hard and painful labor); *Trop* v. *Dulles,* 356 U. S. 86 (1958) (expatriation); *Robinson* v. *California,* 370 U. S. 660 (1962) (imprisonment for narcotics addiction). Each punishment, of course, was degrading to human dignity, but of none could it be said conclusively that it was fatally offensive under one or the other of the principles. Rather, these "cruel and unusual punishments" seriously implicated several of the principles, and it was the application of the principles in combination that supported the judgment. That, indeed, is not surprising. The function of these principles, after all, is simply to provide means by which a court can determine whether a challenged punishment comports with human dignity. They are, therefore, interrelated, and in most cases it will be their convergence that will justify the conclusion that a punishment is "cruel and unusual." The test, then, will ordinarily be a cumulative one: If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, and if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment, then the continued infliction of that punishment violates the command of the Clause that the State may not inflict inhuman and uncivilized punishments upon those convicted of crimes.

## III

The punishment challenged in these cases is death. Death, of course, is a "traditional" punishment, *Trop* v. *Dulles, supra,* at 100, one that "has been employed throughout our history," *id.,* at 99, and its constitu-

tional background is accordingly an appropriate subject of inquiry.

There is, first, a textual consideration raised by the Bill of Rights itself. The Fifth Amendment declares that if a particular crime is punishable by death, a person charged with that crime is entitled to certain procedural protections.[27] We can thus infer that the Framers recognized the existence of what was then a common punishment. We cannot, however, make the further inference that they intended to exempt this particular punishment from the express prohibition of the Cruel and Unusual Punishments Clause.[28] Nor is there any indication in the debates on the Clause that a special exception was to be made for death. If anything, the indication is to the contrary, for Livermore specifically mentioned death as a candidate for future proscription under the Clause. See *supra,* at 262. Finally, it does not advance analysis to insist that the Framers did not believe that adoption

---

[27] The Fifth Amendment provides: "No person shall be held to answer for a *capital,* or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ; nor shall any person be subject for the same offence to be twice put in jeopardy of *life* or limb; . . . nor be deprived of *life,* liberty, or property, without due process of law . . . ." (Emphasis added.)

[28] No one, of course, now contends that the reference in the Fifth Amendment to "jeopardy of . . . limb" provides perpetual constitutional sanction for such corporal punishments as branding and earcropping, which were common punishments when the Bill of Rights was adopted. But cf. n. 29, *infra.* As the California Supreme Court pointed out with respect to the California Constitution:

"The Constitution expressly proscribes cruel or unusual punishments. It would be mere speculation and conjecture to ascribe to the framers an intent to exempt capital punishment from the compass of that provision solely because at a time when the death penalty was commonly accepted they provided elsewhere in the Constitution for special safeguards in its application." *People* v. *Anderson,* 6 Cal. 3d 628, 639, 493 P. 2d 880, 887 (1972).

of the Bill of Rights would immediately prevent the infliction of the punishment of death; neither did they believe that it would immediately prevent the infliction of other corporal punishments that, although common at the time, see n. 6, *supra,* are now acknowledged to be impermissible.[29]

There is also the consideration that this Court has decided three cases involving constitutional challenges to particular methods of inflicting this punishment. In *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), and *In re Kemmler,* 136 U. S. 436 (1890), the Court, expressing in both cases the since-rejected "historical" view of the Clause, see *supra,* at 264–265, approved death by shooting and death by electrocution. In *Wilkerson,* the Court concluded that shooting was a common method of execution, see *supra,* at 275–276; [30] in *Kemmler,* the Court held that the Clause did not apply to the States, 136 U. S., at 447–449.[31]

---

[29] Cf. *McGautha* v. *California,* 402 U. S. 183, 226 (1971) (separate opinion of Black, J.) :

"The [Clause] forbids 'cruel and unusual punishments.' In my view, these words cannot be read to outlaw capital punishment because that penalty was in common use and authorized by law here and in the countries from which our ancestors came at the time the [Clause] was adopted. It is inconceivable to me that the framers intended to end capital punishment by the [Clause]."

Under this view, of course, any punishment that was in common use in 1791 is forever exempt from the Clause.

[30] The Court expressly noted that the constitutionality of the punishment itself was not challenged. *Wilkerson* v. *Utah,* 99 U. S., at 136–137. Indeed, it may be that the only contention made was that, in the absence of statutory sanction, the sentencing "court possessed no authority to prescribe the mode of execution." *Id.,* at 137.

[31] Cf. *McElvaine* v. *Brush,* 142 U. S. 155, 158–159 (1891) :

"We held in the case of *Kemmler* . . . that as the legislature of the State of New York had determined that [electrocution] did not inflict cruel and unusual punishment, and its courts had sustained that

In *Louisiana ex rel. Francis* v. *Resweber, supra,* the Court approved a second attempt at electrocution after the first had failed. It was said that "[t]he Fourteenth [Amendment] would prohibit by its due process clause execution by a state in a cruel manner," 329 U. S., at 463, but that the abortive attempt did not make the "subsequent execution any more cruel in the constitutional sense than any other execution," *id.,* at 464.[32] These three decisions thus reveal that the Court, while ruling upon various methods of inflicting death, has assumed in the past that death was a constitutionally permissible punishment.[33] Past assumptions, however, are not sufficient to limit the scope of our examination of this punishment today. The constitutionality of death itself under the Cruel and Unusual Punishments Clause is before this Court for the first time; we cannot avoid the question by recalling past cases that never directly considered it.

The question, then, is whether the deliberate infliction of death is today consistent with the command of the Clause that the State may not inflict punishments that do not comport with human dignity. I will analyze the punishment of death in terms of the principles

---

determination, we were unable to perceive that the State had thereby abridged the privileges or immunities of petitioner or deprived him of due process of law."

[32] It was also asserted that the Constitution prohibits "cruelty inherent in the method of punishment," but does not prohibit "the necessary suffering involved in any method employed to extinguish life humanely." 329 U. S., at 464. No authority was cited for this assertion, and, in any event, the distinction drawn appears to be meaningless.

[33] In a nondeath case, *Trop* v. *Dulles,* it was said that *"in a day* when it is still *widely accepted,* [death] cannot be said to violate the constitutional concept of cruelty." 356 U. S., at 99 (emphasis added). This statement, of course, left open the future constitutionality of the punishment.

set out above and the cumulative test to which they lead: It is a denial of human dignity for the State arbitrarily to subject a person to an unusually severe punishment that society has indicated it does not regard as acceptable, and that cannot be shown to serve any penal purpose more effectively than a significantly less drastic punishment. Under these principles and this test, death is today a "cruel and unusual" punishment.

Death is a unique punishment in the United States. In a society that so strongly affirms the sanctity of life, not surprisingly the common view is that death is the ultimate sanction. This natural human feeling appears all about us. There has been no national debate about punishment, in general or by imprisonment, comparable to the debate about the punishment of death. No other punishment has been so continuously restricted, see *infra,* at 296–298, nor has any State yet abolished prisons, as some have abolished this punishment. And those States that still inflict death reserve it for the most heinous crimes. Juries, of course, have always treated death cases differently, as have governors exercising their commutation powers. Criminal defendants are of the same view. "As all practicing lawyers know, who have defended persons charged with capital offenses, often the only goal possible is to avoid the death penalty." *Griffin* v. *Illinois,* 351 U. S. 12, 28 (1956) (Burton and Minton, JJ., dissenting). Some legislatures have required particular procedures, such as two-stage trials and automatic appeals, applicable only in death cases. "It is the universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations." *Ibid.* See *Williams* v. *Florida,* 399 U. S. 78, 103 (1970) (all States require juries of 12 in death cases). This Court, too, almost

always treats death cases as a class apart.[34] And the unfortunate effect of this punishment upon the functioning of the judicial process is well known; no other punishment has a similar effect.

The only explanation for the uniqueness of death is its extreme severity. Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity. No other existing punishment is comparable to death in terms of physical and mental suffering. Although our information is not conclusive, it appears that there is no method available that guarantees an immediate and painless death.[35] Since the discon-

_____

[34] "That life is at stake is of course another important factor in creating the extraordinary situation. The difference between capital and non-capital offenses is the basis of differentiation in law in diverse ways in which the distinction becomes relevant." *Williams* v. *Georgia,* 349 U. S. 375, 391 (1955) (Frankfurter, J.). "When the penalty is death, we, like state court judges, are tempted to strain the evidence and even, in close cases, the law in order to give a doubtfully condemned man another chance." *Stein* v. *New York,* 346 U. S. 156, 196 (1953) (Jackson, J.). "In death cases doubts such as those presented here should be resolved in favor of the accused." *Andres* v. *United States,* 333 U. S. 740, 752 (1948) (Reed, J.). Mr. Justice Harlan expressed the point strongly: "I do not concede that whatever process is 'due' an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case. The distinction is by no means novel, . . . nor is it negligible, being literally that between life and death." *Reid* v. *Covert,* 354 U. S. 1, 77 (1957) (concurring in result). And, of course, for many years this Court distinguished death cases from all others for purposes of the constitutional right to counsel. See *Powell* v. *Alabama,* 287 U. S. 45 (1932); *Betts* v. *Brady,* 316 U. S. 455 (1942); *Bute* v. *Illinois,* 333 U. S. 640 (1948).

[35] See Report of Royal Commission on Capital Punishment 1949–1953, ¶¶ 700–789, pp. 246–273 (1953); Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess., 19–21 (1968) (testimony of Clinton Duffy); H. Barnes & N. Teeters, New Horizons

tinuance of flogging as a constitutionally permissible punishment, *Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968), death remains as the only punishment that may involve the conscious infliction of physical pain. In addition, we know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death. Cf. *Ex parte Medley,* 134 U. S. 160, 172 (1890). As the California Supreme Court pointed out, "the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture." *People* v. *Anderson,* 6 Cal. 3d 628, 649, 493 P. 2d 880, 894 (1972).[36] Indeed, as Mr. Justice Frankfurter noted, "the onset of insanity while awaiting

in Criminology 306–309 (3d ed. 1959); C. Chessman, Trial by Ordeal 195–202 (1955); M. DiSalle, The Power of Life and Death 84–85 (1965); C. Duffy & A. Hirschberg, 88 Men and 2 Women 13–14 (1962); B. Eshelman, Death Row Chaplain 26–29, 101–104, 159–164 (1962); R. Hammer, Between Life and Death 208–212 (1969); K. Lamott, Chronicles of San Quentin 228–231 (1961); L. Lawes, Life and Death in Sing Sing 170–171 (1928); Rubin, The Supreme Court, Cruel and Unusual Punishment, and the Death Penalty, 15 Crime & Delin. 121, 128–129 (1969); Comment, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1338–1341 (1968); Brief *amici curiae* filed by James V. Bennett, Clinton T. Duffy, Robert G. Sarver, Harry C. Tinsley, and Lawrence E. Wilson 12–14.

[36] See Barnes & Teeters, *supra,* at 309–311 (3d ed. 1959); Camus, Reflections on the Guillotine, in A. Camus, Resistance, Rebellion, and Death 131, 151–156 (1960); C. Duffy & A. Hirschberg, *supra,* at 68–70, 254 (1962); Hammer, *supra,* at 222–235, 244–250, 269–272 (1969); S. Rubin, The Law of Criminal Correction 340 (1963); Bluestone & McGahee, Reaction to Extreme Stress: Impending Death by Execution, 119 Amer. J. Psychiatry 393 (1962); Gottlieb, Capital Punishment, 15 Crime & Delin. 1, 8–10 (1969); West, Medicine and Capital Punishment, in Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Com-

execution of a death sentence is not a rare phenomenon." *Solesbee* v. *Balkcom,* 339 U. S. 9, 14 (1950) (dissenting opinion). The "fate of ever-increasing fear and distress" to which the expatriate is subjected, *Trop* v. *Dulles,* 356 U. S., at 102, can only exist to a greater degree for a person confined in prison awaiting death.[37]

The unusual severity of death is manifested most clearly in its finality and enormity. Death, in these respects, is in a class by itself. Expatriation, for example, is a punishment that "destroys for the individual the political existence that was centuries in the development," that "strips the citizen of his status in the national and international political community," and that puts "[h]is very existence" in jeopardy. Expatriation thus inherently entails "the total destruction of the individual's status in organized society." *Id.,* at 101. "In short, the expatriate has lost the right to have rights." *Id.,* at 102. Yet, demonstrably, expatriation is not "a fate worse than death." *Id.,* at 125 (Frankfurter, J., dissenting).[38] Although death, like expatriation, destroys the

---

mittee on the Judiciary, 90th Cong., 2d Sess., 124 (1968); Ziferstein, Crime and Punishment, The Center Magazine 84 (Jan. 1968); Comment, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1342 (1968); Note, Mental Suffering under Sentence of Death: A Cruel and Unusual Punishment, 57 Iowa L. Rev. 814 (1972).

[37] The State, of course, does not purposely impose the lengthy waiting period in order to inflict further suffering. The impact upon the individual is not the less severe on that account. It is no answer to assert that long delays exist only because condemned criminals avail themselves of their full panoply of legal rights. The right not to be subjected to inhuman treatment cannot, of course, be played off against the right to pursue due process of law, but, apart from that, the plain truth is that it is society that demands, even against the wishes of the criminal, that all legal avenues be explored before the execution is finally carried out.

[38] It was recognized in *Trop* itself that expatriation is a "punishment short of death." 356 U. S., at 99. Death, however, was distinguished on the ground that it was "still widely accepted." *Ibid.*

individual's "political existence" and his "status in organized society," it does more, for, unlike expatriation, death also destroys "[h]is very existence." There is, too, at least the possibility that the expatriate will in the future regain "the right to have rights." Death forecloses even that possibility.

Death is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose "the right to have rights." A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a "person" for purposes of due process of law and the equal protection of the laws. A prisoner remains a member of the human family. Moreover, he retains the right of access to the courts. His punishment is not irrevocable. Apart from the common charge, grounded upon the recognition of human fallibility, that the punishment of death must inevitably be inflicted upon innocent men, we know that death has been the lot of men whose convictions were unconstitutionally secured in view of later, retroactively applied, holdings of this Court. The punishment itself may have been unconstitutionally inflicted, see *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), yet the finality of death precludes relief. An executed person has indeed "lost the right to have rights." As one 19th century proponent of punishing criminals by death declared, "When a man is hung, there is an end of our relations with him. His execution is a way of saying, 'You are not fit for this world, take your chance elsewhere.'"[39]

---

[39] Stephen, Capital Punishments, 69 Fraser's Magazine 753, 763 (1864).

In comparison to all other punishments today, then, the deliberate extinguishment of human life by the State is uniquely degrading to human dignity. I would not hesitate to hold, on that ground alone, that death is today a "cruel and unusual" punishment, were it not that death is a punishment of longstanding usage and acceptance in this country. I therefore turn to the second principle—that the State may not arbitrarily inflict an unusually severe punishment.

The outstanding characteristic of our present practice of punishing criminals by death is the infrequency with which we resort to it. The evidence is conclusive that death is not the ordinary punishment for any crime.

There has been a steady decline in the infliction of this punishment in every decade since the 1930's, the earliest period for which accurate statistics are available. In the 1930's, executions averaged 167 per year; in the 1940's, the average was 128; in the 1950's, it was 72; and in the years 1960–1962, it was 48. There have been a total of 46 executions since then, 36 of them in 1963–1964.[40] Yet our population and the number of capital crimes committed have increased greatly over the past four decades. The contemporary rarity of the infliction of this punishment is thus the end result of a long-continued decline. That rarity is plainly revealed by an examination of the years 1961–1970, the last 10-year period for which statistics are available. During that time, an average of 106 death sentences

---

[40] From 1930 to 1939: 155, 153, 140, 160, 168, 199, 195, 147, 190, 160. From 1940 to 1949: 124, 123, 147, 131, 120, 117, 131, 153, 119, 119. From 1950 to 1959: 82, 105, 83, 62, 81, 76, 65, 65, 49, 49. From 1960 to 1967: 56, 42, 47, 21, 15, 7, 1, 2. Department of Justice, National Prisoner Statistics No. 46, Capital Punishment 1930–1970, p. 8 (Aug. 1971). The last execution in the United States took place on June 2, 1967. *Id.*, at 4.

was imposed each year.[41] Not nearly that number, however, could be carried out, for many were precluded by commutations to life or a term of years,[42] transfers to mental institutions because of insanity,[43] resentences to life or a term of years, grants of new trials and orders for resentencing, dismissals of indictments and reversals of convictions, and deaths by suicide and natural causes.[44] On January 1, 1961, the death row population was 219; on December 31, 1970, it was 608; during that span, there were 135 executions.[45] Consequently, had the 389 additions to death row also been executed, the annual average would have been 52.[46] In short, the country

---

[41] 1961—140; 1962—103; 1963—93; 1964—106; 1965—86; 1966—118; 1967—85; 1968—102; 1969—97; 1970—127. *Id.*, at 9.

[42] Commutations averaged about 18 per year. 1961—17; 1962—27; 1963—16; 1964—9; 1965—19; 1966—17; 1967—13; 1968—16; 1969—20; 1970—29. *Ibid.*

[43] Transfers to mental institutions averaged about three per year. 1961—3; 1962—4; 1963—1; 1964—3; 1965—4; 1966—3; 1967—3; 1968—2; 1969—1; 1970—5. *Ibid.*

[44] These four methods of disposition averaged about 44 per year. 1961—31, 1962—30; 1963—32; 1964—58; 1965—39; 1966—33; 1967—53; 1968—59; 1969—64; 1970—42. *Ibid.* Specific figures are available starting with 1967. Resentences: 1967—7; 1968—18; 1969—12; 1970—14. Grants of new trials and orders for resentencing: 1967—31; 1968—21; 1969—13; 1970—9. Dismissals of indictments and reversals of convictions: 1967—12; 1968—19; 1969—33; 1970—17. Deaths by suicide and natural causes: 1967—2; 1968—1; 1969—5; 1970—2. National Prisoner Statistics No. 42, Executions 1930-1967, p. 13 (June 1968); National Prisoner Statistics No. 45, Capital Punishment 1930-1968, p. 12 (Aug. 1969); National Prisoner Statistics, *supra,* n. 40, at 14–15.

[45] *Id.*, at 9.

[46] During that 10-year period, 1,177 prisoners entered death row, including 120 who were returned following new trials or treatment at mental institutions. There were 653 dispositions other than by

might, at most, have executed one criminal each week. In fact, of course, far fewer were executed. Even before the moratorium on executions began in 1967, executions totaled only 42 in 1961 and 47 in 1962, an average of less than one per week; the number dwindled to 21 in 1963, to 15 in 1964, and to seven in 1965; in 1966, there was one execution, and in 1967, there were two.[47]

When a country of over 200 million people inflicts an unusually severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied. To dispel it would indeed require a clear showing of nonarbitrary infliction.

Although there are no exact figures available, we know that thousands of murders and rapes are committed annually in States where death is an authorized punishment for those crimes. However the rate of infliction is characterized—as "freakishly" or "spectacularly" rare, or simply as rare—it would take the purest sophistry to deny that death is inflicted in only a minute fraction of these cases. How much rarer, after all, could the infliction of death be?

When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system. The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity: Death is inflicted, they say, only in "extreme" cases.

Informed selectivity, of course, is a value not to be denigrated. Yet presumably the States could make precisely the same claim if there were 10 executions per

execution, leaving 524 prisoners who might have been executed, of whom 135 actually were. *Ibid.*

[47] *Id.*, at 8.

year, or five, or even if there were but one. That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at this low level, it is highly implausible that only the worst criminals or the criminals who commit the worst crimes are selected for this punishment. No one has yet suggested a rational basis that could differentiate in those terms the few who die from the many who go to prison. Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible. Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme." Nor is the distinction credible in fact. If, for example, petitioner Furman or his crime illustrates the "extreme," then nearly all murderers and their murders are also "extreme." [48] Furthermore, our procedures in death cases,

---

[48] The victim surprised Furman in the act of burglarizing the victim's home in the middle of the night. While escaping, Furman killed the victim with one pistol shot fired through the closed kitchen door from the outside. At the trial, Furman gave his version of the killing:

"They got me charged with murder and I admit, I admit going to these folks' home and they did caught me in there and I was coming back out, backing up and there was a wire down there on the floor. I was coming out backwards and fell back and I didn't intend to kill nobody. I didn't know they was behind the door. The gun went off and I didn't know nothing about no murder until they arrested me, and when the gun went off I was down on the floor and I got up and ran. That's all to it." App. 54–55.

The Georgia Supreme Court accepted that version:

"The admission in open court by the accused . . . that during the period in which he was involved in the commission of a criminal act at the home of the deceased, he accidentally tripped over a wire in leaving the premises causing the gun to go off, together with other facts and circumstances surrounding the death of the deceased by violent means, was sufficient to support the verdict of guilty of

rather than resulting in the selection of "extreme" cases for this punishment, actually sanction an arbitrary selection. For this Court has held that juries may, as they do, make the decision whether to impose a death sentence wholly unguided by standards governing that decision. *McGautha* v. *California,* 402 U. S. 183, 196–208 (1971). In other words, our procedures are not constructed to guard against the totally capricious selection of criminals for the punishment of death.

Although it is difficult to imagine what further facts would be necessary in order to prove that death is, as my Brother STEWART puts it, "wantonly and . . . freakishly" inflicted, I need not conclude that arbitrary infliction is patently obvious. I am not considering this punishment by the isolated light of one principle. The probability of arbitrariness is sufficiently substantial that it can be relied upon, in combination with the other principles, in reaching a judgment on the constitutionality of this punishment.

When there is a strong probability that an unusually severe and degrading punishment is being inflicted arbitrarily, we may well expect that society will disapprove of its infliction. I turn, therefore, to the third principle. An examination of the history and present operation of the American practice of punishing criminals by death reveals that this punishment has been almost totally rejected by contemporary society.

I cannot add to my Brother MARSHALL's comprehensive treatment of the English and American history of

---

murder . . . ." *Furman* v. *State,* 225 Ga. 253, 254, 167 S. E. 2d 628, 629 (1969).

About Furman himself, the jury knew only that he was black and that, according to his statement at trial, he was 26 years old and worked at "Superior Upholstery." App. 54. It took the jury one hour and 35 minutes to return a verdict of guilt and a sentence of death. *Id.,* at 64–65.

this punishment. I emphasize, however, one significant conclusion that emerges from that history. From the beginning of our Nation, the punishment of death has stirred acute public controversy. Although pragmatic arguments for and against the punishment have been frequently advanced, this longstanding and heated controversy cannot be explained solely as the result of differences over the practical wisdom of a particular government policy. At bottom, the battle has been waged on moral grounds. The country has debated whether a society for which the dignity of the individual is the supreme value can, without a fundamental inconsistency, follow the practice of deliberately putting some of its members to death. In the United States, as in other nations of the western world, "the struggle about this punishment has been one between ancient and deeply rooted beliefs in retribution, atonement or vengeance on the one hand, and, on the other, beliefs in the personal value and dignity of the common man that were born of the democratic movement of the eighteenth century, as well as beliefs in the scientific approach to an understanding of the motive forces of human conduct, which are the result of the growth of the sciences of behavior during the nineteenth and twentieth centuries." [49] It is this essentially moral conflict that forms the backdrop for the past changes in and the present operation of our system of imposing death as a punishment for crime.

Our practice of punishing criminals by death has changed greatly over the years. One significant change has been in our methods of inflicting death. Although this country never embraced the more violent and repulsive methods employed in England, we did for a long time rely almost exclusively upon the gallows and the firing squad. Since the development of the supposedly

---

[49] T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute 15 (1959).

more humane methods of electrocution late in the 19th century and lethal gas in the 20th, however, hanging and shooting have virtually ceased.[50] Our concern for decency and human dignity, moreover, has compelled changes in the circumstances surrounding the execution itself. No longer does our society countenance the spectacle of public executions, once thought desirable as a deterrent to criminal behavior by others. Today we reject public executions as debasing and brutalizing to us all.

Also significant is the drastic decrease in the crimes for which the punishment of death is actually inflicted. While esoteric capital crimes remain on the books, since 1930 murder and rape have accounted for nearly 99% of the total executions, and murder alone for about 87%.[51] In addition, the crime of capital murder has itself been limited. As the Court noted in *McGautha* v. *California,* 402 U. S., at 198, there was in this country a "rebellion against the common-law rule imposing a mandatory death sentence on all convicted murderers." Initially, that rebellion resulted in legislative definitions that distinguished between degrees of murder, retaining the mandatory death sentence only for murder in the first degree. Yet "[t]his new legislative criterion for isolating crimes appropriately punishable by death soon proved as unsuccessful as the concept of 'malice aforethought,' " *ibid.,* the common-law means of separating murder from manslaughter. Not only was the distinction between degrees of murder confusing and uncertain in practice, but even in clear cases of first-degree murder juries continued to take the law into

---

[50] Eight States still employ hanging as the method of execution, and one, Utah, also employs shooting. These nine States have accounted for less than 3% of the executions in the United States since 1930. National Prisoner Statistics, *supra,* n. 40, at 10–11.

[51] *Id.,* at 8.

their own hands: if they felt that death was an inappropriate punishment, "they simply refused to convict of the capital offense." *Id.*, at 199. The phenomenon of jury nullification thus remained to counteract the rigors of mandatory death sentences. Bowing to reality, "legislatures did not try, as before, to refine further the definition of capital homicides. Instead they adopted the method of forthrightly granting juries the discretion which they had been exercising in fact." *Ibid.* In consequence, virtually all death sentences today are discretionarily imposed. Finally, it is significant that nine States no longer inflict the punishment of death under any circumstances,[52] and five others have restricted it to extremely rare crimes.[53]

---

[52] Alaska, Hawaii, Iowa, Maine, Michigan, Minnesota, Oregon, West Virginia, and Wisconsin have abolished death as a punishment for crimes. *Id.*, at 50. In addition, the California Supreme Court held the punishment unconstitutional under the state counterpart of the Cruel and Unusual Punishments Clause. *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880 (1972).

[53] New Mexico, New York, North Dakota, Rhode Island, and Vermont have almost totally abolished death as a punishment for crimes. National Prisoner Statistics, *supra,* n. 40, at 50. Indeed, these five States might well be considered *de facto* abolition States. North Dakota and Rhode Island, which restricted the punishment in 1915 and 1852 respectively, have not carried out an execution since at least 1930, *id.*, at 10; nor have there been any executions in New York, Vermont, or New Mexico since they restricted the punishment in 1965, 1965, and 1969 respectively, *id.*, at 10–11. As of January 1, 1971, none of the five States had even a single prisoner under sentence of death. *Id.*, at 18–19.

In addition, six States, while retaining the punishment on the books in generally applicable form, have made virtually no use of it. Since 1930, Idaho, Montana, Nebraska, New Hampshire, South Dakota, and Wyoming have carried out a total of 22 executions. *Id.*, at 10–11. As of January 1, 1971, these six States had a total of three prisoners under sentences of death. *Id.*, at 18–19. Hence, assuming 25 executions in 42 years, each State averaged about one execution every 10 years.

Thus, although "the death penalty has been employed throughout our history," *Trop* v. *Dulles,* 356 U. S., at 99, in fact the history of this punishment is one of successive restriction. What was once a common punishment has become, in the context of a continuing moral debate, increasingly rare. The evolution of this punishment evidences, not that it is an inevitable part of the American scene, but that it has proved progressively more troublesome to the national conscience. The result of this movement is our current system of administering the punishment, under which death sentences are rarely imposed and death is even more rarely inflicted. It is, of course, "We, the People" who are responsible for the rarity both of the imposition and the carrying out of this punishment. Juries, "express[ing] the conscience of the community on the ultimate question of life or death," *Witherspoon* v. *Illinois,* 391 U. S., at 519, have been able to bring themselves to vote for death in a mere 100 or so cases among the thousands tried each year where the punishment is available. Governors, elected by and acting for us, have regularly commuted a substantial number of those sentences. And it is our society that insists upon due process of law to the end that no person will be unjustly put to death, thus ensuring that many more of those sentences will not be carried out. In sum, we have made death a rare punishment today.

The progressive decline in, and the current rarity of, the infliction of death demonstrate that our society seriously questions the appropriateness of this punishment today. The States point out that many legislatures authorize death as the punishment for certain crimes and that substantial segments of the public, as reflected in opinion polls and referendum votes, continue to support it. Yet the availability of this punishment through statutory authorization, as well as the polls and refer-

enda, which amount simply to approval of that authorization, simply underscores the extent to which our society has in fact rejected this punishment. When an unusually severe punishment is authorized for wide-scale application but not, because of society's refusal, inflicted save in a few instances, the inference is compelling that there is a deep-seated reluctance to inflict it. Indeed, the likelihood is great that the punishment is tolerated only because of its disuse. The objective indicator of society's view of an unusually severe punishment is what society does with it, and today society will inflict death upon only a small sample of the eligible criminals. Rejection could hardly be more complete without becoming absolute. At the very least, I must conclude that contemporary society views this punishment with substantial doubt.

The final principle to be considered is that an unusually severe and degrading punishment may not be excessive in view of the purposes for which it is inflicted. This principle, too, is related to the others. When there is a strong probability that the State is arbitrarily inflicting an unusually severe punishment that is subject to grave societal doubts, it is likely also that the punishment cannot be shown to be serving any penal purpose that could not be served equally well by some less severe punishment.

The States' primary claim is that death is a necessary punishment because it prevents the commission of capital crimes more effectively than any less severe punishment. The first part of this claim is that the infliction of death is necessary to stop the individuals executed from committing further crimes. The sufficient answer to this is that if a criminal convicted of a capital crime poses a danger to society, effective administration of the State's pardon and parole laws can delay or deny his release from prison, and techniques of isolation can elim-

inate or minimize the danger while he remains confined.

The more significant argument is that the threat of death prevents the commission of capital crimes because it deters potential criminals who would not be deterred by the threat of imprisonment. The argument is not based upon evidence that the threat of death is a superior deterrent. Indeed, as my Brother MARSHALL establishes, the available evidence uniformly indicates, although it does not conclusively prove, that the threat of death has no greater deterrent effect than the threat of imprisonment. The States argue, however, that they are entitled to rely upon common human experience, and that experience, they say, supports the conclusion that death must be a more effective deterrent than any less severe punishment. Because people fear death the most, the argument runs, the threat of death must be the greatest deterrent.

It is important to focus upon the precise import of this argument. It is not denied that many, and probably most, capital crimes cannot be deterred by the threat of punishment. Thus the argument can apply only to those who think rationally about the commission of capital crimes. Particularly is that true when the potential criminal, under this argument, must not only consider the risk of punishment, but also distinguish between two possible punishments. The concern, then, is with a particular type of potential criminal, the rational person who will commit a capital crime knowing that the punishment is long-term imprisonment, which may well be for the rest of his life, but will not commit the crime knowing that the punishment is death. On the face of it, the assumption that such persons exist is implausible.

In any event, this argument cannot be appraised in the abstract. We are not presented with the theoretical question whether under any imaginable circumstances the

302

threat of death might be a greater deterrent to the commission of capital crimes than the threat of imprisonment. We are concerned with the practice of punishing criminals by death as it exists in the United States today. Proponents of this argument necessarily admit that its validity depends upon the existence of a system in which the punishment of death is invariably and swiftly imposed. Our system, of course, satisfies neither condition. A rational person contemplating a murder or rape is confronted, not with the certainty of a speedy death, but with the slightest possibility that he will be executed in the distant future. The risk of death is remote and improbable; in contrast, the risk of long-term imprisonment is near and great. In short, whatever the speculative validity of the assumption that the threat of death is a superior deterrent, there is no reason to believe that as currently administered the punishment of death is necessary to deter the commission of capital crimes. Whatever might be the case were all or substantially all eligible criminals quickly put to death, unverifiable possibilities are an insufficient basis upon which to conclude that the threat of death today has any greater deterrent efficacy than the threat of imprisonment.[54]

---

[54] There is also the more limited argument that death is a necessary punishment when criminals are already serving or subject to a sentence of life imprisonment. If the only punishment available is further imprisonment, it is said, those criminals will have nothing to lose by committing further crimes, and accordingly the threat of death is the sole deterrent. But "life" imprisonment is a misnomer today. Rarely, if ever, do crimes carry a mandatory life sentence without possibility of parole. That possibility ensures that criminals do not reach the point where further crimes are free of consequences. Moreover, if this argument is simply an assertion that the threat of death is a more effective deterrent than the threat of increased imprisonment by denial of release on parole, then, as noted above, there is simply no evidence to support it.

There is, however, another aspect to the argument that the punishment of death is necessary for the protection of society. The infliction of death, the States urge, serves to manifest the community's outrage at the commission of the crime. It is, they say, a concrete public expression of moral indignation that inculcates respect for the law and helps assure a more peaceful community. Moreover, we are told, not only does the punishment of death exert this widespread moralizing influence upon community values, it also satisfies the popular demand for grievous condemnation of abhorrent crimes and thus prevents disorder, lynching, and attempts by private citizens to take the law into their own hands.

The question, however, is not whether death serves these supposed purposes of punishment, but whether death serves them more effectively than imprisonment. There is no evidence whatever that utilization of imprisonment rather than death encourages private blood feuds and other disorders. Surely if there were such a danger, the execution of a handful of criminals each year would not prevent it. The assertion that death alone is a sufficiently emphatic denunciation for capital crimes suffers from the same defect. If capital crimes require the punishment of death in order to provide moral reinforcement for the basic values of the community, those values can only be undermined when death is so rarely inflicted upon the criminals who commit the crimes. Furthermore, it is certainly doubtful that the infliction of death by the State does in fact strengthen the community's moral code; if the deliberate extinguishment of human life has any effect at all, it more likely tends to lower our respect for life and brutalize our values. That, after all, is why we no longer carry out public executions. In any event, this claim simply means that one purpose of punishment is to indicate social disapproval of crime. To serve that purpose our

laws distribute punishments according to the gravity of crimes and punish more severely the crimes society regards as more serious. That purpose cannot justify any particular punishment as the upper limit of severity.

There is, then, no substantial reason to believe that the punishment of death, as currently administered, is necessary for the protection of society. The only other purpose suggested, one that is independent of protection for society, is retribution. Shortly stated, retribution in this context means that criminals are put to death because they deserve it.

Although it is difficult to believe that any State today wishes to proclaim adherence to "naked vengeance," *Trop v. Dulles*, 356 U. S., at 112 (BRENNAN, J., concurring), the States claim, in reliance upon its statutory authorization, that death is the only fit punishment for capital crimes and that this retributive purpose justifies its infliction. In the past, judged by its statutory authorization, death was considered the only fit punishment for the crime of forgery, for the first federal criminal statute provided a mandatory death penalty for that crime. Act of April 30, 1790, § 14, 1 Stat. 115. Obviously, concepts of justice change; no immutable moral order requires death for murderers and rapists. The claim that death is a just punishment necessarily refers to the existence of certain public beliefs. The claim must be that for capital crimes death alone comports with society's notion of proper punishment. As administered today, however, the punishment of death cannot be justified as a necessary means of exacting retribution from criminals. When the overwhelming number of criminals who commit capital crimes go to prison, it cannot be concluded that death serves the purpose of retribution more effectively than imprisonment. The asserted public belief that murderers and rapists deserve to die is flatly inconsistent with the execution of a random

few. As the history of the punishment of death in this country shows, our society wishes to prevent crime; we have no desire to kill criminals simply to get even with them.

In sum, the punishment of death is inconsistent with all four principles: Death is an unusually severe and degrading punishment; there is a strong probability that it is inflicted arbitrarily; its rejection by contemporary society is virtually total; and there is no reason to believe that it serves any penal purpose more effectively than the less severe punishment of imprisonment. The function of these principles is to enable a court to determine whether a punishment comports with human dignity. Death, quite simply, does not.

## IV

When this country was founded, memories of the Stuart horrors were fresh and severe corporal punishments were common. Death was not then a unique punishment. The practice of punishing criminals by death, moreover, was widespread and by and large acceptable to society. Indeed, without developed prison systems, there was frequently no workable alternative. Since that time, successive restrictions, imposed against the background of a continuing moral controversy, have drastically curtailed the use of this punishment. Today death is a uniquely and unusually severe punishment. When examined by the principles applicable under the Cruel and Unusual Punishments Clause, death stands condemned as fatally offensive to human dignity. The punishment of death is therefore "cruel and unusual," and the States may no longer inflict it as a punishment for crimes. Rather than kill an arbitrary handful of criminals each year, the States will confine them in prison. "The State thereby suffers nothing and loses no power. The purpose of punishment is fulfilled, crime

is repressed by penalties of just, not tormenting, severity, its repetition is prevented, and hope is given for the reformation of the criminal." *Weems* v. *United States,* 217 U. S., at 381.

I concur in the judgments of the Court.

MR. JUSTICE STEWART, concurring.

The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

For these and other reasons, at least two of my Brothers have concluded that the infliction of the death penalty is constitutionally impermissible in all circumstances under the Eighth and Fourteenth Amendments. Their case is a strong one. But I find it unnecessary to reach the ultimate question they would decide. See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 347 (Brandeis, J., concurring).

The opinions of other Justices today have set out in admirable and thorough detail the origins and judicial history of the Eighth Amendment's guarantee against the infliction of cruel and unusual punishments,[1] and the origin and judicial history of capital punishment.[2] There

---

[1] See dissenting opinion of THE CHIEF JUSTICE, *post,* at 376–379; concurring opinion of MR. JUSTICE DOUGLAS, *ante,* at 242–244; concurring opinion of MR. JUSTICE BRENNAN, *ante,* at 258–269; concurring opinion of MR. JUSTICE MARSHALL, *post,* at 316–328; dissenting opinion of MR. JUSTICE BLACKMUN, *post,* at 407–409; dissenting opinion of MR. JUSTICE POWELL, *post,* at 421–427.

[2] See dissenting opinion of THE CHIEF JUSTICE, *post,* at 380; concurring opinion of MR. JUSTICE BRENNAN, *ante,* at 282–285; concurring opinion of MR. JUSTICE MARSHALL, *post,* at 333–341; dissenting opinion of MR. JUSTICE POWELL, *post,* at 421–424.

is thus no need for me to review the historical materials here, and what I have to say can, therefore, be briefly stated.

Legislatures—state and federal—have sometimes specified that the penalty of death shall be the mandatory punishment for every person convicted of engaging in certain designated criminal conduct. Congress, for example, has provided that anyone convicted of acting as a spy for the enemy in time of war shall be put to death.[3] The Rhode Island Legislature has ordained the death penalty for a life term prisoner who commits murder.[4] Massachusetts has passed a law imposing the death penalty upon anyone convicted of murder in the commission of a forcible rape.[5] An Ohio law imposes the mandatory penalty of death upon the assassin of the President of the United States or the Governor of a State.[6]

If we were reviewing death sentences imposed under these or similar laws, we would be faced with the need to decide whether capital punishment is unconstitutional for all crimes and under all circumstances. We would need to decide whether a legislature—state or federal—could constitutionally determine that certain criminal conduct is so atrocious that society's interest in deterrence and retribution wholly outweighs any considerations of reform or rehabilitation of the perpetrator, and that, despite the inconclusive empirical evidence,[7] only

[3] 10 U. S. C. § 906.

[4] R. I. Gen. Laws Ann. § 11–23–2.

[5] Mass. Gen. Laws Ann., c. 265, § 2.

[6] Ohio Rev. Code Ann., Tit. 29, §§ 2901.09 and 2901.10.

[7] Many statistical studies—comparing crime rates in jurisdictions with and without capital punishment and in jurisdictions before and after abolition of capital punishment—have indicated that there is little, if any, measurable deterrent effect. See H. Bedau, The Death Penalty in America 258–332 (1967 rev. ed.). There remains uncertainty, however, because of the difficulty of identifying and holding constant all other relevant variables. See Comment, The Death

the automatic penalty of death will provide maximum deterrence.

On that score I would say only that I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.

The constitutionality of capital punishment in the abstract is not, however, before us in these cases. For the Georgia and Texas Legislatures have not provided that the death penalty shall be imposed upon all those who are found guilty of forcible rape.[8] And the Georgia Legislature has not ordained that death shall be the automatic punishment for murder.[9] In a word, neither State

Penalty Cases, 56 Calif. L. Rev. 1268, 1275–1292. See also dissenting opinion of THE CHIEF JUSTICE, *post*, at 395; concurring opinion of MR. JUSTICE MARSHALL, *post*, at 346–354.

[8] Georgia law, at the time of the conviction and sentencing of the petitioner in No. 69–5030, left the jury a choice between the death penalty, life imprisonment, or "imprisonment and labor in the penitentiary for not less than one year nor more than 20 years." Ga. Code Ann. § 26–1302 (Supp. 1971) (effective prior to July 1, 1969). The current Georgia provision for the punishment of forcible rape continues to leave the same broad sentencing leeway. Ga. Crim. Code § 26–2001 (1971 rev.) (effective July 1, 1969). Texas law, under which the petitioner in No. 69–5031 was sentenced, provides that a "person guilty of rape shall be punished by death or by confinement in the penitentiary for life, or for any term of years not less than five." Texas Penal Code, Art. 1189.

[9] Georgia law, under which the petitioner in No. 69–5003, was sentenced, left the jury a choice between the death penalty and life imprisonment. Ga. Code Ann. § 26–1005 (Supp. 1971) (effective

has made a legislative determination that forcible rape and murder can be deterred only by imposing the penalty of death upon all who perpetrate those offenses. As MR. JUSTICE WHITE so tellingly puts it, the "legislative will is not frustrated if the penalty is never imposed." *Post,* at 311.

Instead, the death sentences now before us are the product of a legal system that brings them, I believe, within the very core of the Eighth Amendment's guarantee against cruel and unusual punishments, a guarantee applicable against the States through the Fourteenth Amendment. *Robinson* v. *California,* 370 U. S. 660. In the first place, it is clear that these sentences are "cruel" in the sense that they excessively go beyond, not in degree but in kind, the punishments that the state legislatures have determined to be necessary. *Weems* v. *United States,* 217 U. S. 349. In the second place, it is equally clear that these sentences are "unusual" in the sense that the penalty of death is infrequently imposed for murder, and that its imposition for rape is extraordinarily rare.[10] But I do not rest my conclusion upon these two propositions alone.

These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968,[11] many just as reprehensible as these, the petitioners are among a capriciously

---

prior to July 1, 1969). Current Georgia law provides for similar sentencing leeway. Ga. Crim. Code § 26–1101 (1971 rev.) (effective July 1, 1969).

[10] See dissenting opinion of THE CHIEF JUSTICE, *post,* at 386–387, n. 11; concurring opinion of MR. JUSTICE BRENNAN, *ante,* at 291–293.

[11] Petitioner Branch was sentenced to death in a Texas court on July 26, 1967. Petitioner Furman was sentenced to death in a Georgia court on September 20, 1968. Petitioner Jackson was sentenced to death in a Georgia court on December 10, 1968.

selected random handful upon whom the sentence of death has in fact been imposed.[12] My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race.[13] See *McLaughlin* v. *Florida,* 379 U. S. 184. But racial discrimination has not been proved,[14] and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

For these reasons I concur in the judgments of the Court.

MR. JUSTICE WHITE, concurring.

The facial constitutionality of statutes requiring the imposition of the death penalty for first-degree murder, for more narrowly defined categories of murder, or for rape would present quite different issues under the Eighth Amendment than are posed by the cases before us. In joining the Court's judgments, therefore, I do not at all

---

[12] A former United States Attorney General has testified before the Congress that only a "small and capricious selection of offenders have been put to death. Most persons convicted of the same crimes have been imprisoned." Statement by Attorney General Clark in Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess., 93.

In *McGautha* v. *California,* 402 U. S. 183, the Court dealt with claims under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. We expressly declined in that case to consider claims under the constitutional guarantee against cruel and unusual punishments. See 398 U. S. 936 (limited grant of certiorari).

[13] See concurring opinion of MR. JUSTICE DOUGLAS, *ante,* at 249–251; concurring opinion of MR. JUSTICE MARSHALL, *post,* at 366 n. 155.

[14] Cf. Note, A Study of the California Penalty Jury in First-Degree-Murder Cases, 21 Stan. L. Rev. 1297 (1969); dissenting opinion of THE CHIEF JUSTICE, *post,* at 389–390, n. 12.

intimate that the death penalty is unconstitutional *per se* or that there is no system of capital punishment that would comport with the Eighth Amendment. That question, ably argued by several of my Brethren, is not presented by these cases and need not be decided.

The narrower question to which I address myself concerns the constitutionality of capital punishment statutes under which (1) the legislature authorizes the imposition of the death penalty for murder or rape; (2) the legislature does not itself mandate the penalty in any particular class or kind of case (that is, legislative will is not frustrated if the penalty is never imposed), but delegates to judges or juries the decisions as to those cases, if any, in which the penalty will be utilized; and (3) judges and juries have ordered the death penalty with such infrequency that the odds are now very much against imposition and execution of the penalty with respect to any convicted murderer or rapist. It is in this context that we must consider whether the execution of these petitioners would violate the Eighth Amendment.

I begin with what I consider a near truism: that the death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system. It is perhaps true that no matter how infrequently those convicted of rape or murder are executed, the penalty so imposed is not disproportionate to the crime and those executed may deserve exactly what they received. It would also be clear that executed defendants are finally and completely incapacitated from again committing rape or murder or any other crime. But when imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied. Nor could it be said with confidence that society's need for specific deterrence justifies death

for so few when for so many in like circumstances life imprisonment or shorter prison terms are judged sufficient, or that community values are measurably reinforced by authorizing a penalty so rarely invoked.

Most important, a major goal of the criminal law—to deter others by punishing the convicted criminal—would not be substantially served where the penalty is so seldom invoked that it ceases to be the credible threat essential to influence the conduct of others. For present purposes I accept the morality and utility of punishing one person to influence another. I accept also the effectiveness of punishment generally and need not reject the death penalty as a more effective deterrent than a lesser punishment. But common sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted.

The imposition and execution of the death penalty are obviously cruel in the dictionary sense. But the penalty has not been considered cruel and unusual punishment in the constitutional sense because it was thought justified by the social ends it was deemed to serve. At the moment that it ceases realistically to further these purposes, however, the emerging question is whether its imposition in such circumstances would violate the Eighth Amendment. It is my view that it would, for its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

It is also my judgment that this point has been reached with respect to capital punishment as it is presently ad-

ministered under the statutes involved in these cases. Concededly, it is difficult to prove as a general proposition that capital punishment, however administered, more effectively serves the ends of the criminal law than does imprisonment. But however that may be, I cannot avoid the conclusion that as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice.

I need not restate the facts and figures that appear in the opinions of my Brethren. Nor can I "prove" my conclusion from these data. But, like my Brethren, I must arrive at judgment; and I can do no more than state a conclusion based on 10 years of almost daily exposure to the facts and circumstances of hundreds and hundreds of federal and state criminal cases involving crimes for which death is the authorized penalty. That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not. The short of it is that the policy of vesting sentencing authority primarily in juries—a decision largely motivated by the desire to mitigate the harshness of the law and to bring community judgment to bear on the sentence as well as guilt or innocence—has so effectively achieved its aims that capital punishment within the confines of the statutes now before us has for all practical purposes run its course.

Judicial review, by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to us in no different posture. It seems conceded by all that the Amendment imposes some obligations on the judiciary to judge the

constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not. Inevitably, then, there will be occasions when we will differ with Congress or state legislatures with respect to the validity of punishment. There will also be cases in which we shall strongly disagree among ourselves. Unfortunately, this is one of them. But as I see it, this case is no different in kind from many others, although it may have wider impact and provoke sharper disagreement.

In this respect, I add only that past and present legislative judgment with respect to the death penalty loses much of its force when viewed in light of the recurring practice of delegating sentencing authority to the jury and the fact that a jury, in its own discretion and without violating its trust or any statutory policy, may refuse to impose the death penalty no matter what the circumstances of the crime. Legislative "policy" is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them. In my judgment what was done in these cases violated the Eighth Amendment.

I concur in the judgments of the Court.

MR. JUSTICE MARSHALL, concurring.

These three cases present the question whether the death penalty is a cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution.[1]

---

[1] Certiorari was also granted in a fourth case, *Aikens* v. *California*, No. 68–5027, but the writ was dismissed after the California Supreme Court held that capital punishment violates the State Constitution. 406 U. S. 813. See *People* v. *Anderson*, 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972). The California decision reduced by slightly more than 100 the number of persons currently awaiting execution.

In No. 69–5003, Furman was convicted of murder for shooting the father of five children when he discovered that Furman had broken into his home early one morning. Nos. 69–5030 and 69–5031 involve state convictions for forcible rape. Jackson was found guilty of rape during the course of a robbery in the victim's home. The rape was accomplished as he held the pointed ends of scissors at the victim's throat. Branch also was convicted of a rape committed in the victim's home. No weapon was utilized, but physical force and threats of physical force were employed.

The criminal acts with which we are confronted are ugly, vicious, reprehensible acts. Their sheer brutality cannot and should not be minimized. But, we are not called upon to condone the penalized conduct; we are asked only to examine the penalty imposed on each of the petitioners and to determine whether or not it violates the Eighth Amendment. The question then is not whether we condone rape or murder, for surely we do not; it is whether capital punishment is "a punishment no longer consistent with our own self-respect" [2] and, therefore, violative of the Eighth Amendment.

The elasticity of the constitutional provision under consideration presents dangers of too little or too much self-restraint.[3] Hence, we must proceed with caution to answer the question presented.[4] By first examining the historical derivation of the Eighth Amendment and

[2] 268 Parl. Deb., H. L. (5th ser.) 703 (1965) (Lord Chancellor Gardiner).

[3] Compare, e. g., *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, 470 (1947) (Frankfurter, J., concurring), with F. Frankfurter, Of Law and Men 81 (1956). See *In re Anderson*, 69 Cal. 2d 613, 634–635, 447 P. 2d 117, 131–132 (1968) (Mosk, J., concurring); cf. *McGautha* v. *California*, 402 U. S. 183, 226 (1971) (separate opinion of Black, J.); *Witherspoon* v. *Illinois*, 391 U. S. 510, 542 (1968) (WHITE, J., dissenting).

[4] See generally Frankel, Book Review, 85 Harv. L. Rev. 354, 362 (1971).

the construction given it in the past by this Court, and then exploring the history and attributes of capital punishment in this country, we can answer the question presented with objectivity and a proper measure of self-restraint.

Candor is critical to such an inquiry. All relevant material must be marshaled and sorted and forthrightly examined. We must not only be precise as to the standards of judgment that we are utilizing, but exacting in examining the relevant material in light of those standards.

Candor compels me to confess that I am not oblivious to the fact that this is truly a matter of life and death. Not only does it involve the lives of these three petitioners, but those of the almost 600 other condemned men and women in this country currently awaiting execution. While this fact cannot affect our ultimate decision, it necessitates that the decision be free from any possibility of error.

## I

The Eighth Amendment's ban against cruel and unusual punishments derives from English law. In 1583, John Whitgift, Archbishop of Canterbury, turned the High Commission into a permanent ecclesiastical court, and the Commission began to use torture to extract confessions from persons suspected of various offenses.[5] Sir Robert Beale protested that cruel and barbarous torture violated Magna Carta, but his protests were made in vain.[6]

---

[5] Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 848 (1969).

[6] *Ibid.* Beale's views were conveyed from England to America and were first written into American law by the Reverend Nathaniel Ward who wrote the Body of Liberties for the Massachusetts Bay Colony. Clause 46 of that work read: "For bodilie punishments

Cruel punishments were not confined to those accused of crimes, but were notoriously applied with even greater relish to those who were convicted. Blackstone described in ghastly detail the myriad of inhumane forms of punishment imposed on persons found guilty of any of a large number of offenses.[7] Death, of course, was the usual result.[8]

The treason trials of 1685—the "Bloody Assizes"—which followed an abortive rebellion by the Duke of Monmouth, marked the culmination of the parade of horrors, and most historians believe that it was this event that finally spurred the adoption of the English Bill of Rights containing the progenitor of our prohibition against cruel and unusual punishments.[9] The conduct of Lord Chief Justice Jeffreys at those trials has been described as an "insane lust for cruelty" which was "stimulated by orders from the King" (James II).[10] The assizes received wide publicity from Puritan pamphleteers and doubtless had some influence on the adoption of a cruel and unusual punishments clause. But,

we allow amongst us none that are inhumane, Barbarous or cruel." 1 B. Schwartz, The Bill of Rights: A Documentary History 71, 77 (1971).

[7] 4 W. Blackstone, Commentaries *376–377. See also 1 J. Chitty, The Criminal Law 785–786 (5th ed. 1847); Sherman, ". . . Nor Cruel and Unusual Punishments Inflicted," 14 Crime & Delin. 73, 74 (1968).

[8] Not content with capital punishment as a means of retribution for crimes, the English also provided for attainder ("dead in law") as the immediate and inseparable concomitant of the death sentence. The consequences of attainder were forfeiture of real and personal estates and corruption of blood. An attainted person could not inherit land or other hereditaments, nor retain those he possessed, nor transmit them by descent to any heir. Descents were also obstructed whenever posterity derived a title through one who was attainted. 4 W. Blackstone, Commentaries *380–381.

[9] E. g., 2 J. Story, On the Constitution § 1903, p. 650 (5th ed. 1891).

[10] 2 G. Trevelyan, History of England 467 (1952 reissue).

the legislative history of the English Bill of Rights of 1689 indicates that the assizes may not have been as critical to the adoption of the clause as is widely thought. After William and Mary of Orange crossed the channel to invade England, James II fled. Parliament was summoned into session and a committee was appointed to draft general statements containing "such things as are absolutely necessary to be considered for the better securing of our religion, laws and liberties."[11] An initial draft of the Bill of Rights prohibited "illegal" punishments, but a later draft referred to the infliction by James II of "illegal and cruel" punishments, and declared "cruel and unusual" punishments to be prohibited.[12] The use of the word "unusual" in the final draft appears to be inadvertent.

This legislative history has led at least one legal historian to conclude "that the cruel and unusual punishments clause of the Bill of Rights of 1689 was, first, an objection to the imposition of punishments that were unauthorized by statute and outside the jurisdiction of the sentencing court, and second, a reiteration of the English policy against disproportionate penalties,"[13] and not primarily a reaction to the torture of the High Commission, harsh sentences, or the assizes.

---

[11] Granucci, *supra*, n. 5, at 854.

[12] *Id.*, at 855.

[13] *Id.*, at 860. In reaching this conclusion, Professor Granucci relies primarily on the trial of Titus Oates as the impetus behind the adoption of the clause. Oates was a minister of the Church of England who proclaimed the existence of a plot to assassinate King Charles II. He was tried for perjury, convicted, and sentenced to a fine of 2,000 marks, life imprisonment, whippings, pillorying four times a year, and defrocking. Oates petitioned both the House of Commons and the House of Lords for release from judgment. The House of Lords rejected his petition, but a minority of its members concluded that the King's Bench had no jurisdiction to compel de-

Whether the English Bill of Rights prohibition against cruel and unusual punishments is properly read as a response to excessive or illegal punishments, as a reaction to barbaric and objectionable modes of punishment, or as both, there is no doubt whatever that in borrowing the language and in including it in the Eighth Amendment, our Founding Fathers intended to outlaw torture and other cruel punishments.[14]

The precise language used in the Eighth Amendment first appeared in America on June 12, 1776, in Virginia's "Declaration of Rights," § 9 of which read: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." [15] This language was drawn verbatim from the English Bill of Rights of 1689. Other States adopted similar clauses,[16] and there is evidence in the debates of the various state conventions that were

---

frocking and that the other punishments were barbarous, inhumane, unchristian, and unauthorized by law. The House of Commons agreed with the dissenting Lords. *Id.*, at 857–859.

The author also relies on the dictionary definition of "cruel," which meant "severe" or "hard" in the 17th century, to support his conclusion. *Ibid.*

[14] Most historians reach this conclusion by reading the history of the Cruel and Unusual Punishments Clause as indicating that it was a reaction to inhumane punishments. Professor Granucci reaches the same conclusion by finding that the draftsmen of the Constitution misread the British history and erroneously relied on Blackstone. Granucci, *supra,* n. 5, at 862–865. It is clear, however, that prior to the adoption of the Amendment there was some feeling that a safeguard against cruelty was needed and that this feeling had support in past practices. See n. 6, *supra,* and accompanying text.

[15] Grannucci, *supra,* n. 5, at 840; 1 Schwartz, *supra,* n. 6, at 276, 278.

[16] See, *e. g.,* Delaware Declaration of Rights (1776), Maryland Declaration of Rights (1776), Massachusetts Declaration of Rights (1780), and New Hampshire Bill of Rights (1783). 1 Schwartz, *supra,* n. 6, at 276, 278; 279, 281; 337, 343; 374, 379.

called upon to ratify the Constitution of great concern for the omission of any prohibition against torture or other cruel punishments.[17]

The Virginia Convention offers some clues as to what the Founding Fathers had in mind in prohibiting cruel and unusual punishments. At one point George Mason advocated the adoption of a Bill of Rights, and Patrick Henry concurred, stating:

"By this Constitution, some of the best barriers of human rights are thrown away. Is there not an additional reason to have a bill of rights? . . . Congress, from their general powers, may fully go into business of human legislation. They may legislate, in criminal cases, from treason to the lowest offence—petty larceny. They may define crimes and prescribe punishments. In the definition of crimes, I trust they will be directed by what wise representatives ought to be governed by. But, when we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives. What says our bill of rights?—'that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' Are you not, therefore, now calling on those gentlemen who are to compose Congress, to prescribe trials and define punishments without this control? Will they find sentiments there similar to this bill of rights? You let them loose; you do more — you depart from the genius of your country. . . .

"In this business of legislation, your members of Congress will loose the restriction of not imposing excessive fines, demanding excessive bail, and in-

---

[17] See 2 J. Elliot's Debates 111 (2d ed. 1876); 3 *id.*, at 447–481. See also, 2 Schwartz, *supra,* n. 6, at 629, 674, 762, 852, 968.

flicting cruel and unusual punishments. These are prohibited by your declaration of rights. What has distinguished our ancestors?—That they would not admit of tortures, or cruel and barbarous punishment. But Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of France, Spain, and Germany—of torturing, to extort a confession of the crime. They will say that they might as well draw examples from those countries as from Great Britain, and they will tell you that there is such a necessity of strengthening the arm of government, that they must have a criminal equity, and extort confession by torture, in order to punish with still more relentless severity. We are then lost and undone." [18]

Henry's statement indicates that he wished to insure that "relentless severity" would be prohibited by the Constitution. Other expressions with respect to the proposed Eighth Amendment by Members of the First Congress indicate that they shared Henry's view of the need for and purpose of the Cruel and Unusual Punishments Clause.[19]

---

[18] 3 Elliot, *supra*, n. 17, at 446–448. A comment by George Mason which misinterprets a criticism leveled at himself and Patrick Henry is further evidence of the intention to prohibit torture and the like by prohibiting cruel and unusual punishments. *Id.*, at 452.

[19] 1 Annals of Cong. 782–783 (1789). There is some recognition of the fact that a prohibition against cruel and unusual punishments is a flexible prohibition that may change in meaning as the mores of a society change, and that may eventually bar certain punishments not barred when the Constitution was adopted. *Ibid.* (remarks of Mr. Livermore of New Hampshire). There is also evidence that the general opinion at the time the Eighth Amendment was adopted was that it prohibited every punishment that was not "evidently necessary." W. Bradford, An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania (1793), reprinted in 12 Am. J. Legal Hist. 122, 127 (1968).

Thus, the history of the clause clearly establishes that it was intended to prohibit cruel punishments. We must now turn to the case law to discover the manner in which courts have given meaning to the term "cruel."

## II

This Court did not squarely face the task of interpreting the cruel and unusual punishments language for the first time until *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), although the language received a cursory examination in several prior cases. See, *e. g., Pervear* v. *Commonwealth,* 5 Wall. 475 (1867). In *Wilkerson,* the Court unanimously upheld a sentence of public execution by shooting imposed pursuant to a conviction for premeditated murder. In his opinion for the Court, Mr. Justice Clifford wrote:

> "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." 99 U. S., at 135–136.

Thus, the Court found that unnecessary cruelty was no more permissible than torture. To determine whether the punishment under attack was unnecessarily cruel, the Court examined the history of the Utah Territory and the then-current writings on capital punishment, and compared this Nation's practices with those of other countries. It is apparent that the Court felt it could not dispose of the question simply by referring to traditional practices; instead, it felt bound to examine developing thought.

Eleven years passed before the Court again faced a challenge to a specific punishment under the Eighth

Amendment. In the case of *In re Kemmler,* 136 U. S. 436 (1890), Chief Justice Fuller wrote an opinion for a unanimous Court upholding electrocution as a permissible mode of punishment. While the Court ostensibly held that the Eighth Amendment did not apply to the States, it is very apparent that the nature of the punishment involved was examined under the Due Process Clause of the Fourteenth Amendment. The Court held that the punishment was not objectionable. Today, *Kemmler* stands primarily for the proposition that a punishment is not necessarily unconstitutional simply because it is unusual, so long as the legislature has a humane purpose in selecting it.[20]

Two years later in *O'Neil* v. *Vermont,* 144 U. S. 323 (1892), the Court reaffirmed that the Eighth Amendment was not applicable to the States. O'Neil was found guilty on 307 counts of selling liquor in violation of Vermont law. A fine of $6,140 ($20 for each offense) and the costs of prosecution ($497.96) were imposed. O'Neil was committed to prison until the fine and the costs were paid; and the court provided that if they were not paid before a specified date, O'Neil was to be confined in the house of corrections for 19,914 days (approximately 54 years) at hard labor. Three Justices—Field, Harlan, and Brewer—dissented. They maintained not only that the Cruel and Unusual Punishments Clause was applicable to the States, but that in O'Neil's case it had been violated. Mr. Justice Field wrote:

"That designation [cruel and unusual], it is true, is usually applied to punishments which inflict torture, such as the rack, the thumbscrew, the iron boot, the stretching of limbs and the like, which

---

[20] The New York Court of Appeals had recognized the unusual nature of the execution, but attributed it to a legislative desire to minimize the pain of persons executed.

are attended with acute pain and suffering. . . . The inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive . . . ." *Id.*, at 339–340.

In *Howard* v. *Fleming,* 191 U. S. 126 (1903), the Court, in essence, followed the approach advocated by the dissenters in *O'Neil.* In rejecting the claim that 10-year sentences for conspiracy to defraud were cruel and unusual, the Court (per Mr. Justice Brewer) considered the nature of the crime, the purpose of the law, and the length of the sentence imposed.

The Court used the same approach seven years later in the landmark case of *Weems* v. *United States,* 217 U. S. 349 (1910). Weems, an officer of the Bureau of Coast Guard and Transportation of the United States Government of the Philippine Islands, was convicted of falsifying a "public and official document." He was sentenced to 15 years' incarceration at hard labor with chains on his ankles, to an unusual loss of his civil rights, and to perpetual surveillance. Called upon to determine whether this was a cruel and unusual punishment, the Court found that it was.[21] The Court emphasized that the Constitution was not an "ephemeral" enactment, or one "designed to meet passing occasions."[22] Recognizing that "[t]ime works changes, [and] brings into existence new conditions and purposes,"[23] the Court commented that "[i]n the application of a constitu-

---

[21] The prohibition against cruel and unusual punishments relevant to Weems was that found in the Philippine Bill of Rights. It was, however, borrowed from the Eighth Amendment to the United States Constitution and had the same meaning. 217 U. S., at 367.

[22] *Id.,* at 373.

[23] *Ibid.*

tion . . . our contemplation cannot be only of what has been but of what may be." [24]

In striking down the penalty imposed on Weems, the Court examined the punishment in relation to the offense, compared the punishment to those inflicted for other crimes and to those imposed in other jurisdictions, and concluded that the punishment was excessive.[25] Justices White and Holmes dissented and argued that the cruel and unusual prohibition was meant to prohibit only those things that were objectionable at the time the Constitution was adopted.[26]

*Weems* is a landmark case because it represents the first time that the Court invalidated a penalty prescribed by a legislature for a particular offense. The Court made it plain beyond any reasonable doubt that excessive punishments were as objectionable as those that were inherently cruel. Thus, it is apparent that the dissenters' position in *O'Neil* had become the opinion of the Court in *Weems*.

*Weems* was followed by two cases that added little to our knowledge of the scope of the cruel and unusual language, *Badders* v. *United States,* 240 U. S. 391 (1916), and *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U. S. 407 (1921).[27] Then

---

[24] *Ibid.*

[25] *Id.,* at 381.

[26] *Id.,* at 389–413. Mr. Justice Black expressed a similar point of view in his separate opinion in *McGautha* v. *California,* 402 U. S., at 226 (1971).

[27] Badders was found guilty on seven counts of using the mails as part of a scheme to defraud. He was sentenced to concurrent five-year sentences and to a $1,000 fine on each count. The Court summarily rejected his claim that the sentence was a cruel and unusual punishment. In *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U. S. 407 (1921), the Court upheld the denial of second-class mailing privileges to a newspaper that had allegedly printed articles conveying false reports of United States

came another landmark case, *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947).

Francis had been convicted of murder and sentenced to be electrocuted. The first time the current passed through him, there was a mechanical failure and he did not die. Thereafter, Francis sought to prevent a second electrocution on the ground that it would be a cruel and unusual punishment. Eight members of the Court assumed the applicability of the Eighth Amendment to the States.[28] The Court was virtually unanimous in agreeing that "[t]he traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain,"[29] but split 5-4 on whether Francis would, under the circumstances, be forced to undergo any excessive pain. Five members of the Court treated the case like *In re Kemmler* and held that the legislature adopted electrocution for a humane purpose, and that its will should not be thwarted because, in its desire to reduce pain and suffering in most cases, it may have inadvertently increased suffering in one particular case.[30]

---

conduct during the First World War with intent to cause disloyalty. Mr. Justice Brandeis dissented and indicated his belief that the "punishment" was unusual and possibly excessive under *Weems* v. *United States,* 217 U. S. 349 (1910). There is nothing in either of these cases demonstrating a departure from the approach used in *Weems,* or adding anything to it.

[28] Mr. Justice Frankfurter was the only member of the Court unwilling to make this assumption. However, like Chief Justice Fuller in *In re Kemmler,* 136 U. S. 436 (1890), he examined the propriety of the punishment under the Due Process Clause of the Fourteenth Amendment. 329 U. S., at 471. As MR. JUSTICE POWELL makes clear, Mr. Justice Frankfurter's analysis was different only in form from that of his Brethren; in substance, his test was fundamentally identical to that used by the rest of the Court.

[29] *Id.,* at 463.

[30] English law required a second attempt at execution if the first attempt failed. L. Radzinowicz, A History of English Criminal Law 185–186 (1948).

The four dissenters felt that the case should be remanded for further facts.

As in *Weems,* the Court was concerned with excessive punishments. *Resweber* is perhaps most significant because the analysis of cruel and unusual punishment questions first advocated by the dissenters in *O'Neil* was at last firmly entrenched in the minds of an entire Court.

*Trop* v. *Dulles,* 356 U. S. 86 (1958), marked the next major cruel and unusual punishment case in this Court. Trop, a native-born American, was declared to have lost his citizenship by reason of a conviction by court-martial for wartime desertion. Writing for himself and Justices Black, DOUGLAS, and Whittaker, Chief Justice Warren concluded that loss of citizenship amounted to a cruel and unusual punishment that violated the Eighth Amendment.[31]

Emphasizing the flexibility inherent in the words "cruel and unusual," the Chief Justice wrote that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[32] His approach to the problem was that utilized by the Court in *Weems:* he scrutinized the severity of the penalty in relation to the offense, examined the practices of other civilized nations of the world, and concluded that involuntary statelessness was an excessive and, therefore, an unconstitutional punishment. Justice Frankfurter, dissenting, urged that expatriation was not punishment, and that even if it were, it was not excessive. While he criticized the conclusion arrived at by the Chief Justice, his approach to the Eighth Amendment question was identical.

[31] MR. JUSTICE BRENNAN concurred and concluded that the statute authorizing deprivations of citizenship exceeded Congress' legislative powers. 356 U. S., at 114.

[32] *Id.,* at 101.

Whereas in *Trop* a majority of the Court failed to agree on whether loss of citizenship was a cruel and unusual punishment, four years later a majority did agree in *Robinson* v. *California,* 370 U. S. 660 (1962), that a sentence of 90 days' imprisonment for violation of a California statute making it a crime to "be addicted to the use of narcotics" was cruel and unusual. MR. JUSTICE STEWART, writing the opinion of the Court, reiterated what the Court had said in *Weems* and what Chief Justice Warren wrote in *Trop*—that the cruel and unusual punishment clause was not a static concept, but one that must be continually re-examined "in the light of contemporary human knowledge." [33] The fact that the penalty under attack was only 90 days evidences the Court's willingness to carefully examine the possible excessiveness of punishment in a given case even where what is involved is a penalty that is familiar and widely accepted.[34]

We distinguished *Robinson* in *Powell* v. *Texas,* 392 U. S. 514 (1968), where we sustained a conviction for drunkenness in a public place and a fine of $20. Four Justices dissented on the ground that *Robinson* was controlling. The analysis in both cases was the same; only the conclusion as to whether or not the punishment was excessive differed. *Powell* marked the last time prior to today's decision that the Court has had occasion to construe the meaning of the term "cruel and unusual" punishment.

Several principles emerge from these prior cases and serve as a beacon to an enlightened decision in the instant cases.

[33] 370 U. S., at 666.

[34] *Robinson* v. *California,* 370 U. S. 660 (1962), removes any lingering doubts as to whether the Eighth Amendment's prohibition against cruel and unusual punishments is binding on the States. See also *Powell* v. *Texas,* 392 U. S. 514 (1968).

## III

Perhaps the most important principle in analyzing "cruel and unusual" punishment questions is one that is reiterated again and again in the prior opinions of the Court: *i. e.*, the cruel and unusual language "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." [35] Thus, a penalty that was permissible at one time in our Nation's history is not necessarily permissible today.

The fact, therefore, that the Court, or individual Justices, may have in the past expressed an opinion that the death penalty is constitutional is not now binding on us. A fair reading of *Wilkerson* v. *Utah, supra; In re Kemmler, supra;* and *Louisiana ex rel. Francis* v. *Resweber, supra,* would certainly indicate an acceptance *sub silentio* of capital punishment as constitutionally permissible. Several Justices have also expressed their individual opinions that the death penalty is constitutional.[36] Yet, some of these same Justices and others have at times expressed concern over capital punishment.[37]

---

[35] *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958). See also *Weems* v. *United States,* 217 U. S., at 373; *Robinson* v. *California,* 370 U. S., at 666. See also n. 19, *supra.*

[36] *E. g., McGautha* v. *California,* 402 U. S., at 226 (separate opinion of Black, J.); *Trop* v. *Dulles, supra,* at 99 (Warren, C. J.), 125 (Frankfurter, J., dissenting).

[37] See, *e. g., Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 474 (Burton, J., dissenting); *Trop* v. *Dulles, supra,* at 99 (Warren, C. J.); *Rudolph* v. *Alabama,* 375 U. S. 889 (1963) (Goldberg, J., dissenting from denial of certiorari); F. Frankfurter, Of Law and Men 81 (1956).

There is no violation of the principle of *stare decisis* in a decision that capital punishment now violates the Eighth Amendment. The last case that implied that capital punishment was still permissible was *Trop* v. *Dulles, supra,* at 99. Not only was the implication purely dictum, but it was also made in the context of a flexible analysis that recognized that as public opinion changed, the

There is no holding directly in point, and the very nature of the Eighth Amendment would dictate that unless a very recent decision existed, *stare decisis* would bow to changing values, and the question of the constitutionality of capital punishment at a given moment in history would remain open.

Faced with an open question, we must establish our standards for decision. The decisions discussed in the previous section imply that a punishment may be deemed cruel and unusual for any one of four distinct reasons.

First, there are certain punishments that inherently involve so much physical pain and suffering that civilized people cannot tolerate them—*e. g.,* use of the rack, the thumbscrew, or other modes of torture. See *O'Neil* v. *Vermont,* 144 U. S., at 339 (Field, J., dissenting). Regardless of public sentiment with respect to imposition of one of these punishments in a particular case or at any one moment in history, the Constitution prohibits it. These are punishments that have been barred since the adoption of the Bill of Rights.

---

validity of the penalty would have to be re-examined. *Trop* v. *Dulles* is nearly 15 years old now, and 15 years change many minds about many things. MR. JUSTICE POWELL suggests, however, that our recent decisions in *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), and *McGautha* v. *California,* 402 U. S. 183 (1971), imply that capital punishment is constitutionally permissible, because if they are viewed any other way they amount to little more than an academic exercise. In my view, this distorts the "rule of four" by which this Court decides which cases and which issues it will consider, and in what order. See *United States* v. *Generes,* 405 U. S. 93, 113 (1972) (DOUGLAS, J., dissenting). There are many reasons why four members of the Court might have wanted to consider the issues presented in those cases before considering the difficult question that is now before us. While I do not intend to catalogue these reasons here, it should suffice to note that I do not believe that those decisions can, in any way, fairly be used to support *any* inference whatever that the instant cases have already been disposed of *sub silentio.*

Second, there are punishments that are unusual, signifying that they were previously unknown as penalties for a given offense. Cf. *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U. S., at 435 (Brandeis, J., dissenting). If these punishments are intended to serve a humane purpose, they may be constitutionally permissible. *In re Kemmler,* 136 U. S., at 447; *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 464. Prior decisions leave open the question of just how much the word "unusual" adds to the word "cruel." I have previously indicated that use of the word "unusual" in the English Bill of Rights of 1689 was inadvertent, and there is nothing in the history of the Eighth Amendment to give flesh to its intended meaning. In light of the meager history that does exist, one would suppose that an innovative punishment would probably be constitutional if no more cruel than that punishment which it superseded. We need not decide this question here, however, for capital punishment is certainly not a recent phenomenon.

Third, a penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose. *Weems* v. *United States, supra.* The decisions previously discussed are replete with assertions that one of the primary functions of the cruel and unusual punishments clause is to prevent excessive or unnecessary penalties, *e. g., Wilkerson* v. *Utah,* 99 U. S., at 134; *O'Neil* v. *Vermont,* 144 U. S., at 339–340 (Field, J., dissenting); *Weems* v. *United States,* 217 U. S., at 381; *Louisiana ex rel. Francis* v. *Resweber, supra;* these punishments are unconstitutional even though popular sentiment may favor them. Both THE CHIEF JUSTICE and MR. JUSTICE POWELL seek to ignore or to minimize this aspect of the Court's prior decisions. But, since Mr. Justice Field first suggested that "[t]he whole inhibition [of the prohibition against cruel and unusual punish-

332

ments] is against that which is excessive," *O'Neil* v. *Vermont,* 144 U. S., at 340, this Court has steadfastly maintained that a penalty is unconstitutional whenever it is unnecessarily harsh or cruel. This is what the Founders of this country intended; this is what their fellow citizens believed the Eighth Amendment provided; and this was the basis for our decision in *Robinson* v. *California, supra,* for the plurality opinion by Mr. Chief Justice Warren in *Trop* v. *Dulles, supra,* and for the Court's decision in *Weems* v. *United States, supra.* See also W. Bradford, An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania (1793), reprinted in 12 Am. J. Legal Hist. 122, 127 (1968). It should also be noted that the "cruel and unusual" language of the Eighth Amendment immediately follows language that prohibits *excessive* bail and *excessive* fines. The entire thrust of the Eighth Amendment is, in short, against "that which is excessive."

Fourth, where a punishment is not excessive and serves a valid legislative purpose, it still may be invalid if popular sentiment abhors it. For example, if the evidence clearly demonstrated that capital punishment served valid legislative purposes, such punishment would, nevertheless, be unconstitutional if citizens found it to be morally unacceptable. A general abhorrence on the part of the public would, in effect, equate a modern punishment with those barred since the adoption of the Eighth Amendment. There are no prior cases in this Court striking down a penalty on this ground, but the very notion of changing values requires that we recognize its existence.

It is immediately obvious, then, that since capital punishment is not a recent phenomenon, if it violates the Constitution, it does so because it is excessive or

unnecessary, or because it is abhorrent to currently existing moral values.

We must proceed to the history of capital punishment in the United States.

## IV

Capital punishment has been used to penalize various forms of conduct by members of society since the beginnings of civilization. Its precise origins are difficult to perceive, but there is some evidence that its roots lie in violent retaliation by members of a tribe or group, or by the tribe or group itself, against persons committing hostile acts toward group members.[38] Thus, infliction of death as a penalty for objectionable conduct appears to have its beginnings in private vengeance.[39]

As individuals gradually ceded their personal prerogatives to a sovereign power, the sovereign accepted the authority to punish wrongdoing as part of its "divine right" to rule. Individual vengeance gave way to the vengeance of the state, and capital punishment became a public function.[40] Capital punishment worked its way into the laws of various countries,[41] and was inflicted in a variety of macabre and horrific ways.[42]

It was during the reign of Henry II (1154–1189) that English law first recognized that crime was more than a personal affair between the victim and the per-

[38]Ancel, The Problem of the Death Penalty, in Capital Punishment 4–5 (T. Sellin ed. 1967); G. Scott, The History of Capital Punishment 1 (1950).

[39] Scott, *supra,* n. 38, at 1.

[40] *Id.,* at 2; Ancel, *supra,* n. 38, at 4–5.

[41] The Code of Hammurabi is one of the first known laws to have recognized the concept of an "eye for an eye," and consequently to have accepted death as an appropriate punishment for homicide. E. Block, And May God Have Mercy . . . 13–14 (1962).

[42] Scott, *supra,* n. 38, at 19–33.

petrator.[43] The early history of capital punishment in England is set forth in *McGautha* v. *California*, 402 U. S. 183, 197–200 (1971), and need not be repeated here.

By 1500, English law recognized eight major capital crimes: treason, petty treason (killing of husband by his wife), murder, larceny, robbery, burglary, rape, and arson.[44] Tudor and Stuart kings added many more crimes to the list of those punishable by death, and by 1688 there were nearly 50.[45] George II (1727–1760) added nearly 36 more, and George III (1760–1820) increased the number by 60.[46]

By shortly after 1800, capital offenses numbered more than 200 and not only included crimes against person and property, but even some against the public peace. While England may, in retrospect, look particularly brutal, Blackstone points out that England was fairly civilized when compared to the rest of Europe.[47]

---

[43] *Id.*, at 5. Prior to this time, the laws of Alfred (871–901) provided that one who willfully slayed another should die, at least under certain circumstances. 3 J. Stephen, History of the Criminal Law of England 24 (1883). But, punishment was apparently left largely to private enforcement.

[44] T. Plucknett, A Concise History of the Common Law 424–454 (5th ed. 1956).

[45] Introduction in H. Bedau, The Death Penalty in America 1 (1967 rev. ed.).

[46] *Ibid.*

[47] 4 W. Blackstone, Commentaries *377. How many persons were actually executed for committing capital offenses is not known. See Bedau, *supra*, n. 45, at 3; L. Radzinowicz, A History of English Criminal Law 151, 153 (1948); Sellin, Two Myths in the History of Capital Punishment, 50 J. Crim. L. C. & P. S. 114 (1959). "Benefit of clergy" mitigated the harshness of the law somewhat. This concept arose from the struggle between church and state and originally provided that members of the clergy should be tried in ecclesiastical courts. Eventually all first offenders were entitled to "benefit of clergy." Bedau, *supra*, at 4.

Capital punishment was not as common a penalty in the American Colonies. "The Capitall Lawes of New-England," dating from 1636, were drawn by the Massachusetts Bay Colony and are the first written expression of capital offenses known to exist in this country. These laws make the following crimes capital offenses: idolatry, witchcraft, blasphemy, murder, assault in sudden anger, sodomy, buggery, adultery, statutory rape, rape, manstealing, perjury in a capital trial, and rebellion. Each crime is accompanied by a reference to the Old Testament to indicate its source.[48] It is not known with any certainty exactly when, or even if, these laws were enacted as drafted; and, if so, just how vigorously these laws were enforced.[49] We do know that the other Colonies had a variety of laws that spanned the spectrum of severity.[50]

By the 18th century, the list of crimes became much less theocratic and much more secular. In the average colony, there were 12 capital crimes.[51] This was far fewer than existed in England, and part of the reason was that there was a scarcity of labor in the Colonies.[52] Still, there were many executions, because "[w]ith county jails inadequate and insecure, the criminal population seemed best controlled by death, mutilation, and fines."[53]

Even in the 17th century, there was some opposition

---

[48] G. Haskins, The Capitall Lawes of New-England, Harv. L. Sch. Bull. 10–11 (Feb. 1956).

[49] Compare Haskins, *supra*, n. 48, with E. Powers, Crime and Punishment in Early Massachusetts, 1620–1692 (1966). See also Bedau, *supra*, n. 45, at 5.

[50] *Id.*, at 6.

[51] Filler, Movements to Abolish the Death Penalty in the United States, 284 Annals Am. Acad. Pol. & Soc. Sci. 124 (1952).

[52] *Ibid.*

[53] *Ibid.* (footnotes omitted).

to capital punishment in some of the colonies. In his "Great Act" of 1682, William Penn prescribed death only for premeditated murder and treason,[54] although his reform was not long lived.[55]

In 1776 the Philadelphia Society for Relieving Distressed Prisoners organized, and it was followed 11 years later by the Philadelphia Society for Alleviating the Miseries of Public Prisons.[56] These groups pressured for reform of all penal laws, including capital offenses. Dr. Benjamin Rush soon drafted America's first reasoned argument against capital punishment, entitled An Enquiry into the Effects of Public Punishments upon Criminals and upon Society.[57] In 1793, William Bradford, the Attorney General of Pennsylvania and later Attorney General of the United States, conducted "An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania."[58] He concluded that it was doubtful whether capital punishment was at all necessary, and that until more information could be obtained, it should be immediately eliminated for all offenses except high treason and murder.[59]

The "Enquiries" of Rush and Bradford and the Pennsylvania movement toward abolition of the death

---

[54] Ibid.; Bedau, supra, n. 45, at 6.

[55] For an unknown reason, Pennsylvania adopted the harsher penal code of England upon William Penn's death in 1718. There was no evidence, however of an increase in crime between 1682 and 1718. Filler, supra, n. 51, at 124. In 1794, Pennsylvania eliminated capital punishment except for "murder of the first degree," which included all "willful, deliberate or premeditated" killings. The death penalty was mandatory for this crime. Pa. Stat. 1794, c. 1777. Virginia followed Pennsylvania's lead and enacted similar legislation. Other States followed suit.

[56] Filler, supra, n. 51, at 124.

[57] Id., at 124–125.

[58] Reprinted in 12 Am. J. Legal Hist. 122 (1968).

[59] His advice was in large measure followed. See n. 55, supra.

penalty had little immediate impact on the practices of other States.[60] But in the early 1800's, Governors George and DeWitt Clinton and Daniel Tompkins unsuccessfully urged the New York Legislature to modify or end capital punishment. During this same period, Edward Livingston, an American lawyer who later became Secretary of State and Minister to France under President Andrew Jackson, was appointed by the Louisiana Legislature to draft a new penal code. At the center of his proposal was "the total abolition of capital punishment." [61] His Introductory Report to the System of Penal Law Prepared for the State of Louisiana [62] contained a systematic rebuttal of all arguments favoring capital punishment. Drafted in 1824, it was not published until 1833. This work was a tremendous impetus to the abolition movement for the next half century.

During the 1830's, there was a rising tide of sentiment against capital punishment. In 1834, Pennsylvania abolished public executions,[63] and two years later, The Report on Capital Punishment Made to the Maine Legislature was published. It led to a law that prohibited the executive from issuing a warrant for execution within one year after a criminal was sentenced by the courts. The totally discretionary character of the law was at odds with almost all prior practices. The "Maine Law" resulted in little enforcement of the death penalty, which was not surprising since the legislature's idea in passing the law was that the affirmative burden placed on the governor to issue a warrant one full year

---

[60] One scholar has noted that the early abolition movement in the United States lacked the leadership of major public figures. Bedau, *supra,* n. 45, at 8.

[61] *Ibid.;* Filler, *supra,* n. 51, at 126–127.

[62] See Scott, *supra,* n. 38, at 114–116.

[63] Filler, *supra,* n. 51, at 127.

or more after a trial would be an effective deterrent to exercise of his power.[64] The law spread throughout New England and led to Michigan's being the first State to abolish capital punishment in 1846.[65]

Anti-capital-punishment feeling grew in the 1840's as the literature of the period pointed out the agony of the condemned man and expressed the philosophy that repentance atoned for the worst crimes, and that true repentance derived, not from fear, but from harmony with nature.[66]

By 1850, societies for abolition existed in Massachusetts, New York, Pennsylvania, Tennessee, Ohio, Alabama, Louisiana, Indiana, and Iowa.[67] New York, Massachusetts, and Pennsylvania constantly had abolition bills before their legislatures. In 1852, Rhode Island followed in the footsteps of Michigan and partially abolished capital punishment.[68] Wisconsin totally abolished the death penalty the following year.[69] Those States that did not abolish the death penalty greatly reduced its scope, and "[f]ew states outside the South had more than one or two . . . capital offenses" in addition to treason and murder.[70]

But the Civil War halted much of the abolition furor. One historian has said that "[a]fter the Civil War, men's finer sensibilities, which had once been revolted by the execution of a fellow being, seemed hardened and

---

[64] Davis, The Movement to Abolish Capital Punishment in America, 1787–1861, 63 Am. Hist. Rev. 23, 33 (1957).

[65] Filler, *supra*, n. 51, at 128. Capital punishment was abolished for all crimes but treason. The law was enacted in 1846, but did not go into effect until 1847.

[66] Davis, *supra*, n. 64, at 29–30.

[67] Filler, *supra*, n. 51, at 129.

[68] *Id.*, at 130.

[69] *Ibid.*

[70] Bedau, *supra*, n. 45, at 10.

blunted." [71] Some of the attention previously given to abolition was diverted to prison reform. An abolitionist movement still existed, however. Maine abolished the death penalty in 1876, restored it in 1883, and abolished it again in 1887; Iowa abolished capital punishment from 1872–1878; Colorado began an erratic period of *de facto* abolition and revival in 1872; and Kansas also abolished it *de facto* in 1872, and by law in 1907. [72]

One great success of the abolitionist movement in the period from 1830–1900 was almost complete elimination of mandatory capital punishment. Before the legislatures formally gave juries discretion to refrain from imposing the death penalty, the phenomenon of "jury nullification," in which juries refused to convict in cases in which they believed that death was an inappropriate penalty, was experienced. [73] Tennessee was the first State to give juries discretion, Tenn. Laws 1837–1838, c. 29, but other States quickly followed suit. Then, Rep. Curtis of New York introduced a federal bill that ultimately became law in 1897 which reduced the number of federal capital offenses from 60 to 3 (treason, murder, and rape) and gave the jury sentencing discretion in murder and rape cases. [74]

By 1917 12 States had become abolitionist jurisdictions. [75] But, under the nervous tension of World War I,

---

[71] Davis, *supra,* n. 64, at 46.

[72] Kansas restored it in 1935. See Appendix I to this opinion, *infra,* at 372.

[73] See *McGautha* v. *California,* 402 U. S., at 199.

[74] Filler, *supra,* n. 51, at 133. See also *Winston* v. *United States,* 172 U. S. 303 (1899). More than 90% of the executions since 1930 in this country have been for offenses with a discretionary death penalty. Bedau, The Courts, the Constitution, and Capital Punishment, 1968 Utah L. Rev. 201, 204.

[75] See n. 72, *supra.*

four of these States reinstituted capital punishment and promising movements in other States came grinding to a halt.[76] During the period following the First World War, the abolitionist movement never regained its momentum.

It is not easy to ascertain why the movement lost its vigor. Certainly, much attention was diverted from penal reform during the economic crisis of the depression and the exhausting years of struggle during World War II. Also, executions, which had once been frequent public spectacles, became infrequent private affairs. The manner of inflicting death changed, and the horrors of the punishment were, therefore, somewhat diminished in the minds of the general public.[77]

In recent years there has been renewed interest in modifying capital punishment. New York has moved toward abolition,[78] as have several other States.[79] In 1967, a bill was introduced in the Senate to abolish

[76] Filler, *supra,* n. 51, at 134.

[77] Sellin, Executions in the United States, in Capital Punishment 35 (T. Sellin ed. 1967); United Nations, Department of Economic and Social Affairs, Capital Punishment, Pt. II, ¶¶ 82–85, pp. 101–102 (1968).

[78] New York authorizes the death penalty only for murder of a police officer or for murder by a life term prisoner. N. Y. Penal Code § 125.30 (1967).

[79] See generally Bedau, *supra,* n. 74. Nine States do not authorize capital punishment under any circumstances: Alaska, Hawaii, Iowa, Maine, Michigan, Minnesota, Oregon, West Virginia, and Wisconsin. Puerto Rico and the Virgin Islands also have no provision for capital punishment. Bedau, *supra,* n. 45, at 39. Those States that severely restrict the imposition of the death penalty are: New Mexico, N. M. Stat. Ann. § 40A–29–2.1 (1972); New York, N. Y. Penal Code § 125.30 (1967); North Dakota, N. D. Cent. Code §§ 12–07–01, 12–27–13 (1960); Rhode Island, R. I. Gen. Laws § 11–23–2 (1970); Vermont, Vt. Stat. Ann., Tit. 13, § 2303 (Supp. 1971). California is the only State in which the judiciary has declared capital punishment to be invalid. See n. 1, *supra.*

capital punishment for all federal crimes, but it died in committee.[80]

At the present time, 41 States, the District of Columbia, and other federal jurisdictions authorize the death penalty for at least one crime. It would be fruitless to attempt here to categorize the approach to capital punishment taken by the various States.[81] It is sufficient to note that murder is the crime most often punished by death, followed by kidnaping and treason.[82] Rape is a capital offense in 16 States and the federal system.[83]

The foregoing history demonstrates that capital punishment was carried from Europe to America but, once here, was tempered considerably. At times in our history, strong abolitionist movements have existed. But, they have never been completely successful, as no more than one-quarter of the States of the Union have, at any one time, abolished the death penalty. They have had partial success, however, especially in reducing the number of capital crimes, replacing mandatory death sentences with jury discretion, and developing more humane methods of conducting executions.

This is where our historical foray leads. The question now to be faced is whether American society has

[80] See generally Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess. (1968).

[81] Extensive compilations of the capital crimes in particular States can be found in Bedau, *supra,* n. 45, at 39–52 and in the Brief for the Petitioner in No. 68–5027, App. G (*Aikens* v. *California,* 406 U. S. 813 (1972)). An attempt is made to break down capital offenses into categories in Finkel, A Survey of Capital Offenses, in Capital Punishment 22 (T. Sellin ed. 1967).

[82] Bedau, *supra,* n. 45, at 43.

[83] *Ibid.* See also *Ralph* v. *Warden,* 438 F. 2d 786, 791–792 (CA4 1970).

reached a point where abolition is not dependent on a successful grass roots movement in particular jurisdictions, but is demanded by the Eighth Amendment. To answer this question, we must first examine whether or not the death penalty is today tantamount to excessive punishment.

## V

In order to assess whether or not death is an excessive or unnecessary penalty, it is necessary to consider the reasons why a legislature might select it as.punishment for one or more offenses, and examine whether less severe penalties would satisfy the legitimate legislative wants as well as capital punishment. If they would, then the death penalty is unnecessary cruelty, and, therefore, unconstitutional.

There are six purposes conceivably served by capital punishment: retribution, deterrence, prevention of repetitive criminal acts, encouragement of guilty pleas and confessions, eugenics, and economy. These are considered *seriatim* below.

A. The concept of retribution is one of the most misunderstood in all of our criminal jurisprudence. The principal source of confusion derives from the fact that, in dealing with the concept, most people confuse the question "why do men in fact punish?" with the question "what justifies men in punishing?" [84] Men may punish for any number of reasons, but the one reason that punishment is morally good or morally justifiable is that someone has broken the law. Thus, it can correctly be said that breaking the law is the *sine qua non* of punishment, or, in other words, that we only

---

[84] See Hart, Murder and the Principles of Punishment: England and the United States, 52 Nw. U. L. Rev. 433, 448 (1957); Report of Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶¶ 52–53, pp. 17–18 (1953). See generally, Reichert, Capital Punishment Reconsidered, 47 Ky. L. J. 397, 399 (1959).

tolerate punishment as it is imposed on one who deviates from the norm established by the criminal law.

The fact that the State may seek retribution against those who have broken its laws does not mean that retribution may then become the State's sole end in punishing. Our jurisprudence has always accepted deterrence in general, deterrence of individual recidivism, isolation of dangerous persons, and rehabilitation as proper goals of punishment. See *Trop* v. *Dulles,* 356 U. S., at 111 (BRENNAN, J., concurring). Retaliation, vengeance, and retribution have been roundly condemned as intolerable aspirations for a government in a free society.

Punishment as retribution has been condemned by scholars for centuries,[85] and the Eighth Amendment itself was adopted to prevent punishment from becoming synonymous with vengeance.

In *Weems* v. *United States,* 217 U. S., at 381, the Court, in the course of holding that Weems' punishment violated the Eighth Amendment, contrasted it with penalties provided for other offenses and concluded:

> "[T]his contrast shows more than different exercises of legislative judgment. It is greater than that. It condemns the sentence in this case as cruel and unusual. It exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice. The State thereby suffers nothing and loses no power. *The purpose of punishment is fulfilled, crime is repressed by penalties of just, not tormenting, severity, its repetition is prevented, and hope is given for the reformation of the criminal."* (Emphasis added.)

---

[85] See, *e. g.,* C. Beccaria, On Crimes and Punishment (tr. by H. Paolucci 1963); 1 Archbold, On the Practice, Pleading, and Evidence in Criminal Cases §§ 11–17, pp. XV–XIX (T. Waterman 7th ed. 1860).

It is plain that the view of the *Weems* Court was that punishment for the sake of retribution was not permissible under the Eighth Amendment. This is the only view that the Court could have taken if the "cruel and unusual" language were to be given any meaning. Retribution surely underlies the imposition of some punishment on one who commits a criminal act. But, the fact that *some* punishment may be imposed does not mean that *any* punishment is permissible. If retribution alone could serve as a justification for any particular penalty, then all penalties selected by the legislature would by definition be acceptable means for designating society's moral approbation of a particular act. The "cruel and unusual" language would thus be read out of the Constitution and the fears of Patrick Henry and the other Founding Fathers would become realities.

To preserve the integrity of the Eighth Amendment, the Court has consistently denigrated retribution as a permissible goal of punishment.[86] It is undoubtedly correct that there is a demand for vengeance on the part of many persons in a community against one who is convicted of a particularly offensive act. At times a cry is heard that morality requires vengeance to evi-

---

[86] See, *e. g., Rudolph* v. *Alabama,* 375 U. S. 889 (1963) (Goldberg, J., dissenting from denial of certiorari); *Trop* v. *Dulles,* 356 U. S., at 97 (Warren, C. J.), 113 (BRENNAN, J., concurring); *Morissette* v. *United States,* 342 U. S. 246 (1952); *Williams* v. *New York,* 337 U. S. 241 (1949). In *Powell* v. *Texas,* 392 U. S., at 530, we said: "This Court has never held that anything in the Constitution requires that penal sanctions be designed solely to achieve therapeutic or rehabilitative effects . . . ." This is, of course, correct, since deterrence and isolation are clearly recognized as proper. *E. g., Trop* v. *Dulles, supra,* at 111 (BRENNAN, J., concurring). There is absolutely nothing in the language, the rationale, or the holding of *Powell* v. *Texas* that implies that retribution for its own sake is a proper legislative aim in punishing.

dence society's abhorrence of the act.[87] But the Eighth Amendment is our insulation from our baser selves. The "cruel and unusual" language limits the avenues through which vengeance can be channeled. Were this not so, the language would be empty and a return to the rack and other tortures would be possible in a given case.

Mr. Justice Story wrote that the Eighth Amendment's limitation on punishment "would seem to be wholly unnecessary in a free government, since it is scarcely possible that any department of such a government should authorize or justify such atrocious conduct." [88]

I would reach an opposite conclusion—that only in a free society would men recognize their inherent weaknesses and seek to compensate for them by means of a Constitution.

The history of the Eighth Amendment supports only the conclusion that retribution for its own sake is improper.

B. The most hotly contested issue regarding capital punishment is whether it is better than life imprisonment as a deterrent to crime.[89]

While the contrary position has been argued,[90] it is my firm opinion that the death penalty is a more severe sanction than life imprisonment. Admittedly, there are

---

[87] See, e. g., Vellenga, Christianity and The Death Penalty, in Bedau, supra, n. 45, at 123–130; Hook, The Death Sentence, in Bedau, supra, at 146–154. See also Ehrenzweig, A Psychoanalysis of the Insanity Plea—Clues to the Problems of Criminal Responsibility and Insanity in the Death Cell, 73 Yale L. J. 425, 433–439 (1964).

[88] 2 J. Story, On the Constitution § 1903, p. 650 (5th ed. 1891).

[89] Note, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1275 (1968); Note, Justice or Revenge?, 60 Dick. L. Rev. 342, 343 (1956); Royal Commission, supra, n. 84, ¶ 55, at 18.

[90] Barzun, In Favor of Capital Punishment, in Bedau, supra, n. 45, at 154, 163; Hook, supra, n. 87, at 152.

some persons who would rather die than languish in prison for a lifetime. But, whether or not they should be able to choose death as an alternative is a far different question from that presented here—*i. e.,* whether the State can impose death as a punishment. Death is irrevocable; life imprisonment is not. Death, of course, makes rehabilitation impossible; life imprisonment does not. In short, death has always been viewed as the ultimate sanction, and it seems perfectly reasonable to continue to view it as such.[91]

It must be kept in mind, then, that the question to be considered is not simply whether capital punishment is

---

[91] See *Commonwealth* v. *Elliott,* 371 Pa. 70, 78, 89 A. 2d 782, 786 (1952) (Musmanno, J., dissenting); F. Frankfurter, Of Law and Men 101 (1956). The assertion that life imprisonment may somehow be more cruel than death is usually rejected as frivolous. Hence, I confess to surprise at finding the assertion being made in various ways in today's opinions. If there were any merit to the contention, it would do much to undercut even the retributive motive for imposing capital punishment. In any event, there is no better response to such an assertion than that of former Pennsylvania Supreme Court Justice Musmanno in his dissent in *Commonwealth* v. *Elliott, supra,* at 79–80, 89 A. 2d, at 787:

"One of the judges of the lower court indicated from the bench that a sentence of life imprisonment is not to be regarded as a lesser penalty than that of death. I challenge that statement categorically. It can be stated as a universal truth stretching from nadir to zenith that regardless of circumstances, no one wants to die. Some person may, in an instant of spiritual or physical agony express a desire for death as an anodyne from intolerable pain, but that desire is never full-hearted because there is always the reserve of realization that the silken cord of life is not broken by a mere wishing. There is no person in the actual extremity of dropping from the precipice of life who does not desperately reach for a crag of time to which to cling even for a moment against the awful eternity of silence below. With all its 'slings and arrows of outrageous fortune,' life is yet sweet and death is always cruel."

Attention should also be given to the hypothesis of Sir James Stephen, quoted in the text, *infra,* at 347–348.

a deterrent, but whether it is a better deterrent than life imprisonment.[92]

There is no more complex problem than determining the deterrent efficacy of the death penalty. "Capital punishment has obviously failed as a deterrent when a murder is committed. We can number its failures. But we cannot number its successes. No one can ever know how many people have refrained from murder because of the fear of being hanged." [93] This is the nub of the problem and it is exacerbated by the paucity of useful data. The United States is more fortunate than most countries, however, in that it has what are generally considered to be the world's most reliable statistics.[94]

The two strongest arguments in favor of capital punishment as a deterrent are both logical hypotheses devoid of evidentiary support, but persuasive nonetheless. The first proposition was best stated by Sir James Stephen in 1864:

> "No other punishment deters men so effectually from committing crimes as the punishment of death. This is one of those propositions which it is difficult to prove, simply because they are in themselves more obvious than any proof can make them. It is possible to display ingenuity in arguing against it, but that is all. The whole experience of mankind is in the other direction. The threat of instant death is the one to which resort has always been made when there was an absolute necessity for producing some result. . . . No one goes to certain

---

[92] See Bedau, Deterrence and the Death Penalty: A Reconsideration, 61 J. Crim. L. C. & P. S. 539, 542 (1970).

[93] Royal Commission, *supra*, n. 84, ¶ 59, at 20.

[94] United Nations, *supra*, n. 77, ¶ 134, at 117. The great advantage that this country has is that it can compare abolitionist and retentionist States with geographic, economic, and cultural similarities.

> inevitable death except by compulsion. Put the matter the other way. Was there ever yet a criminal who, when sentenced to death and brought out to die, would refuse the offer of a commutation of his sentence for the severest secondary punishment? Surely not. Why is this? It can only be because 'All that a man has will he give for his life.' In any secondary punishment, however terrible, there is hope; but death is death; its terrors cannot be described more forcibly."[95]

This hypothesis relates to the use of capital punishment as a deterrent for any crime. The second proposition is that "if life imprisonment is the maximum penalty for a crime such as murder, an offender who is serving a life sentence cannot then be deterred from murdering a fellow inmate or a prison officer."[96] This hypothesis advocates a limited deterrent effect under particular circumstances.

Abolitionists attempt to disprove these hypotheses by amassing statistical evidence to demonstrate that there is no correlation between criminal activity and the existence or nonexistence of a capital sanction. Almost all of the evidence involves the crime of murder, since murder is punishable by death in more jurisdictions than are other offenses,[97] and almost 90% of all executions since 1930 have been pursuant to murder convictions.[98]

Thorsten Sellin, one of the leading authorities on capital punishment, has urged that if the death penalty

---

[95] Reprinted in Royal Commission, *supra,* n. 84, ¶ 57, at 19.

[96] United Nations, *supra,* n. 77, ¶ 139, at 118.

[97] See Bedau, *supra,* n. 45, at 43.

[98] T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute (ALI) 5 (1959); Morris, Thoughts on Capital Punishment, 35 Wash. L. Rev. & St. Bar J. 335, 340 (1960).

deters prospective murderers, the following hypotheses should be true:

"(a) Murders should be less frequent in states that have the death penalty than in those that have abolished it, other factors being equal. Comparisons of this nature must be made among states that are as alike as possible in all other respects—character of population, social and economic condition, etc.—in order not to introduce factors known to influence murder rates in a serious manner but present in only one of these states.

"(b) Murders should increase when the death penalty is abolished and should decline when it is restored.

"(c) The deterrent effect should be greatest and should therefore affect murder rates most powerfully in those communities where the crime occurred and its consequences are most strongly brought home to the population.

"(d) Law enforcement officers would be safer from murderous attacks in states that have the death penalty than in those without it." [99] (Footnote omitted.)

Sellin's evidence indicates that not one of these propositions is true. This evidence has its problems, however. One is that there are no accurate figures for capital murders; there are only figures on homicides and they, of course, include noncapital killings.[100] A second problem is that certain murders undoubtedly are misinterpreted as accidental deaths or suicides, and there

---

[99] Sellin, *supra,* n. 98, at 21.

[100] Such crimes might include lesser forms of homicide or homicide by a child or a lunatic. *Id.,* at 22; The Laws, The Crimes, and The Executions, in Bedau, *supra,* n. 45, at 32, 61.

is no way of estimating the number of such undetected crimes. A third problem is that not all homicides are reported. Despite these difficulties, most authorities have assumed that the proportion of capital murders in a State's or nation's homicide statistics remains reasonably constant,[101] and that the homicide statistics are therefore useful.

Sellin's statistics demonstrate that there is no correlation between the murder rate and the presence or absence of the capital sanction. He compares States that have similar characteristics and finds that irrespective of their position on capital punishment, they have similar murder rates. In the New England States, for example, there is no correlation between executions [102] and homicide rates.[103] The same is true for Midwestern States,[104] and for all others studied. Both the United Nations [105] and Great Britain [106] have acknowledged the validity of Sellin's statistics.

Sellin also concludes that abolition and/or reintroduction of the death penalty had no effect on the homicide rates of the various States involved.[107] This conclusion is borne out by others who have made similar

[101] Sutherland, Murder and the Death Penalty, 15 J. Crim. L. & Crim. 522 (1925); ALI, *supra,* n. 98, at 22; Bedau, *supra,* n. 45, at 73.

[102] Executions were chosen for purposes of comparison because whatever impact capital punishment had would surely be most forcefully felt where punishment was actually imposed.

[103] See Appendix II to this opinion, *infra,* at 373.

[104] See Appendix III to this opinion, *infra,* at 374.

[105] United Nations, *supra,* n. 77, ¶ 134, at 117.

[106] Royal Commission, *supra,* n. 84, at 349–351. Accord, Vold, Extent and Trend of Capital Crimes in United States, 284 Annals Am. Acad. Pol. & Soc. Sci. 1, 4 (1952).

[107] Sellin, *supra,* n. 98, at 34.

inquiries[108] and by the experience of other countries.[109] Despite problems with the statistics,[110] Sellin's evidence has been relied upon in international studies of capital punishment.[111]

Statistics also show that the deterrent effect of capital punishment is no greater in those communities where executions take place than in other communities.[112] In fact, there is some evidence that imposition of capital punishment may actually encourage crime, rather than deter it.[113] And, while police and law enforcement offi-

---

[108] See, e. g., Guillot, Abolition and Restoration of the Death Penalty in Missouri, in Bedau, supra, n. 45, at 351, 358–359; Cobin, Abolition and Restoration of the Death Penalty in Delaware, in Bedau, supra, at 359, 371–372.

[109] Sellin, supra, n. 98, at 38–39; Royal Commission, supra, n. 84, at 353; United Nations, supra, n. 77, ¶¶ 130–136, at 116–118.

[110] One problem is that the statistics for the 19th century are especially suspect; another is that de jure abolition may have been preceded by de facto abolition which would have distorted the figures. It should also be noted that the figures for several States reflect homicide convictions rather than homicide rates.

[111] Royal Commission, supra, n. 84, ¶ 65, at 23; 346–349; United Nations, supra, n. 77, ¶ 132, at 117.

[112] Hayner & Cranor, The Death Penalty in Washington State, 284 Annals Am. Acad. Pol. & Soc. Sci. 101 (1952); Graves, A Doctor Looks at Capital Punishment, 10 Med. Arts & Sci 137 (1956); Dann, The Deterrent Effect of Capital Punishment, Bull. 29, Friends Social Service Series, Committee on Philanthropic Labor and Philadelphia Yearly Meeting of Friends (1935); Savitz, A Study in Capital Punishment, 49 J. Crim. L. C. & P. S. 338 (1958); United Nations, supra, n. 77, ¶ 135, at 118.

[113] Graves, supra, n. 112; Hearings, supra, n. 80, at 23 (testimony of C. Duffy), 126 (statement of Dr. West); T. Reik, The Compulsion to Confess 474 (1959); McCafferty, Major Trends in the Use of Capital Punishment, 25 Fed. Prob., No. 3, p. 15 (Sept. 1961). Capital punishment may provide an outlet for suicidal impulses or a means of achieving notoriety, for example.

cers are the strongest advocates of capital punishment,[114] the evidence is overwhelming that police are no safer in communities that retain the sanction than in those that have abolished it.[115]

There is also a substantial body of data showing that the existence of the death penalty has virtually no effect on the homicide rate in prisons.[116] Most of the persons sentenced to death are murderers, and murderers tend to be model prisoners.[117]

---

[114] See, *e. g.*, Gerstein,. A Prosecutor Looks at Capital Punishment, 51 J. Crim. L. C. & P. S. 252 (1960); Hoover, Statements in Favor of the Death Penalty, in Bedau, *supra*, n. 45, at 130; Younger, Capital Punishment: A Sharp Medicine Reconsidered, 42 A. B. A. J. 113 (1956). But see, Symposium on Capital Punishment, District Attorneys' Assn. of State of New York, Jan. 27, 1961, 7 N. Y. L. F. 249, 267 (1961) (statement of A. Herman, head of the homicide bureau of the New York City District Attorney's office).

[115] Sellin, *supra*, n. 98, at 56–58; Koeninger, Capital Punishment in Texas, 1924–1968, 15 Crime & Delin. 132 (1969); Sellin, Does the Death Penalty Protect Municipal Police, in Bedau, *supra*, n. 45, at 284; United Nations, *supra*, n. 77, ¶ 136, at 118.

[116] L. Lawes, Life and Death in Sing Sing 150 (1928); McGee, Capital Punishment as Seen by a Correctional Administrator, 28 Fed. Prob., No. 2, p. 11 (June 1964); 1950 Survey of the International Penal and Penitentiary Commission, cited in Sellin, *supra*, n. 98, at 70–72; Sellin, Prisons Homicides, in Capital Punishment 154 (T. Sellin ed. 1967); cf. Akman, Homicides and Assaults in Canadian Prisons, in Capital Punishment, *supra*, at 161–168. The argument can be made that the reason for the good record of murderers is that those who are likely to be recidivists are executed. There is, however, no evidence to show that in choosing between life and death sentences juries select the lesser penalties for those persons they believe are unlikely to commit future crimes.

[117] *E. g.*, United Nations, *supra*, n. 77, ¶ 144, at 119; B. Eshelman & F. Riley, Death Row Chaplain 224 (1962). This is supported also by overwhelming statistics showing an extremely low rate of recidivism for convicted murderers who are released from prison. Royal Commission, *supra*, n. 84, App. 15, at 486–491; Sellin, *supra*, n. 98, at 72–79; United Nations, *supra*, n. 77, ¶ 144, at 119.

In sum, the only support for the theory that capital punishment is an effective deterrent is found in the hypotheses with which we began and the occasional stories about a specific individual being deterred from doing a contemplated criminal act.[118] These claims of specific deterrence are often spurious,[119] however, and may be more than counterbalanced by the tendency of capital punishment to incite certain crimes.[120]

The United Nations Committee that studied capital punishment found that "[i]t is generally agreed between the retentionists and abolitionists, whatever their opinions about the validity of comparative studies of deterrence, that the data which now exist show no correlation between the existence of capital punishment and lower rates of capital crime." [121]

Despite the fact that abolitionists have not proved non-deterrence beyond a reasonable doubt, they have succeeded in showing by clear and convincing evidence that capital punishment is not necessary as a deterrent to crime in our society. This is all that they must do. We would shirk our judicial responsibilities if we failed to accept the presently existing statistics and demanded more proof. It may be that we now possess all the proof that anyone could ever hope to assemble on the subject. But, even if further proof were to be forthcoming, I believe there is more than enough evidence presently available for a decision in this case.

In 1793 William Bradford studied the utility of the death penalty in Pennsylvania and found that it probably had no deterrent effect but that more evidence

---

[118] See, e. g., The Question of Deterrence, in Bedau, supra, n. 45, at 267.

[119] Ibid. and n. 11; Note, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1282–1283 (1968).

[120] See n. 113, supra.

[121] United Nations, supra, n. 77, ¶ 159, at 123.

was needed.[122] Edward Livingston reached a similiar conclusion with respect to deterrence in 1833 upon completion of his study for Louisiana.[123] Virtually every study that has since been undertaken has reached the same result.[124]

In light of the massive amount of evidence before us, I see no alternative but to conclude that capital punishment cannot be justified on the basis of its deterrent effect.[125]

---

[122] See nn. 58 and 59, *supra*, and accompanying text.

[123] See n. 62, *supra*, and accompanying text.

[124] Graves, A Doctor Looks at Capital Punishment, 10 Med. Arts. & Sci. 137 (1956); Royal Commission, *supra*, n. 84, ¶ 60, at 20–21; Schuessler, The Deterrent Influence of the Death Penalty, 284 Annals Am. Acad. Pol. & Soc. Sci. 54 (1952); United Nations, *supra*, n. 77, ¶ 142, at 119; M. Wolfgang, Patterns in Criminal Homicide (1958). One would assume that if deterrence were enhanced by capital punishment, the increased deterrence would be most effective with respect to the premeditating murderer or the hired killer who plots his crime before committing it. But, such people rarely expect to be caught and usually assume that if they are caught they will either be acquitted or sentenced to prison. This is a fairly dependable assumption since a reliable estimate is that one person is executed for every 100 capital murders known to the police. Hart, Murder and the Principles of Punishment: England and the United States, 52 Nw. U. L. Rev. 433, 444–445 (1957). For capital punishment to deter anybody it must be a certain result of a criminal act, cf. *Ex parte Medley*, 134 U. S. 160 (1890), and it is not. It must also follow swiftly upon completion of the offense and it cannot in our complicated due process system of justice. See, *e. g.*, The Question of Deterrence, in Bedau, *supra*, n. 45, at 258, 271–272; DiSalle, Trends in the Abolition of Capital Punishment, 1969 U. Toledo L. Rev. 1, 4. It is ironic that those persons whom we would like to deter the most have the least to fear from the death penalty and recognize that fact. Sellin, Address for Canadian Society for Abolition of the Death Penalty, Feb. 7, 1965, in 8 Crim. L. Q. 36, 48 (1966); Proceedings of the Section of Criminal Law of the ABA, Aug. 24, 1959, p. 7 (M. DiSalle).

[125] In reaching this conclusion, I maintain agreement with that portion of Stephen's hypothesis that suggests that convicted crim-

C. Much of what must be said about the death penalty as a device to prevent recidivism is obvious—if a murderer is executed, he cannot possibly commit another offense. The fact is, however, that murderers are extremely unlikely to commit other crimes either in prison or upon their release.[126] For the most part, they are first offenders, and when released from prison they are known to become model citizens.[127] Furthermore, most persons who commit capital crimes are not executed. With respect to those who are sentenced to die, it is critical to note that the jury is never asked to determine whether they are likely to be recidivists. In light of these facts, if capital punishment were justified purely on the basis of preventing recidivism, it would have to be considered to be excessive; no general need to obliterate all capital offenders could have been demonstrated, nor any specific need in individual cases.

D. The three final purposes which may underlie utilization of a capital sanction—encouraging guilty pleas and confessions, eugenics, and reducing state ` expenditures—may be dealt with quickly. If the death penalty is used to encourage guilty pleas and thus to deter suspects from exercising their rights under the Sixth Amendment to jury trials, it is unconstitutional. *United States*

---

inals fear death more than they fear life imprisonment. As I stated earlier, the death penalty is a more severe sanction. The error in the hypothesis lies in its assumption that because men fear death more than imprisonment after they are convicted, they necessarily must weigh potential penalties prior to committing criminal acts and that they will conform their behavior so as to insure that, if caught, they will receive the lesser penalty. It is extremely unlikely that much thought is given to penalties before the act is committed, and even if it were, the preceding footnote explains why such thought would not lead to deterrence.

[126] See n. 117, *supra*.

[127] See, *e. g.*, Royal Commission, *supra*, n. 84, App. 15, at 486–491.

v. *Jackson,* 390 U. S. 570 (1968).[128] Its elimination would do little to impair the State's bargaining position in criminal cases, since life imprisonment remains a severe sanction which can be used as leverage for bargaining for pleas or confessions in exchange either for charges of lesser offenses or recommendations of leniency.

Moreover, to the extent that capital punishment is used to encourage confessions and guilty pleas, it is not being used for punishment purposes. A State that justifies capital punishment on its utility as part of the conviction process could not profess to rely on capital punishment as a deterrent. Such a State's system would be structured with twin goals only: obtaining guilty pleas and confessions and imposing *imprisonment* as the maximum sanction. Since life imprisonment is sufficient for bargaining purposes, the death penalty is excessive if used for the same purposes.

In light of the previous discussion on deterrence, any suggestions concerning the eugenic benefits of capital punishment are obviously meritless.[129] As I pointed out above, there is not even any attempt made to discover which capital offenders are likely to be recidivists, let alone which are positively incurable. No test or procedure presently exists by which incurables can be screened from those who would benefit from treatment. On the one hand, due process would seem to require that we have some procedure to demonstrate incurability before execution; and, on the other hand, equal protection would then seemingly require that all incurables be executed, cf. *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942). In addition, the "cruel and unusual" language

---

[128] *Jackson* applies to the States under the criteria articulated in *Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968).

[129] See, *e. g.,* Barzun, In Favor of Capital Punishment, in Bedau, *supra,* n. 45, at 154.

would require that life imprisonment, treatment, and sterilization be inadequate for eugenic purposes. More importantly, this Nation has never formally professed eugenic goals, and the history of the world does not look kindly on them. If eugenics is one of our purposes, then the legislatures should say so forthrightly and design procedures to serve this goal. Until such time, I can only conclude, as has virtually everyone else who has looked at the problem,[130] that capital punishment cannot be defended on the basis of any eugenic purposes.

As for the argument that it is cheaper to execute a capital offender than to imprison him for life, even assuming that such an argument, if true, would support a capital sanction, it is simply incorrect. A disproportionate amount of money spent on prisons is attributable to death row.[131] Condemned men are not productive members of the prison community, although they could be,[132] and executions are expensive.[133] Appeals are often automatic, and courts admittedly spend more time with death cases.[134]

---

[130] See, e. g., Death as a Punishment, in Bedau, supra, at 214, 226–228; Caldwell, Why is the Death Penalty Retained?, 284 Annals Am. Acad. Pol. & Soc. Sci. 45, 50 (1952); Johnson, Selective Factors in Capital Punishment, 36 Social Forces 165, 169 (1957); Sellin, Capital Punishment, 25 Fed. Prob., No. 3, p. 3 (Sept. 1961). We should not be surprised at the lack of merit in the eugenic arguments. There simply is no evidence that mentally ill persons who commit capital offenses constitute a psychiatric entity distinct from other mentally disordered patients or that they do not respond as readily to treatment. Cruvant & Waldrop, The Murderer in the Mental Institution, 284 Annals Am. Acad. Pol. & Soc. Sci. 35, 43 (1952).

[131] Caldwell, supra, n. 130, at 48; McGee, supra, n. 116.

[132] McGee, supra, at 13–14; Bailey, Rehabilitation on Death Row, in Bedau, supra, n. 45, at 556.

[133] T. Thomas, This Life We Take 20 (3d ed. 1965).

[134] Stein v. New York, 346 U. S. 156, 196 (1953) (Jackson, J.); cf. Reid v. Covert, 354 U. S. 1, 77 (1957) (Harlan, J., concurring in result).

At trial, the selection of jurors is likely to become a costly, time-consuming problem in a capital case,[135] and defense counsel will reasonably exhaust every possible means to save his client from execution, no matter how long the trial takes.

During the period between conviction and execution, there are an inordinate number of collateral attacks on the conviction and attempts to obtain executive clemency, all of which exhaust the time, money, and effort of the State. There are also continual assertions that the condemned prisoner has gone insane.[136] Because there is a formally established policy of not executing insane persons,[137] great sums of money may be spent on detecting and curing mental illness in order to perform the execution.[138] Since no one wants the responsibility for the execution, the condemned man is likely to be passed back and forth from doctors to custodial officials to courts like a ping-pong ball.[139] The entire process is very costly.

When all is said and done, there can be no doubt that it costs more to execute a man than to keep him in prison for life.[140]

E. There is but one conclusion that can be drawn from all of this—*i. e.,* the death penalty is an excessive and unnecessary punishment that violates the Eighth

[135] See, *e. g., Witherspoon* v. *Illinois,* 391 U. S. 510 (1968).

[136] Slovenko, And the Penalty is (Sometimes) Death, 24 Antioch Review 351 (1964).

[137] See, *e. g., Caritativo* v. *California,* 357 U. S. 549 (1958).

[138] To others, as well as to the author of this opinion, this practice has seemed a strange way to spend money. See, *e. g.,* T. Arnold, The Symbols of Government 10–13 (1935).

[139] Slovenko, *supra,* n. 136, at 363.

[140] B. Eshelman & F. Riley, Death Row Chaplain 226 (1962); Caldwell, *supra,* n. 130, at 48; McGee, *supra,* n. 116, at 13; Sellin, *supra,* n. 130, at 3 (Sept. 1961).

Amendment. The statistical evidence is not convincing beyond all doubt, but it is persuasive. It is not improper at this point to take judicial notice of the fact that for more than 200 years men have labored to demonstrate that capital punishment serves no purpose that life imprisonment could not serve equally well. And they have done so with great success. Little, if any, evidence has been adduced to prove the contrary. The point has now been reached at which deference to the legislatures is tantamount to abdication of our judicial roles as factfinders, judges, and ultimate arbiters of the Constitution. We know that at some point the presumption of constitutionality accorded legislative acts gives way to a realistic assessment of those acts. This point comes when there is sufficient evidence available so that judges can determine, not whether the legislature acted wisely, but whether it had any rational basis whatsoever for acting. We have this evidence before us now. There is no rational basis for concluding that capital punishment is not excessive. It therefore violates the Eighth Amendment.[141]

---

[141] This analysis parallels in some ways the analysis used in striking down legislation on the ground that it violates Fourteenth Amendment concepts of substantive due process. See Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1074 (1964). There is one difference, however. Capital punishment is unconstitutional because it is excessive and unnecessary punishment, not because it is irrational.

The concepts of cruel and unusual punishment and substantive due process become so close as to merge when the substantive due process argument is stated in the following manner: because capital punishment deprives an individual of a fundamental right (*i. e.*, the right to life), *Johnson* v. *Zerbst*, 304 U. S. 458, 462 (1938), the State needs a compelling interest to justify it. See Note, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1324–1354 (1968). Thus stated, the substantive due process argument reiterates what is essentially the primary purpose of the Cruel and Unusual Punishments

## VI

In addition, even if capital punishment is not excessive, it nonetheless violates the Eighth Amendment because it is morally unacceptable to the people of the United States at this time in their history.

In judging whether or not a given penalty is morally acceptable, most courts have said that the punishment is valid unless "it shocks the conscience and sense of justice of the people." [142]

---

Clause of the Eighth Amendment—*i. e.*, punishment may not be more severe than is necessary to serve the legitimate interests of the State.

THE CHIEF JUSTICE asserts that if we hold that capital punishment is unconstitutional because it is excessive, we will next have to determine whether a 10-year prison sentence rather than a five-year sentence is also excessive, or whether a $5 fine would not do equally well as a $10 fine. He may be correct that such determinations will have to be made, but, as in these cases, those persons challenging the penalty will bear a heavy burden of demonstrating that it is excessive. These cases arise after 200 years of inquiry, 200 years of public debate and 200 years of marshaling evidence. The burden placed on those challenging capital punishment could not have been greater. I am convinced that they have met their burden. Whether a similar burden will prove too great in future cases is a question that we can resolve in time.

[142] *United States* v. *Rosenberg,* 195 F. 2d 583, 608 (CA2) (Frank, J.), cert. denied, 344 U. S. 838 (1952). See also *Kasper* v. *Brittain,* 245 F. 2d 92, 96 (CA6), cert. denied, 355 U. S. 834 (1957) ("shocking to the sense of justice"); *People* v. *Morris,* 80 Mich. 634, 639, 45 N. W. 591, 592 (1890) ("shock the moral sense of the people"). In *Repouille* v. *United States,* 165 F. 2d 152 (CA2 1947), and *Schmidt* v. *United States,* 177 F. 2d 450, 451 (CA2 1949), Judge Learned Hand wrote that the standard of "good moral character" in the Nationality Act was to be judged by "the generally accepted moral conventions current at the time." 165 F. 2d, at 153. Judge Frank, who was later to author the *Rosenberg* opinion, in which a similar standard was adopted, dissented in *Repouille* and urged that the correct standard was the "attitude of our ethical leaders." 165 F. 2d, at 154. In light of *Rosenberg,* it is apparent that Judge Frank would require a much broader based moral approbation before strik-

Judge Frank once noted the problems inherent in the use of such a measuring stick:

> "[The court,] before it reduces a sentence as 'cruel and unusual,' must have reasonably good assurances that the sentence offends the 'common conscience.' And, in any context, such a standard—the community's attitude—is usually an unknowable. It resembles a slithery shadow, since one can seldom learn, at all accurately, what the community, or a majority, actually feels. Even a carefully-taken 'public opinion poll' would be inconclusive in a case like this." [143]

While a public opinion poll obviously is of some assistance in indicating public acceptance or rejection of a specific penalty,[144] its utility cannot be very great. This is because whether or not a punishment is cruel and unusual depends, not on whether its mere mention "shocks the conscience and sense of justice of the people," but on whether people who were fully informed as to the purposes of the penalty and its liabilities would find the penalty shocking, unjust, and unacceptable.[145]

---

ing down a punishment as cruel and unusual than he would for merely holding that conduct was evidence of bad moral character under a legislative act.

[143] *United States* v. *Rosenberg, supra,* at 608.

[144] See *Repouille* v. *United States, supra,* at 153. In *Witherspoon* v. *Illinois,* 391 U. S., at 520, the Court cited a public opinion poll that showed that 42% of the American people favored capital punishment, while 47% opposed it. But the polls have shown great fluctuation. See What Do Americans Think of the Death Penalty?, in Bedau, *supra,* n. 45, at 231–241.

[145] The fact that the constitutionality of capital punishment turns on the opinion of an informed citizenry undercuts the argument that since the legislature is the voice of the people, its retention of capital punishment must represent the will of the people. So few people have been executed in the past decade that capital punishment is

In other words, the question with which we must deal is not whether a substantial proportion of American citizens would today, if polled, opine that capital punishment is barbarously cruel, but whether they would find it to be so in the light of all information presently available.

This is not to suggest that with respect to this test of unconstitutionality people are required to act rationally; they are not. With respect to this judgment, a violation of the Eighth Amendment is totally dependent on the predictable subjective, emotional reactions of informed citizens.[146]

It has often been noted that American citizens know almost nothing about capital punishment.[147] Some of the conclusions arrived at in the preceding section and the supporting evidence would be critical to an informed judgment on the morality of the death penalty: *e. g.*, that the death penalty is no more effective a deterrent than life imprisonment, that convicted murderers are

---

a subject only rarely brought to the attention of the average American. Lack of exposure to the problem is likely to lead to indifference, and indifference and ignorance result in preservation of the status quo, whether or not that is desirable, or desired.

It might be argued that in choosing to remain indifferent and uninformed, citizens reflect their judgment that capital punishment is really a question of utility, not morality, and not one, therefore, of great concern. As attractive as this is on its face, it cannot be correct, because such an argument requires that the choice to remain ignorant or indifferent be a viable one. That, in turn, requires that it be a knowledgeable choice. It is therefore imperative for constitutional purposes to attempt to discern the probable opinion of an informed electorate.

[146] Cf. Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1076 (1964).

[147] *E. g.*, Gold, A Psychiatric Review of Capital Punishment, 6 J. Forensic Sci. 465, 466 (1961); A. Koestler, Reflections on Hanging 164 (1957); cf. C. Duffy & A. Hirshberg, 88 Men and 2 Women 257–258 (1962).

rarely executed, but are usually sentenced to a term in prison; that convicted murderers usually are model prisoners, and that they almost always become law-abiding citizens upon their release from prison; that the costs of executing a capital offender exceed the costs of imprisoning him for life; that while in prison, a convict under sentence of death performs none of the useful functions that life prisoners perform; that no attempt is made in the sentencing process to ferret out likely recidivists for execution; and that the death penalty may actually stimulate criminal activity.

This information would almost surely convince the average citizen that the death penalty was unwise, but a problem arises as to whether it would convince him that the penalty was morally reprehensible. This problem arises from the fact that the public's desire for retribution, even though this is a goal that the legislature cannot constitutionally pursue as its sole justification for capital punishment, might influence the citizenry's view of the morality of capital punishment. The solution to the problem lies in the fact that no one has ever seriously advanced retribution as a legitimate goal of our society. Defenses of capital punishment are always mounted on deterrent or other similar theories. This should not be surprising. It is the people of this country who have urged in the past that prisons rehabilitate as well as isolate offenders, and it is the people who have injected a sense of purpose into our penology. I cannot believe that at this stage in our history, the American people would ever knowingly support purposeless vengeance. Thus, I believe that the great mass of citizens would conclude on the basis of the material already considered that the death penalty is immoral and therefore unconstitutional.

But, if this information needs supplementing, I believe that the following facts would serve to convince

even the most hesitant of citizens to condemn death as a sanction: capital punishment is imposed discriminatorily against certain identifiable classes of people; there is evidence that innocent people have been executed before their innocence can be proved; and the death penalty wreaks havoc with our entire criminal justice system. Each of these facts is considered briefly below.

Regarding discrimination, it has been said that "[i]t is usually the poor, the illiterate, the underprivileged, the member of the minority group—the man who, because he is without means, and is defended by a court-appointed attorney—who becomes society's sacrificial lamb . . . ." [148] Indeed, a look at the bare statistics regarding executions is enough to betray much of the discrimination. A total of 3,859 persons have been executed since 1930, of whom 1,751 were white and 2,066 were Negro. [149] Of the executions, 3,334 were for murder; 1,664 of the executed murderers were white and 1,630 were Negro; [150] 455 persons, including 48 whites and 405 Negroes, were executed for rape. [151] It is immediately apparent that Negroes were executed far more often than whites in proportion to their percentage of the population. Studies indicate that while the higher rate of execution among Negroes is partially due to a higher rate of crime, there is evidence of racial discrimination. [152]

---

[148] Hearings, *supra*, n. 80, at 11 (statement of M. DiSalle).

[149] National Prisoner Statistics No. 45, Capital Punishment 1930–1968, p. 7 (Aug. 1969).

[150] *Ibid.*

[151] *Ibid.*

[152] Alexander, The Abolition of Capital Punishment, Proceedings of the 96th Congress of Correction of the American Correctional Association, Baltimore, Md., 57 (1966); Criminal Justice: The General Aspects, in Bedau, *supra*, n. 45, at 405, 411–414; Bedau, Death Sentences in New Jersey, 1907–1960, 19 Rutgers L. Rev. 1,

Racial or other discriminations should not be surprising. In *McGautha* v. *California,* 402 U. S., at 207, this Court held "that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is [not] offensive to anything in the Constitution." This was an open invitation to discrimination.

There is also overwhelming evidence that the death penalty is employed against men and not women. Only 32 women have been executed since 1930, while 3,827 men have met a similar fate.[153] It is difficult to understand why women have received such favored treatment since the purposes allegedly served by capital punishment seemingly are equally applicable to both sexes.[154]

It also is evident that the burden of capital punishment falls upon the poor, the ignorant, and the under-

18–21, 52–53 (1964); R. Clark, Crime in America 335 (1970); Hochkammer, The Capital Punishment Controversy, 60 J. Crim. L. C. & P. S. 360, 361–362 (1969); Johnson, The Negro and Crime, 217 Annals Am. Acad. Pol. & Soc. Sci. 93, 95, 99 (1941); Johnson, Selective Factors in Capital Punishment, 36 Social Forces 165 (1957); United Nations, *supra,* n. 77, ¶ 69, at 98; Williams, The Death Penalty and the Negro, 67 Crisis 501, 511 (1960); M. Wolfgang & B. Cohen, Crime and Race: Conceptions and Misconceptions 77, 80–81, 85–86 (1970); Wolfgang, Kelly, & Nolde, Comparison of the Executed and the Commuted Among Admissions to Death Row, 53 J. Crim. L. C. & P. S. 301 (1962). MR. JUSTICE DOUGLAS explores the discriminatory application of the death penalty at great length, *ante,* at 249–257.

[153] National Prisoner Statistics No. 45, Capital Punishment 1930–1968, p. 28 (Aug. 1969).

[154] Men kill between four and five times more frequently than women. See Wolfgang, A Sociological Analysis of Criminal Homicide, in Bedau, *supra,* n. 45, at 74, 75. Hence, it would not be irregular to see four or five times as many men executed as women. The statistics show a startlingly greater disparity, however. United Nations, *supra,* n. 77, ¶ 67, at 97–98.

privileged members of society.[155] It is the poor, and the members of minority groups who are least able to voice their complaints against capital punishment. Their impotence leaves them victims of a sanction that the wealthier, better-represented, just-as-guilty person can escape. So long as the capital sanction is used only against the forlorn, easily forgotten members of society, legislators are content to maintain the status quo, because change would draw attention to the problem and concern might develop. Ignorance is perpetuated and apathy soon becomes its mate, and we have today's situation.

Just as Americans know little about who is executed and why, they are unaware of the potential dangers of executing an innocent man. Our "beyond a reasonable doubt" burden of proof in criminal cases is intended to protect the innocent, but we know it is not foolproof. Various studies have shown that people whose innocence is later convincingly established are convicted and sentenced to death.[156]

---

[155] Criminal Justice: The General Aspects, in Bedau, *supra*, at 405, 411; Bedau, Capital Punishment in Oregon, 1903–64, 45 Ore. L. Rev. 1 (1965); Bedau, Death Sentences in New Jersey, 1907–1960, 19 Rutgers L. Rev. 1 (1964); R. Clark, Crime in America 335 (1970); C. Duffy & A. Hirshberg, 88 Men and 2 Women 256–257 (1962); Carter & Smith, The Death Penalty in California: A Statistical and Composite Portrait, 15 Crime & Delin. 62 (1969); Hearings, *supra*, n. 80, at 124–125 (statement of Dr. West); Koeninger, Capital Punishment in Texas, 1924–1968, 15 Crime & Delin. 132 (1969); McGee, *supra*, n. 116, at 11–12.

[156] See, *e. g.*, E. Borchard, Convicting the Innocent (1932); J. Frank & B. Frank, Not Guilty (1957); E. Gardner, Court of Last Resort (1952). These three books examine cases in which innocent persons were sentenced to die. None of the innocents was actually executed, however. Bedau has abstracted 74 cases occurring in the United States since 1893 in which a wrongful con-

Proving one's innocence after a jury finding of guilt is almost impossible. While reviewing courts are willing to entertain all kinds of collateral attacks where a sentence of death is involved, they very rarely dispute the jury's interpretation of the evidence. This is, perhaps, as it should be. But, if an innocent man has been found guilty, he must then depend on the good faith of the prosecutor's office to help him establish his innocence. There is evidence, however, that prosecutors do not welcome the idea of having convictions, which they labored hard to secure, overturned, and that their cooperation is highly unlikely.[157]

No matter how careful courts are, the possibility of perjured testimony, mistaken honest testimony, and human error remain all too real.[158] We have no way of

---

viction for murder was alleged and usually proved "beyond doubt." In almost every case, the convictions were sustained on appeal. Bedau seriously contends that innocent persons were actually executed. Murder, Errors of Justice, and Capital Punishment, in Bedau, *supra*, n. 45, at 434, 438. See also Black, The Crisis in Capital Punishment, 31 Md. L. Rev. 289 (1971); Hirschberg, Wrongful Convictions, 13 Rocky Mt. L. Rev. 20 (1940); Pollak, The Errors of Justice, 284 Annals Am. Acad. Pol. & Soc. Sci. 115 (1952).

[157] E. Gardner, Court of Last Resort 178 (1952).

[158] MR. JUSTICE DOUGLAS recognized this fact when he wrote:

"One who reviews the records of criminal trials need not look long to find an instance where the issue of guilt or innocence hangs in delicate balance. A judge who denies a stay of execution in a capital case often wonders if an innocent man is going to his death. . . .

"Those doubts exist because our system of criminal justice does not work with the efficiency of a machine—errors are made and innocent as well as guilty people are sometimes punished. . . .

". . . We believe that it is better for ten guilty people to be set free than for one innocent man to be unjustly imprisoned.

"Yet the sad truth is that a cog in the machine often slips: memories fail; mistaken identifications are made; those who wield the power of life and death itself—the police officer, the witness, the prosecutor, the juror, and even the judge—become overzealous in

judging how many innocent persons have been executed but we can be certain that there were some. Whether there were many is an open question made difficult by the loss of those who were most knowledgeable about the crime for which they were convicted. Surely there will be more as long as capital punishment remains part of our penal law.

While it is difficult to ascertain with certainty the degree to which the death penalty is discriminatorily imposed or the number of innocent persons sentenced to die, there is one conclusion about the penalty that is universally accepted—*i. e.,* it "tends to distort the course of the criminal law." [159] As Mr. Justice Frankfurter said:

> "I am strongly against capital punishment . . . . When life is at hazard in a trial, it sensationalizes the whole thing almost unwittingly; the effect on juries, the Bar, the public, the Judiciary, I regard as very bad. I think scientifically the claim of deterrence is not worth much. Whatever proof there may be in my judgment does not outweigh the social loss due to the inherent sensationalism of a trial for life." [160]

their concern that criminals be brought to justice. And at times there is a venal combination between the police and a witness." Foreword, J. Frank & B. Frank, Not Guilty 11–12 (1957).

There has been an "incredible lag" between the development of modern scientific methods of investigation and their application to criminal cases. When modern methodology is available, prosecutors have the resources to utilize it, whereas defense counsel often may not. Lassers, Proof of Guilt in Capital Cases—An Unscience, 58 J. Crim. L. C. & P. S. 310 (1967). This increases the chances of error.

[159] Ehrmann, The Death Penalty and the Administration of Justice, 284 Annals Am. Acad. Pol. & Soc. Sci. 73, 83 (1952).

[160] F. Frankfurter, Of Law and Men 81 (1956).

The deleterious effects of the death penalty are also felt otherwise than at trial. For example, its very existence "inevitably sabotages a social or institutional program of reformation." [161] In short "[t]he presence of the death penalty as the keystone of our penal system bedevils the administration of criminal justice all the way down the line and is the stumbling block in the path of general reform and of the treatment of crime and criminals." [162]

Assuming knowledge of all the facts presently available regarding capital punishment, the average citizen would, in my opinion, find it shocking to his conscience and sense of justice.[163] For this reason alone capital punishment cannot stand.

---

[161] B. Eshelman & F. Riley, Death Row Chaplain 222 (1962).

[162] McCafferty, Major Trends in the Use of Capital Punishment, 25 Fed. Prob., No. 3, pp. 15, 21 (Sept. 1961) (quoting Dr. S. Glueck of Harvard University).

[163] MR. JUSTICE POWELL suggests that this conclusion is speculative, and he is certainly correct. But the mere recognition of this truth does not undercut the validity of the conclusion. MR. JUSTICE POWELL himself concedes that judges somehow know that certain punishments are no longer acceptable in our society; for example, he refers to branding and pillorying. Whence comes this knowledge? The answer is that it comes from our intuition as human beings that our fellow human beings no longer will tolerate such punishments.

I agree wholeheartedly with the implication in my Brother POWELL's opinion that judges are not free to strike down penalties that they find personally offensive. But, I disagree with his suggestion that it is improper for judges to ask themselves whether a specific punishment is morally acceptable to the American public. Contrary to some current thought, judges have not lived lives isolated from a broad range of human experience. They have come into contact with many people, many ways of life, and many philosophies. They have learned to share with their fellow human beings common views of morality. If, after drawing on this experience and considering the vast range of people and views that they have encountered, judges conclude that these people would not

## VII

To arrive at the conclusion that the death penalty violates the Eighth Amendment, we have had to engage in a long and tedious journey. The amount of information that we have assembled and sorted is enormous.

knowingly tolerate a specific penalty in light of its costs, then this conclusion is entitled to weight. See Frankel, Book Review, 85 Harv. L. Rev. 354 (1971). Judges can find assistance in determining whether they are being objective, rather than subjective, by referring to the attitudes of the persons whom most citizens consider our "ethical leaders." See *Repouille* v. *United States*, 165 F. 2d, at 154 (Frank, J., dissenting).

I must also admit that I am confused as to the point that my Brother POWELL seeks to make regarding the underprivileged members of our society. If he is stating that this Court cannot solve all of their problems in the context of this case, or even many of them, I would agree with him. But if he is opining that it is only the poor, the ignorant, the racial minorities, and the hapless in our society who are executed; that they are executed for no real reason other than to satisfy some vague notion of society's cry for vengeance; and that knowing these things, the people of this country would not care, then I most urgently disagree.

There is too much crime, too much killing, too much hatred in this country. If the legislatures could eradicate these elements from our lives by utilizing capital punishment, then there would be a valid purpose for the sanction and the public would surely accept it. It would be constitutional. As THE CHIEF JUSTICE and MR. JUSTICE POWELL point out, however, capital punishment has been with us a long time. What purpose has it served? The evidence is that it has served none. I cannot agree that the American people have been so hardened, so embittered that they want to take the life of one who performs even the basest criminal act knowing that the execution is nothing more than bloodlust. This has not been my experience with my fellow citizens. Rather, I have found that they earnestly desire their system of punishments to make sense in order that it can be a morally justifiable system. See generally Arnold, The Criminal Trial As a Symbol of Public Morality, in Criminal Justice In Our Time 137 (A. Howard ed. 1967).

Yet, I firmly believe that we have not deviated in the slightest from the principles with which we began.

At a time in our history when the streets of the Nation's cities inspire fear and despair, rather than pride and hope, it is difficult to maintain objectivity and concern for our fellow citizens. But, the measure of a country's greatness is its ability to retain compassion in time of crisis. No nation in the recorded history of man has a greater tradition of revering justice and fair treatment for all its citizens in times of turmoil, confusion, and tension than ours. This is a country which stands tallest in troubled times, a country that clings to fundamental principles, cherishes its constitutional heritage, and rejects simple solutions that compromise the values that lie at the roots of our democratic system.

In striking down capital punishment, this Court does not malign our system of government. On the contrary, it pays homage to it. Only in a free society could right triumph in difficult times, and could civilization record its magnificent advancement. In recognizing the humanity of our fellow beings, we pay ourselves the highest tribute. We achieve "a major milestone in the long road up from barbarism" [164] and join the approximately 70 other jurisdictions in the world which celebrate their regard for civilization and humanity by shunning capital punishment. [165]

I concur in the judgments of the Court.

[Appendices I, II, and III follow.]

---

[164] R. Clark, Crime in America 336 (1970).

[165] Some jurisdictions have *de facto* abolition; others have *de jure*. *Id.*, at 330; Hearings, *supra*, n. 80, at 9–10 (statement of M. DiSalle). See generally Patrick, The Status of Capital Punishment: A World Perspective, 56 J. Crim. L. C. & P. S. 397 (1965); United Nations, *supra*, n. 77, ¶¶ 10–17, 63–65, at 83–85, 96–97; Brief for Petitioner in No. 68–5027, App. E (*Aikens* v. *California,* 406 U. S. 813 (1972)).

## APPENDIX I TO OPINION OF MARSHALL, J., CONCURRING

ABOLITION OF THE DEATH PENALTY IN THE UNITED STATES: 1846–1968

(States are listed according to year most recent action was taken)

| State | Year of partial abolition | Year of complete abolition | Year of restoration | Year of reabolition |
|---|---|---|---|---|
| New York......... | 1965 [1] | — | — | — |
| Vermont .......... | 1965 [2] | — | — | — |
| West Virginia...... | — | 1965 | — | — |
| Iowa ............. | — | 1872 | 1878 | 1965 |
| Oregon .......... | — | 1914 | 1920 | 1964 |
| Michigan ......... | 1847 [3] | 1963 | — | — |
| Delaware ......... | — | 1958 | 1961 | — |
| Alaska .......... | — | 1957 | — | — |
| Hawaii .......... | — | 1957 | — | — |
| South Dakota...... | — | 1915 | 1939 | — |
| Kansas .......... | — | 1907 | 1935 | — |
| Missouri ......... | — | 1917 | 1919 | — |
| Tennessee ........ | 1915 [4] | — | 1919 | — |
| Washington ....... | — | 1913 | 1919 | — |
| Arizona .......... | 1916 [5] | — | 1918 | — |
| North Dakota..... | 1915 [6] | — | — | — |
| Minnesota ........ | — | 1911 | — | — |
| Colorado ......... | — | 1897 | 1901 | — |
| Maine ........... | — | 1876 | 1883 | 1887 |
| Wisconsin ........ | — | 1853 | — | — |
| Rhode Island...... | 1852 [7] | — | — | — |

[1] Death penalty retained for persons found guilty of killing a peace officer who is acting in line of duty, and for prisoners under a life sentence who murder a guard or inmate while in confinement or while escaping from confinement.

[2] Death penalty retained for persons convicted of first-degree murder who commit a second "unrelated" murder, and for the first-degree murder of any law enforcement officer or prison employee who is in the performance of the duties of his office.

[3] Death penalty retained for treason. Partial abolition was voted in 1846, but was not put into effect until 1847.

[4] Death penalty retained for rape.

[5] Death penalty retained for treason.

[6] Death penalty retained for treason, and for first-degree murder committed by a prisoner who is serving a life sentence for first-degree murder.

[7] Death penalty retained for persons convicted of committing murder while serving a life sentence for any offense.

Based on National Prisoner Statistics No. 45, Capital Punishment 1930–1968, p. 30 (Aug. 1969).

# APPENDIX II TO OPINION OF MARSHALL, J., CONCURRING

### CRUDE HOMICIDE DEATH RATES, PER 100,000 POPULATION, AND NUMBER OF EXECUTIONS IN CERTAIN AMERICAN STATES: 1920–1955

| Year | Maine* Rates | N. H. Rates | N. H. Exec. | Vt. Rates | Vt. Exec. | Mass. Rates | Mass. Exec. | R. I.* Rates | Conn. Rates | Conn. Exec. |
|------|------|------|------|------|------|------|------|------|------|------|
| 1920 | 1.4 | 1.8 | | 2.3 | | 2.1 | 1 | 1.8 | 3.9 | 1 |
| 1921 | 2.2 | 2.2 | | 1.7 | | 2.8 | | 3.1 | 2.9 | 2 |
| 1922 | 1.7 | 1.6 | | 1.1 | | 2.6 | | 2.2 | 2.9 | 1 |
| 1923 | 1.7 | 2.7 | | 1.4 | | 2.8 | 1 | 3.5 | 3.1 | |
| 1924 | 1.5 | 1.5 | | .6 | | 2.7 | 1 | 2.0 | 3.5 | |
| 1925 | 2.2 | 1.3 | | .6 | | 2.7 | | 1.8 | 3.7 | |
| 1926 | 1.1 | .9 | | 2.2 | | 2.0 | 1 | 3.2 | 2.9 | 1 |
| 1927 | 1.9 | .7 | | .8 | | 2.1 | 6 | 2.7 | 2.3 | 2 |
| 1928 | 1.6 | 1.3 | | 1.4 | | 1.9 | 3 | 2.7 | 2.7 | |
| 1929 | 1.0 | 1.5 | | 1.4 | | 1.7 | 6 | 2.3 | 2.6 | 1 |
| 1930 | 1.8 | .9 | | 1.4 | | 1.8 | | 2.0 | 3.2 | 2 |
| 1931 | 1.4 | 2.1 | | 1.1 | 1 | 2.0 | 2 | 2.2 | 2.7 | |
| 1932 | 2.0 | .2 | | 1.1 | | 2.1 | 1 | 1.6 | 2.9 | |
| 1933 | 3.3 | 2.7 | | 1.6 | | 2.5 | | 1.9 | 1.8 | |
| 1934 | 1.1 | 1.4 | | 1.9 | | 2.2 | 4 | 1.8 | 2.4 | |
| 1935 | 1.4 | 1.0 | | .3 | | 1.8 | 4 | 1.6 | 1.9 | |
| 1936 | 2.2 | 1.0 | | 2.1 | | 1.6 | 2 | 1.2 | 2.7 | 1 |
| 1937 | 1.4 | 1.8 | | 1.8 | | 1.9 | | 2.3 | 2.0 | 1 |
| 1938 | 1.5 | 1.8 | | 1.3 | | 1.3 | 3 | 1.2 | 2.1 | 1 |
| 1939 | 1.2 | 2.3 | 1 | .8 | | 1.4 | 2 | 1.6 | 1.3 | |
| 1940 | 1.5 | 1.4 | | .8 | | 1.5 | | 1.4 | 1.8 | 2 |
| 1941 | 1.1 | .4 | | 2.2 | | 1.3 | 1 | .8 | 2.2 | |
| 1942 | 1.7 | .2 | | .9 | | 1.3 | 2 | 1.2 | 2.5 | |
| 1943 | 1.7 | .9 | | .6 | | .9 | 3 | 1.5 | 1.6 | 2 |
| 1944 | 1.5 | 1.1 | | .3 | | 1.4 | | .6 | 1.9 | 1 |
| 1945 | .9 | .7 | | 2.9 | | 1.5 | | 1.1 | 1.5 | 1 |
| 1946 | 1.4 | .8 | | 1.7 | | 1.4 | 1 | 1.5 | 1.6 | 3 |
| 1947 | 1.2 | .6 | | 1.1 | 1 | 1.6 | 2 | 1.5 | 1.9 | |
| 1948 | 1.7 | 1.0 | | .8 | | 1.4 | | 2.7 | 1.7 | 1 |
| 1949 | 1.7 | 1.5 | | .5 | | 1.1 | | .5 | 1.8 | |
| 1950 | 1.5 | 1.3 | | .5 | | 1.3 | | 1.5 | 1.4 | |
| 1951 | 2.3 | .6 | | .5 | | 1.0 | | .9 | 2.0 | |
| 1952 | 1.0 | 1.5 | | .5 | | 1.0 | | 1.5 | 1.7 | |
| 1953 | 1.4 | .9 | | .3 | | 1.0 | | .6 | 1.5 | |
| 1954 | 1.7 | .5 | | 1.6 | 2 | 1.0 | | 1.3 | 1.3 | |
| 1955 | 1.2 | 1.1 | | .5 | | 1.2 | | 1.7 | 1.3 | 3 |

*Maine has totally abolished the death penalty, and Rhode Island has severely limited its imposition. Based on ALI, *supra,* n. 98, at 25.

# APPENDIX III TO OPINION OF MARSHALL, J., CONCURRING

## CRUDE HOMICIDE DEATH RATES, PER 100,000 POPULATION, AND NUMBER OF EXECUTIONS IN CERTAIN AMERICAN STATES: 1920–1955

| Year | Mich.* | Ohio | | Ind. | | Minn.* | Iowa | | Wis.* | N.D.* | S.D. | | Neb. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rate | Ex. | Rate | Ex. | Rate | Rate | Ex. | | | Rate | Ex. | Rate | Ex. |
| 1920 | 5.5 | 6.9 | 3 | 4.7 | 2 | 3.1 | ** | | 1.7 | ** | ** | *** | 4.2 | |
| 1921 | 4.7 | 7.9 | 10 | 6.4 | | 4.4 | | | 2.2 | | | | 4.9 | |
| 1922 | 4.3 | 7.3 | 12 | 5.7 | 2 | 3.6 | | 3 | 1.8 | | | | 4.5 | |
| 1923 | 6.1 | 7.8 | 10 | 6.1 | | 2.9 | 2.1 | 2 | 2.2 | | | | 4.1 | |
| 1924 | 7.1 | 6.9 | 10 | 7.3 | | 3.2 | 2.7 | 1 | 1.8 | 2.1 | | | 4.4 | |
| 1925 | 7.4 | 8.1 | 13 | 6.6 | 1 | 3.8 | 2.7 | 2 | 2.3 | 2.0 | | | 4.0 | |
| 1926 | 10.4 | 8.6 | 7 | 5.8 | 3 | 2.2 | 2.3 | | 2.6 | 1.8 | | | 2.7 | |
| 1927 | 8.2 | 8.6 | 8 | 6.3 | 1 | 2.6 | 2.4 | | 2.6 | 1.6 | | | 3.5 | |
| 1928 | 7.0 | 8.2 | 7 | 7.0 | 1 | 2.8 | 2.3 | | 2.1 | 1.0 | | | 3.7 | |
| 1929 | 8.2 | 8.3 | 5 | 7.0 | 1 | 2.2 | 2.6 | | 2.3 | 1.2 | | | 3.0 | |
| 1930 | 6.7 | 9.3 | 8 | 6.4 | 1 | 3.8 | 3.2 | | 3.1 | 3.5 | 1.9 | | 3.5 | |
| 1931 | 6.2 | 9.0 | 10 | 6.5 | 1 | 2.9 | 2.5 | 1 | 3.6 | 2.0 | 2.3 | | 3.6 | |
| 1932 | 5.7 | 8.1 | 7 | 6.7 | 2 | 2.9 | 2.9 | | 2.8 | 1.2 | 1.6 | | 3.7 | |
| 1933 | 5.1 | 8.2 | 11 | 5.6 | 3 | 3.5 | 2.9 | | 1.9 | 1.2 | 1.7 | | 3.2 | |
| 1934 | 4.2 | 7.7 | 7 | 7.1 | 4 | 3.4 | 2.3 | | 2.4 | 1.6 | 3.0 | | 4.4 | |
| 1935 | 4.2 | 7.1 | 10 | 4.4 | 2 | 2.6 | 2.0 | 3 | 1.4 | 2.3 | 2.0 | | 3.4 | |
| 1936 | 4.0 | 6.6 | 6 | 5.2 | 2 | 2.3 | 1.8 | | 1.7 | 2.0 | 1.2 | | 2.5 | |
| 1937 | 4.6 | 5.7 | 1 | 4.7 | 5 | 1.6 | 2.2 | | 2.2 | 1.6 | .1 | | 2.0 | |
| 1938 | 3.4 | 5.1 | 12 | 4.4 | 8 | 1.6 | 1.4 | 4 | 2.0 | 2.4 | .9 | | 1.6 | |
| 1939 | 3.1 | 4.8 | 10 | 3.8 | 3 | 1.6 | 1.8 | | 1.4 | 1.2 | 2.8 | | 2.1 | |
| 1940 | 3.0 | 4.6 | 2 | 3.3 | | 1.2 | 1.3 | 1 | 1.3 | 1.4 | 2.2 | | 1.0 | |
| 1941 | 3.2 | 4.2 | 4 | 3.1 | 1 | 1.7 | 1.3 | 1 | 1.4 | 2.3 | 1.0 | | 2.1 | |
| 1942 | 3.2 | 4.6 | 2 | 3.2 | 1 | 1.7 | 1.2 | | 1.6 | 1.4 | .9 | | 1.8 | |
| 1943 | 3.3 | 4.4 | 5 | 2.8 | | 1.2 | 1.0 | | 1.1 | .6 | 1.4 | | 2.4 | |
| 1944 | 3.3 | 3.9 | 2 | 2.8 | | 1.4 | 1.7 | 1 | .9 | .9 | 1.6 | | 1.3 | |
| 1945 | 3.7 | 4.9 | 7 | 4.0 | 1 | 1.9 | 1.6 | 1 | 1.6 | 1.0 | 2.0 | | 1.2 | 1 |
| 1946 | 3.2 | 5.2 | 2 | 3.9 | 1 | 1.6 | 1.8 | 2 | .9 | 1.5 | 1.1 | | 2.1 | |
| 1947 | 3.8 | 4.9 | 5 | 3.8 | | 1.2 | 1.9 | | 1.4 | .4 | 1.0 | 1 | 2.2 | |
| 1948 | 3.4 | 4.5 | 7 | 4.2 | | 1.9 | 1.4 | | .9 | .9 | 2.0 | | 2.5 | 1 |
| 1949 | 3.5 | 4.4 | 15 | 3.2 | 3 | 1.1 | .9 | 1 | 1.3 | .7 | 2.3 | | 1.8 | |
| 1950 | 3.9 | 4.1 | 4 | 3.6 | 1 | 1.2 | 1.3 | | 1.1 | .5 | 1.1 | | 2.9 | |
| 1951 | 3.7 | 3.8 | 4 | 3.9 | 1 | 1.3 | 1.5 | | 1.1 | .5 | .9 | | 1.0 | |
| 1952 | 3.3 | 4.0 | 4 | 3.8 | | 1.3 | 1.5 | 1 | 1.6 | .8 | 2.3 | | 1.6 | 1 |
| 1953 | 4.6 | 3.6 | 4 | 4.0 | | 1.5 | 1.1 | | 1.2 | 1.1 | 1.1 | | 2.0 | |
| 1954 | 3.3 | 3.4 | 4 | 3.2 | | 1.0 | 1.0 | | 1.1 | .5 | 1.5 | | 2.3 | |
| 1955 | 3.3 | 3.1 | | 3.1 | | 1.1 | 1.2 | | 1.1 | .8 | 1.8 | | 1.3 | |

*Michigan, Minnesota, and Wisconsin have completely abolished capital punishment. North Dakota has severely restricted its use.

**Iowa, North Dakota, and South Dakota were not admitted to the national death registration area until 1923, 1924, and 1930 respectively.

***South Dakota introduced the death penalty in 1939.

Based on ALI, *supra*, n. 98, at 28. See also *id.*, at 32–34.

Mr. Chief Justice Burger, with whom Mr. Justice Blackmun, Mr. Justice Powell, and Mr. Justice Rehnquist join, dissenting.

At the outset it is important to note that only two members of the Court, Mr. Justice Brennan and Mr. Justice Marshall, have concluded that the Eighth Amendment prohibits capital punishment for all crimes and under all circumstances. Mr. Justice Douglas has also determined that the death penalty contravenes the Eighth Amendment, although I do not read his opinion as necessarily requiring final abolition of the penalty.[1] For the reasons set forth in Parts I–IV of this opinion, I conclude that the constitutional prohibition against "cruel and unusual punishments" cannot be construed to bar the imposition of the punishment of death.

Mr. Justice Stewart and Mr. Justice White have concluded that petitioners' death sentences must be set aside because prevailing sentencing practices do not comply with the Eighth Amendment. For the reasons set forth in Part V of this opinion, I believe this approach fundamentally misconceives the nature of the Eighth Amendment guarantee and flies directly in the face of controlling authority of extremely recent vintage.

## I

If we were possessed of legislative power, I would either join with Mr. Justice Brennan and Mr. Justice Marshall or, at the very least, restrict the use of capital punishment to a small category of the most heinous crimes. Our constitutional inquiry, however, must be divorced from personal feelings as to the morality and efficacy of the death penalty, and be confined to the meaning and applicability of the uncertain language of the Eighth Amendment. There is no novelty in being called upon to interpret a constitutional provision that is less than

---

[1] See n. 25, *infra*.

self-defining, but, of all our fundamental guarantees, the
ban on "cruel and unusual punishments" is one of the
most difficult to translate into judicially manageable
terms. The widely divergent views of the Amendment
expressed in today's opinions reveal the haze that sur-
rounds this constitutional command. Yet it is essential
to our role as a court that we not seize upon the enig-
matic character of the guarantee as an invitation to
enact our personal predilections into law.

Although the Eighth Amendment literally reads as pro-
hibiting only those punishments that are both "cruel" and
"unusual," history compels the conclusion that the Con-
stitution prohibits all punishments of extreme and bar-
barous cruelty, regardless of how frequently or infre-
quently imposed.

The most persuasive analysis of Parliament's adop-
tion of the English Bill of Rights of 1689—the unques-
tioned source of the Eighth Amendment wording—
suggests that the prohibition against "cruel and un-
usual punishments" was included therein out of aversion
to severe punishments not legally authorized and not
within the jurisdiction of the courts to impose. To the
extent that the term "unusual" had any importance in
the English version, it was apparently intended as a
reference to illegal punishments.[2]

---

[2] See Granucci, "Nor Cruel and Unusual Punishments Inflicted:"
The Original Meaning, 57 Calif. L. Rev. 839, 852–860 (1969). Earlier
drafts of the Bill of Rights used the phrase "cruel and illegal." It is
thought that the change to the "cruel and unusual" wording was
inadvertent and not intended to work any change in meaning. *Ibid.*
The historical background of the English Bill of Rights is set forth
in the opinion of MR. JUSTICE MARSHALL, *ante*, at 316–318.

It is intimated in the opinion of MR. JUSTICE DOUGLAS, *ante*, at
242–245, that the term "unusual" was included in the English Bill of
Rights as a protest against the discriminatory application of punish-
ments to minorities. However, the history of capital punishment in

From every indication, the Framers of the Eighth Amendment intended to give the phrase a meaning far different from that of its English precursor. The records of the debates in several of the state conventions called to ratify the 1789 draft Constitution submitted prior to the addition of the Bill of Rights show that the Framers' exclusive concern was the absence of any ban on tortures.[3] The later inclusion of the "cruel and unusual punishments" clause was in response to these objections. There was no discussion of the interrelationship of the terms "cruel" and "unusual," and there is nothing in the debates supporting the inference that the Founding Fathers would have been receptive to torturous or excessively cruel punishments even if usual in character or authorized by law.

The cases decided under the Eighth Amendment are consistent with the tone of the ratifying debates. In *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), this Court held that execution by shooting was not a prohibited mode of carrying out a sentence of death. Speaking to the mean-

England dramatically reveals that no premium was placed on equal justice for all, either before or after the Bill of Rights of 1689. From the time of Richard I until 1826 the death penalty was authorized in England for treason and all felonies except larceny and mayhem with the further exception that persons entitled to benefit of clergy were subject to no penalty or at most a very lenient penalty upon the commission of a felony. Benefit of clergy grew out of the exemption of the clergy from the jurisdiction of the lay courts. The exemption expanded to include assistants to clergymen, and by 1689, any male who could read. Although by 1689 numerous felonies had been deemed "nonclergyable," the disparity in punishments imposed on the educated and uneducated remained for most felonies until the early 18th century. See 1 J. Stephen, History of the Criminal Law of England 458 *et seq.* (1883).

[3] See 2 J. Elliot's Debates 111 (2d ed. 1876); 3 *id.,* at 447–448, 451–452.

ing of the Cruel and Unusual Punishments Clause, the Court stated,

"[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." *Id.*, at 136.

The Court made no reference to the role of the term "unusual" in the constitutional guarantee.

In the case of *In re Kemmler*, 136 U. S. 436 (1890), the Court held the Eighth Amendment inapplicable to the States and added the following dictum:

"So that, if the punishment prescribed for an offence against the laws of the State were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like, it would be the duty of the courts to adjudge such penalties to be within the . . . [prohibition of the New York constitution]. And we think this equally true of the Eighth Amendment, in its application to Congress.

". . . Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life." *Id.*, at 446–447.

This language again reveals an exclusive concern with extreme cruelty. The Court made passing reference to the finding of the New York courts that electrocution was an "unusual" punishment, but it saw no need to discuss the significance of that term as used in the Eighth Amendment.

Opinions in subsequent cases also speak of extreme cruelty as though that were the sum and substance of the constitutional prohibition. See *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892) (Field, J., dissenting); *Weems*

v. *United States,* 217 U. S. 349, 372–373 (1910); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947). As summarized by Mr. Chief Justice Warren in the plurality opinion in *Trop* v. *Dulles,* 356 U. S. 86, 100 n. 32 (1958):

> "Whether the word 'unusual' has any qualitative meaning different from 'cruel' is not clear. On the few occasions this Court has had to consider the meaning of the phrase, precise distinctions between cruelty and unusualness do not seem to have been drawn. See *Weems* v. *United States, supra; O'Neil* v. *Vermont, supra; Wilkerson* v. *Utah, supra.* These cases indicate that the Court simply examines the particular punishment involved in light of the basic prohibition against inhuman treatment, without regard to any subtleties of meaning that might be latent in the word 'unusual.'"

I do not suggest that the presence of the word "unusual" in the Eighth Amendment is merely vestigial, having no relevance to the constitutionality of any punishment that might be devised. But where, as here, we consider a punishment well known to history, and clearly authorized by legislative enactment, it disregards the history of the Eighth Amendment and all the judicial comment that has followed to rely on the term "unusual" as affecting the outcome of these cases. Instead, I view these cases as turning on the single question whether capital punishment is "cruel" in the constitutional sense. The term "unusual" cannot be read as limiting the ban on "cruel" punishments or as somehow expanding the meaning of the term "cruel." For this reason I am unpersuaded by the facile argument that since capital punishment has always been cruel in the everyday sense of the word, and has become unusual due to decreased use, it is, therefore, now "cruel and unusual."

## II

Counsel for petitioners properly concede that capital punishment was not impermissibly cruel at the time of the adoption of the Eighth Amendment. Not only do the records of the debates indicate that the Founding Fathers were limited in their concern to the prevention of torture, but it is also clear from the language of the Constitution itself that there was no thought whatever of the elimination of capital punishment. The opening sentence of the Fifth Amendment is a guarantee that the death penalty not be imposed "unless on a presentment or indictment of a Grand Jury." The Double Jeopardy Clause of the Fifth Amendment is a prohibition against being "twice put in jeopardy of life" for the same offense. Similarly, the Due Process Clause commands "due process of law" before an accused can be "deprived of life, liberty, or property." Thus, the explicit language of the Constitution affirmatively acknowledges the legal power to impose capital punishment; it does not expressly or by implication acknowledge the legal power to impose any of the various punishments that have been banned as cruel since 1791. Since the Eighth Amendment was adopted on the same day in 1791 as the Fifth Amendment, it hardly needs more to establish that the death penalty was not "cruel" in the constitutional sense at that time.

In the 181 years since the enactment of the Eighth Amendment, not a single decision of this Court has cast the slightest shadow of a doubt on the constitutionality of capital punishment. In rejecting Eighth Amendment attacks on particular modes of execution, the Court has more than once implicitly denied that capital punishment is impermissibly "cruel" in the constitutional sense. *Wilkerson* v. *Utah,* 99 U. S. 130 (1879); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 464. *In*

*re Kemmler,* 136 U. S. 436 (1890) (dictum). It is only 14 years since Mr. Chief Justice Warren, speaking for four members of the Court, stated without equivocation:

> "Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." *Trop* v. *Dulles,* 356 U. S., at 99.

It is only one year since Mr. Justice Black made his feelings clear on the constitutional issue:

> "The Eighth Amendment forbids 'cruel and unusual punishments.' In my view, these words cannot be read to outlaw capital punishment because that penalty was in common use and authorized by law here and in the countries from which our ancestors came at the time the Amendment was adopted. It is inconceivable to me that the framers intended to end capital punishment by the Amendment." *Mc-Gautha* v. *California,* 402 U. S. 183, 226 (1971) (separate opinion).

By limiting its grants of certiorari, the Court has refused even to hear argument on the Eighth Amendment claim on two occasions in the last four years. *Witherspoon* v. *Illinois,* cert. granted, 389 U. S. 1035, rev'd, 391 U. S. 510 (1968); *McGautha* v. *California,* cert. granted, 398 U. S. 936 (1970), aff'd, 402 U. S. 183 (1971). In these cases the Court confined its attention to the procedural aspects of capital trials, it being implicit that the punishment itself could be constitutionally imposed. Nonetheless, the Court has now been asked to hold that a punishment clearly permissible under the Constitution at the time of its adoption and accepted as such by every

member of the Court until today, is suddenly so cruel as to be incompatible with the Eighth Amendment.

Before recognizing such an instant evolution in the law, it seems fair to ask what factors have changed that capital punishment should now be "cruel" in the constitutional sense as it has not been in the past. It is apparent that there has been no change of constitutional significance in the nature of the punishment itself. Twentieth century modes of execution surely involve no greater physical suffering than the means employed at the time of the Eighth Amendment's adoption. And although a man awaiting execution must inevitably experience extraordinary mental anguish,[4] no one suggests that this anguish is materially different from that experienced by condemned men in 1791, even though protracted appellate review processes have greatly increased the waiting time on "death row." To be sure, the ordeal of the condemned man may be thought cruel in the sense that all suffering is thought cruel. But if the Constitution proscribed every punishment producing severe emotional stress, then capital punishment would clearly have been impermissible in 1791.

However, the inquiry cannot end here. For reasons unrelated to any change in intrinsic cruelty, the Eighth Amendment prohibition cannot fairly be limited to those punishments thought excessively cruel and barbarous at the time of the adoption of the Eighth Amendment. A punishment is inordinately cruel, in the sense we must deal with it in these cases, chiefly as perceived by the society so characterizing it. The standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change. This notion is not

---

[4] But see Bluestone & McGahee, Reaction to Extreme Stress: Impending Death by Execution, 119 Am. J. Psychiatry 393 (1962).

new to Eighth Amendment adjudication. In *Weems* v. *United States,* 217 U. S. 349 (1910), the Court referred with apparent approval to the opinion of the commentators that "[t]he clause of the Constitution . . . may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." 217 U. S., at 378. Mr. Chief Justice Warren, writing the plurality opinion in *Trop* v. *Dulles, supra,* stated, "The Amendment must ⁇draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U. S., at 101. Nevertheless, the Court up to now has never actually held that a punishment has become impermissibly cruel due to a shift in the weight of accepted social values; nor has the Court suggested judicially manageable criteria for measuring such a shift in moral consensus.

The Court's quiescence in this area can be attributed to the fact that in a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people. For this reason, early commentators suggested that the "cruel and unusual punishments" clause was an unnecessary constitutional provision.[5] As acknowledged in the principal brief for petitioners, "both in constitutional contemplation and in fact, it is the legislature, not the Court, which responds to public opinion and immediately reflects the society's standards of decency." [6]

---

[5] See 2 J. Story, On the Constitution § 1903 (5th ed. 1891); 1 T. Cooley, Constitutional Limitations 694 (8th ed. 1927). See also Joseph Story on Capital Punishment (ed. by J. Hogan), 43 Calif. L. Rev. 76 (1955).

[6] Brief for Petitioner in *Aikens* v. *California,* No. 68–5027, p. 19 (cert. dismissed, 406 U. S. 813 (1972)). See *post,* at 443 n. 38. This, plainly, was the foundation of Mr. Justice Black's strong views on this subject expressed most recently in *McGautha* v. *California,* 402 U. S. 183, 226 (1971) (separate opinion).

Accordingly, punishments such as branding and the cutting off of ears, which were commonplace at the time of the adoption of the Constitution, passed from the penal scene without judicial intervention because they became basically offensive to the people and the legislatures responded to this sentiment.

Beyond any doubt, if we were today called upon to review such punishments, we would find them excessively cruel because we could say with complete assurance that contemporary society universally rejects such bizarre penalties. However, this speculation on the Court's probable reaction to such punishments is not of itself significant. The critical fact is that this Court has never had to hold that a mode of punishment authorized by a domestic legislature was so cruel as to be fundamentally at odds with our basic notions of decency. Cf. *Weems* v. *United States, supra.* Judicial findings of impermissible cruelty have been limited, for the most part, to offensive punishments devised without specific authority by prison officials, not by legislatures. See, *e. g., Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968); *Wright* v. *McMann,* 387 F. 2d 519 (CA2 1967). The paucity of judicial decisions invalidating legislatively prescribed punishments is powerful evidence that in this country legislatures have in fact been responsive—albeit belatedly at times—to changes in social attitudes and moral values.

I do not suggest that the validity of legislatively authorized punishments presents no justiciable issue under the Eighth Amendment, but, rather, that the primacy of the legislative role narrowly confines the scope of judicial inquiry. Whether or not provable, and whether or not true at all times, in a democracy the legislative judgment is presumed to embody the basic standards of decency prevailing in the society. This presumption can only be negated by unambiguous and compelling evidence of legislative default.

## III

There are no obvious indications that capital punishment offends the conscience of society to such a degree that our traditional deference to the legislative judgment must be abandoned. It is not a punishment such as burning at the stake that everyone would ineffably find to be repugnant to all civilized standards. Nor is it a punishment so roundly condemned that only a few aberrant legislatures have retained it on the statute books. Capital punishment is authorized by statute in 40 States, the District of Columbia, and in the federal courts for the commission of certain crimes.[7] On four occasions in the last 11 years Congress has added to the list of federal crimes punishable by death.[8] In looking for reliable indicia of contemporary attitude, none more trustworthy has been advanced.

One conceivable source of evidence that legislatures have abdicated their essentially barometric role with respect to community values would be public opinion polls, of which there have been many in the past decade addressed to the question of capital punishment. Without assessing the reliability of such polls, or intimating that any judicial reliance could ever be placed on them,

---

[7] See Department of Justice, National Prisoner Statistics No. 46, Capital Punishment 1930–1970, p. 50 (Aug. 1971). Since the publication of the Department of Justice report, capital punishment has been judicially abolished in California, *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972). The States where capital punishment is no longer authorized are Alaska, California, Hawaii, Iowa, Maine, Michigan, Minnesota, Oregon, West Virginia, and Wisconsin.

[8] See Act of Jan. 2, 1971, Pub. L. 91–644, Tit. IV, § 15, 84 Stat. 1891, 18 U. S. C. § 351; Act of Oct. 15, 1970, Pub. L. 91–452, Tit. XI, § 1102 (a), 84 Stat. 956, 18 U. S. C. § 844 (f) (i); Act of Aug. 28, 1965, 79 Stat. 580, 18 U. S. C. § 1751; Act of Sept. 5, 1961, § 1, 75 Stat. 466, 49 U. S. C. § 1472 (i). See also opinion of MR. JUSTICE BLACKMUN, *post,* at 412–413.

it need only be noted that the reported results have shown nothing approximating the universal condemnation of capital punishment that might lead us to suspect that the legislatures in general have lost touch with current social values.[9]

Counsel for petitioners rely on a different body of empirical evidence. They argue, in effect, that the number of cases in which the death penalty is imposed, as compared with the number of cases in which it is statutorily available, reflects a general revulsion toward the penalty that would lead to its repeal if only it were more generally and widely enforced. It cannot be gainsaid that by the choice of juries—and sometimes judges [10]— the death penalty is imposed in far fewer than half the cases in which it is available.[11] To go further and char-

---

[9] A 1966 poll indicated that 42% of those polled favored capital punishment while 47% opposed it, and 11% had no opinion. A 1969 poll found 51% in favor, 40% opposed, and 9% with no opinion. See Erskine, The Polls: Capital Punishment, 34 Public Opinion Quarterly 290 (1970).

[10] The jury plays the predominant role in sentencing in capital cases in this country. Available evidence indicates that where the judge determines the sentence, the death penalty is imposed with a slightly greater frequency than where the jury makes the determination. H. Kalven & H. Zeisel, The American Jury 436 (1966).

[11] In the decade from 1961–1970, an average of 106 persons per year received the death sentence in the United States, ranging from a low of 85 in 1967 to a high of 140 in 1961; 127 persons received the death sentence in 1970. Department of Justice, National Prisoner Statistics No. 46, Capital Punishment 1930–1970, p. 9. See also Bedau, The Death Penalty in America, 35 Fed. Prob., No. 2, p. 32 (1971). Although accurate figures are difficult to obtain, it is thought that from 15% to 20% of those convicted of murder are sentenced to death in States where it is authorized. See, e. g., McGee, Capital Punishment as Seen by a Correctional Administrator, 28 Fed. Prob., No. 2, pp. 11, 12 (1964); Bedau, Death Sentences in New Jersey 1907–1960, 19 Rutgers L. Rev. 1, 30 (1964); Florida Division of Corrections, Seventh Biennial Report (July 1, 1968, to June 30, 1970) 82 (1970); H. Kalven & H. Zeisel, The

acterize the rate of imposition as "freakishly rare," as petitioners insist, is unwarranted hyperbole. And regardless of its characterization, the rate of imposition does not impel the conclusion that capital punishment is now regarded as intolerably cruel or uncivilized.

It is argued that in those capital cases where juries have recommended mercy, they have given expression to civilized values and effectively renounced the legislative authorization for capital punishment. At the same time it is argued that where juries have made the awesome decision to send men to their deaths, they have acted arbitrarily and without sensitivity to prevailing standards of decency. This explanation for the infrequency of imposition of capital punishment is unsupported by known facts, and is inconsistent in principle with everything this Court has ever said about the functioning of juries in capital cases.

In *McGautha* v. *California, supra,* decided only one year ago, the Court held that there was no mandate in the Due Process Clause of the Fourteenth Amendment that juries be given instructions as to when the death penalty should be imposed. After reviewing the autonomy that juries have traditionally exercised in capital cases and noting the practical difficulties of framing manageable instructions, this Court concluded that judicially articulated standards were not needed to insure a responsible decision as to penalty. Nothing in *McGautha* licenses capital juries to act arbitrarily or assumes that they have so acted in the past. On the contrary, the assumption underlying the *McGautha* ruling is that juries "will act with

American Jury 435–436 (1966). The rate of imposition for rape and the few other crimes made punishable by death in certain States is considerably lower. See, *e. g.,* Florida Division of Corrections, Seventh Biennial Report, *supra,* at 83; Partington, The Incidence of the Death Penalty for Rape in Virginia, 22 Wash. & Lee L. Rev. 43–44, 71–73 (1965).

due regard for the consequences of their decision." 402 U. S., at 208.

The responsibility of juries deciding capital cases in our system of justice was nowhere better described than in *Witherspoon* v. *Illinois, supra:*

> "[A] jury that must choose between life imprisonment and capital punishment can do little more— and must do nothing less—than express *the con science of the community* on the ultimate question of life or death."

> "And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society' " 391 U. S., at 519 and n. 15 (emphasis added).

The selectivity of juries in imposing the punishment of death is properly viewed as a refinement on, rather than a repudiation of, the statutory authorization for that penalty. Legislatures prescribe the categories of crimes for which the death penalty should be available, and, acting as "the conscience of the community," juries are entrusted to determine in individual cases that the ultimate punishment is warranted. Juries are undoubtedly influenced in this judgment by myriad factors. The motive or lack of motive of the perpetrator, the degree of injury or suffering of the victim or victims, and the degree of brutality in the commission of the crime would seem to be prominent among these factors. Given the general awareness that death is no longer a routine punishment for the crimes for which it is made available, it is hardly surprising that juries have been increasingly meticulous in their imposition of the penalty. But to

assume from the mere fact of relative infrequency that only a random assortment of pariahs are sentenced to death, is to cast grave doubt on the basic integrity of our jury system.

It would, of course, be unrealistic to assume that juries have been perfectly consistent in choosing the cases where the death penalty is to be imposed, for no human institution performs with perfect consistency. There are doubtless prisoners on death row who would not be there had they been tried before a different jury or in a different State. In this sense their fate has been controlled by a fortuitous circumstance. However, this element of fortuity does not stand as an indictment either of the general functioning of juries in capital cases or of the integrity of jury decisions in individual cases. There is no empirical basis for concluding that juries have generally failed to discharge in good faith the responsibility described in *Witherspoon*—that of choosing between life and death in individual cases according to the dictates of community values.[12]

---

[12] Counsel for petitioners make the conclusory statement that "[t]hose who are selected to die are the poor and powerless, personally ugly and socially unacceptable." Brief for Petitioner in No. 68–5027, p. 51. However, the sources cited contain no empirical findings to undermine the general premise that juries impose the death penalty in the most extreme cases. One study has discerned a statistically noticeable difference between the rate of imposition on blue collar and white collar defendants; the study otherwise concludes that juries do follow rational patterns in imposing the sentence of death. Note, A Study of the California Penalty Jury in First-Degree-Murder Cases, 21 Stan. L. Rev. 1297 (1969). See also H. Kalven & H. Zeisel, The American Jury 434–449 (1966).

Statistics are also cited to show that the death penalty has been imposed in a racially discriminatory manner. Such statistics suggest, at least as a historical matter, that Negroes have been sentenced to death with greater frequency than whites in several States, particularly for the crime of interracial rape. See, *e. g.*, Koeninger, Capital Punishment in Texas, 1924–1968, 15 Crime & Delin. 132 (1969);

The rate of imposition of death sentences falls far short of providing the requisite unambiguous evidence that the legislatures of 40 States and the Congress have turned their backs on current or evolving standards of decency in continuing to make the death penalty available. For, if selective imposition evidences a rejection of capital punishment in those cases where it is not imposed, it surely evidences a correlative affirmation of the penalty in those cases where it is imposed. Absent some clear indication that the continued imposition of the death penalty on a selective basis is violative of prevailing standards of civilized conduct, the Eighth Amendment cannot be said to interdict its use.

---

Note, Capital Punishment in Virginia, 58 Va. L. Rev. 97 (1972). If a statute that authorizes the discretionary imposition of a particular penalty for a particular crime is used primarily against defendants of a certain race, and if the pattern of use can be fairly explained only by reference to the race of the defendants, the Equal Protection Clause of the Fourteenth Amendment forbids continued enforcement of that statute in its existing form. Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960).

To establish that the statutory authorization for a particular penalty is inconsistent with the dictates of the Equal Protection Clause, it is not enough to show how it was applied in the distant past. The statistics that have been referred to us cover periods when Negroes were systematically excluded from jury service and when racial segregation was the official policy in many States. Data of more recent vintage are essential. See *Maxwell* v. *Bishop,* 398 F. 2d 138, 148 (CA8 1968), vacated, 398 U. S. 262 (1970). While no statistical survey could be expected to bring forth absolute and irrefutable proof of a discriminatory pattern of imposition, a strong showing would have to be made, taking all relevant factors into account.

It must be noted that any equal protection claim is totally distinct from the Eighth Amendment question to which our grant of certiorari was limited in these cases. Evidence of a discriminatory pattern of enforcement does not imply that any use of a particular punishment is so morally repugnant as to violate the Eighth Amendment.

In two of these cases we have been asked to rule on the narrower question whether capital punishment offends the Eighth Amendment when imposed as the punishment for the crime of forcible rape.[13] It is true that the death penalty is authorized for rape in fewer States than it is for murder,[14] and that even in those States it is applied more sparingly for rape than for murder.[15] But for the reasons aptly brought out in the opinion of MR. JUSTICE POWELL, *post,* at 456–461, I do not believe these differences can be elevated to the level of an Eighth Amendment distinction. This blunt constitutional command cannot be sharpened to carve neat distinctions corresponding to the categories of crimes defined by the legislatures.

## IV

Capital punishment has also been attacked as violative of the Eighth Amendment on the ground that it is not needed to achieve legitimate penal aims and is thus "unnecessarily cruel." As a pure policy matter, this approach has much to recommend it, but it seeks to give a dimension to the Eighth Amendment that it was never intended to have and promotes a line of inquiry that this Court has never before pursued.

The Eighth Amendment, as I have noted, was included in the Bill of Rights to guard against the use of torturous and inhuman punishments, not those of limited efficacy. One of the few to speak out against the adop-

---

[13] *Jackson* v. *Georgia,* No. 69–5030; *Branch* v. *Texas,* No. 69–5031.

[14] Rape is punishable by death in 16 States and in the federal courts when committed within the special maritime and territorial jurisdiction of the United States. 18 U. S. C. § 2031. The States authorizing capital punishment for rape are Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia.

[15] See n. 11, *supra.*

tion of the Eighth Amendment asserted that it is often necessary to use cruel punishments to deter crimes.[16] But among those favoring the Amendment, no sentiment was expressed that a punishment of extreme cruelty could ever be justified by expediency. The dominant theme of the Eighth Amendment debates was that the ends of the criminal laws cannot justify the use of measures of extreme cruelty to achieve them. Cf. *Rochin* v. *California,* 342 U. S. 165, 172–173 (1952).

The apparent seed of the "unnecessary cruelty" argument is the following language, quoted earlier, found in *Wilkerson* v. *Utah, supra:*

> "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture . . . *and all others in the same line of unnecessary cruelty,* are forbidden by that amendment to the Constitution." 99 U. S., at 135–136 (emphasis added).

To lift the italicized phrase from the context of the *Wilkerson* opinion and now view it as a mandate for assessing the value of punishments in achieving the aims of penology is a gross distortion; nowhere are such aims even mentioned in the *Wilkerson* opinion. The only fair reading of this phrase is that punishments similar to torture in their extreme cruelty are prohibited by the Eighth Amendment. In *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 463, 464, the Court made reference to the Eighth Amendment's prohibition against the infliction of "unnecessary pain" in carrying out an execution. The context makes abundantly clear that the Court was disapproving the wanton infliction of phys-

---

[16] 1 Annals of Cong. 754 (1789) (remarks of Rep. Livermore).

ical pain, and once again not advising pragmatic analysis of punishments approved by legislatures.[17]

Apart from these isolated uses of the word "unnecessary," nothing in the cases suggests that it is for the courts to make a determination of the efficacy of punishments. The decision in *Weems* v. *United States, supra*, is not to the contrary. In *Weems* the Court held that for the crime of falsifying public documents, the punishment imposed under the Philippine Code of 15 years' imprisonment at hard labor under shackles, followed by perpetual surveillance, loss of voting rights, loss of the right to hold public office, and loss of right to change domicile freely, was violative of the Eighth Amendment. The case is generally regarded as holding that a punishment may be excessively cruel within the meaning of the Eighth Amendment because it is grossly out of proportion to the severity of the crime; [18] some view the decision of the Court primarily as

---

[17] Petitioner Francis had been sentenced to be electrocuted for the crime of murder. He was placed in the electric chair, and the executioner threw the switch. Due to a mechanical difficulty, death did not result. A new death warrant was issued fixing a second date for execution. The Court held that the proposed execution would not constitute cruel and unusual punishment or double jeopardy.

[18] There is no serious claim of disproportionality presented in these cases. Murder and forcible rape have always been regarded as among the most serious crimes. It cannot be said that the punishment of death is out of all proportion to the severity of these crimes.

The Court's decision in *Robinson* v. *California*, 370 U. S. 660 (1962), can be viewed as an extension of the disproportionality doctrine of the Eighth Amendment. The Court held that a statute making it a crime punishable by imprisonment to be a narcotics addict violated the Eighth Amendment. The Court in effect ruled that the status of being an addict is not a criminal act, and that any criminal punishment imposed for addiction exceeds the penal power of the States. The Court made no analysis of the necessity of imprisonment as a means of curbing addiction.

a reaction to the mode of the punishment itself.[19] Under any characterization of the holding, it is readily apparent that the decision grew out of the Court's overwhelming abhorrence of the imposition of the particular penalty for the particular crime; it was making an essentially moral judgment, not a dispassionate assessment of the need for the penalty. The Court specifically disclaimed "the right to assert a judgment against that of the legislature of the expediency of the laws . . . ." 217 U. S., at 378. Thus, apart from the fact that the Court in *Weems* concerned itself with the crime committed as well as the punishment imposed, the case marks no departure from the largely unarticulable standard of extreme cruelty. However intractable that standard may be, that is what the Eighth Amendment is all about. The constitutional provision is not addressed to social utility and does not command that enlightened principles of penology always be followed.

By pursuing the necessity approach, it becomes even more apparent that it involves matters outside the purview of the Eighth Amendment. Two of the several aims of punishment are generally associated with capital punishment—retribution and deterrence. It is argued that retribution can be discounted because that, after all, is what the Eighth Amendment seeks to eliminate. There is no authority suggesting that the Eighth Amendment was intended to purge the law of its retributive elements, and the Court has consistently assumed that retribution is a legitimate dimension of the punishment of crimes. See *Williams* v. *New York,* 337 U. S. 241, 248 (1949); *United States* v. *Lovett,* 328 U. S. 303, 324 (1946) (Frankfurter, J., concurring). Furthermore, responsible legal thinkers of widely varying

---

[19] See Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1075 (1964).

persuasions have debated the sociological and philosophical aspects of the retribution question for generations, neither side being able to convince the other.[20] It would be reading a great deal into the Eighth Amendment to hold that the punishments authorized by legislatures cannot constitutionally reflect a retributive purpose.

The less esoteric but no less controversial question is whether the death penalty acts as a superior deterrent. Those favoring abolition find no evidence that it does.[21] Those favoring retention start from the intuitive notion that capital punishment should act as the most effective deterrent and note that there is no convincing evidence that it does not.[22] Escape from this empirical stalemate is sought by placing the burden of proof on the States and concluding that they have failed to demonstrate that capital punishment is a more effective deterrent than life imprisonment. Numerous justifications have been advanced for shifting the burden, and they

---

[20] See Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401 (1958); H. Packer, The Limits of the Criminal Sanction 37–39 (1968); M. Cohen, Reason and Law 41–44 (1950); Report of Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 52, pp. 17–18 (1953); Hart, Murder and the Principles of Punishment: England and the United States, 52 Nw. U. L. Rev. 433, 446–455 (1957); H. L. A. Hart, Law, Liberty and Morality 60–69 (1963).

[21] See, e. g., Sellin, Homicides in Retentionist and Abolitionist States, in Capital Punishment 135 et seq. (T. Sellin ed. 1967); Schuessler, The Deterrent Influence of the Death Penalty, 284 Annals 54 (1952).

[22] See, e. g., Hoover, Statements in Favor of the Death Penalty, in H. Bedau, The Death Penalty in America 130 (1967 rev. ed.); Allen, Capital Punishment: Your Protection and Mine, in The Death Penalty in America, supra, at 135. See also Hart, 52 Nw. U. L. Rev. supra, at 457; Bedau, The Death Penalty in America, supra, at 265–266.

are not without their rhetorical appeal. However, these arguments are not descended from established constitutional principles, but are born of the urge to bypass an unresolved factual question.[23] Comparative deterrence is not a matter that lends itself to precise measurement; to shift the burden to the States is to provide an illusory solution to an enormously complex problem. If it were proper to put the States to the test of demonstrating the deterrent value of capital punishment, we could just as well ask them to prove the need for life imprisonment or any other punishment. Yet I know of no convincing evidence that life imprisonment is a more effective deterrent than 20 years' imprisonment, or even that a $10 parking ticket is a more effective deterrent than a $5 parking ticket. In fact, there are some who go so far as to challenge the notion that any punishments deter crime.[24] If the States are unable to adduce convincing proof rebutting such assertions, does it then follow that all punishments are suspect as being "cruel and unusual" within the meaning of the Constitution? On the contrary, I submit that the questions raised by the necessity approach are beyond the pale of judicial inquiry under the Eighth Amendment.

## V

Today the Court has not ruled that capital punishment is *per se* violative of the Eighth Amendment; nor has it ruled that the punishment is barred for any particular class or classes of crimes. The substantially similar concurring opinions of MR. JUSTICE STEWART and MR. JUSTICE WHITE, which are necessary to support the judgment setting aside petitioners' sentences, stop

---

[23] See *Powell* v. *Texas,* 392 U. S. 514, 531 (1968) (MARSHALL, J.) (plurality opinion).

[24] See, *e. g.,* K. Menninger, The Crime of Punishment 206–208 (1968).

short of reaching the ultimate question. The actual scope of the Court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear. This much, however, seems apparent: if the legislatures are to continue to authorize capital punishment for some crimes, juries and judges can no longer be permitted to make the sentencing determination in the same manner they have in the past.[25] This approach—not urged in oral arguments or briefs—misconceives the nature of the constitutional command against "cruel and unusual punishments," disregards controlling case law, and demands a rigidity in capital cases which, if possible of achievement, cannot be regarded as a welcome change. Indeed the contrary seems to be the case.

As I have earlier stated, the Eighth Amendment forbids the imposition of punishments that are so cruel and inhumane as to violate society's standards of civilized conduct. The Amendment does not prohibit all punishments the States are unable to prove necessary to deter or control crime. The Amendment is not concerned with the process by which a State determines that a particular punishment is to be imposed in a particular case. And the Amendment most assuredly does not speak to the power of legislatures to confer sentencing discretion on juries, rather than to fix all sentences by statute.

The critical factor in the concurring opinions of both MR. JUSTICE STEWART and MR. JUSTICE WHITE is the infrequency with which the penalty is imposed. This factor is taken not as evidence of society's abhorrence

[25] Much in the concurring opinion of MR. JUSTICE DOUGLAS similarly suggests that it is the sentencing system rather than the punishment itself that is constitutionally infirm. However, the opinion also indicates that in the wake of the Court's decision in *McGautha* v. *California*, 402 U. S. 183 (1971), the validity of the sentencing process is no longer open to question.

of capital punishment—the inference that petitioners would have the Court draw—but as the earmark of a deteriorated system of sentencing. It is concluded that petitioners' sentences must be set aside, not because the punishment is impermissibly cruel, but because juries and judges have failed to exercise their sentencing discretion in acceptable fashion.

To be sure, there is a recitation cast in Eighth Amendment terms: petitioners' sentences are "cruel" because they exceed that which the legislatures have deemed necessary for all cases; [26] petitioners' sentences are "unusual" because they exceed that which is imposed in most cases.[27] This application of the words of the Eighth Amendment suggests that capital punishment can be made to satisfy Eighth Amendment values if its rate of imposition is somehow multiplied; it seemingly follows that the flexible sentencing system created by the legislatures, and carried out by juries and judges, has yielded more mercy than the Eighth Amendment can stand. The implications of this approach are mildly ironical. For example, by this measure of the Eighth Amendment, the elimination of death-qualified juries in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), can only be seen in retrospect as a setback to "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S., at 101.

This novel formulation of Eighth Amendment principles—albeit necessary to satisfy the terms of our limited grant of certiorari—does not lie at the heart of these concurring opinions. The decisive grievance of the opinions—not translated into Eighth Amendment terms—is that the present system of discretionary sentencing

---

[26] See concurring opinion of MR. JUSTICE STEWART, *ante*, at 309–310; concurring opinion of MR. JUSTICE WHITE, *ante*, at 312.

[27] See concurring opinion of MR. JUSTICE STEWART, *ante*, at 309–310; cf. concurring opinion of MR. JUSTICE WHITE, *ante*, at 312.

in capital cases has failed to produce evenhanded justice; the problem is not that too few have been sentenced to die, but that the selection process has followed no rational pattern.[28] This claim of arbitrariness is not only lacking in empirical support,[29] but also it manifestly fails to establish that the death penalty is a "cruel and unusual" punishment. The Eighth Amendment was included in the Bill of Rights to assure that certain types of punishments would never be imposed, not to channelize the sentencing process. The approach of these concurring opinions has no antecedent in the Eighth Amendment cases. It is essentially and exclusively a procedural due process argument.

This ground of decision is plainly foreclosed as well as misplaced. Only one year ago, in *McGautha* v. *California,* the Court upheld the prevailing system of sentencing in capital cases. The Court concluded:

> "In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution." 402 U. S., at 207.

In reaching this decision, the Court had the benefit of extensive briefing, full oral argument, and six months of careful deliberations. The Court's labors are documented by 130 pages of opinions in the United States Reports. All of the arguments and factual contentions accepted

[28] This point is more heavily emphasized in the opinion of MR. JUSTICE STEWART than in that of MR. JUSTICE WHITE. However, since MR. JUSTICE WHITE allows for statutes providing a mandatory death penalty for "more narrowly defined categories" of crimes, it appears that he, too, is more concerned with a regularized sentencing process, than with the aggregate number of death sentences imposed for all crimes.

[29] See n. 12, *supra.*

in the concurring opinions today were considered and rejected by the Court one year ago. *McGautha* was an exceedingly difficult case, and reasonable men could fairly disagree as to the result. But the Court entered its judgment, and if *stare decisis* means anything, that decision should be regarded as a controlling pronouncement of law.

Although the Court's decision in *McGautha* was technically confined to the dictates of the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment as made applicable to the States through the Due Process Clause of the Fourteenth Amendment, it would be disingenuous to suggest that today's ruling has done anything less than overrule *McGautha* in the guise of an Eighth Amendment adjudication. It may be thought appropriate to subordinate principles of *stare decisis* where the subject is as sensitive as capital punishment and the stakes are so high, but these external considerations were no less weighty last year. This pattern of decisionmaking will do little to inspire confidence in the stability of the law.

While I would not undertake to make a definitive statement as to the parameters of the Court's ruling, it is clear that if state legislatures and the Congress wish to maintain the availability of capital punishment, significant statutory changes will have to be made. Since the two pivotal concurring opinions turn on the assumption that the punishment of death is now meted out in a random and unpredictable manner, legislative bodies may seek to bring their laws into compliance with the Court's ruling by providing standards for juries and judges to follow in determining the sentence in capital cases or by more narrowly defining the crimes for which the penalty is to be imposed.[30] If such standards can be devised or

---

[30] It was pointed out in the Court's opinion in *McGautha* that these two alternatives are substantially equivalent. 402 U. S., at 206 n. 16.

the crimes more meticulously defined, the result cannot be detrimental. However, Mr. Justice Harlan's opinion for the Court in *McGautha* convincingly demonstrates that all past efforts "to identify before the fact" the cases in which the penalty is to be imposed have been "uniformly unsuccessful." 402 U. S., at 197. One problem is that "the factors which determine whether the sentence of death is the appropriate penalty in particular cases are too complex to be compressed within the limits of a simple formula . . . ." Report of Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 498, p. 174 (1953). As the Court stated in *McGautha*, "[t]he infinite variety of cases and facets to each case would make general standards either meaningless 'boilerplate' or a statement of the obvious that no jury would need." 402 U. S., at 208. But even assuming that suitable guidelines can be established, there is no assurance that sentencing patterns will change so long as juries are possessed of the power to determine the sentence or to bring in a verdict of guilt on a charge carrying a lesser sentence; juries have not been inhibited in the exercise of these powers in the past. Thus, unless the Court in *McGautha* misjudged the experience of history, there is little reason to believe that sentencing standards in any form will substantially alter the discretionary character of the prevailing system of sentencing in capital cases. That system may fall short of perfection, but it is yet to be shown that a different system would produce more satisfactory results.

Real change could clearly be brought about if legislatures provided mandatory death sentences in such a way as to deny juries the opportunity to bring in a verdict on a lesser charge; under such a system, the death sentence could only be avoided by a verdict of acquittal. If this is the only alternative that the legislatures can safely pursue under today's ruling, I would have preferred that the Court opt for total abolition.

It seems remarkable to me that with our basic trust in lay jurors as the keystone in our system of criminal justice, it should now be suggested that we take the most sensitive and important of all decisions away from them. I could more easily be persuaded that mandatory sentences of death, without the intervening and ameliorating impact of lay jurors, are so arbitrary and doctrinaire that they violate the Constitution. The very infrequency of death penalties imposed by jurors attests their cautious and discriminating reservation of that penalty for the most extreme cases. I had thought that nothing was clearer in history, as we noted in *McGautha* one year ago, than the American abhorrence of "the common-law rule imposing a mandatory death sentence on all convicted murderers." 402 U. S., at 198. As the concurring opinion of MR. JUSTICE MARSHALL shows, *ante,* at 339, the 19th century movement away from mandatory death sentences marked an enlightened introduction of flexibility into the sentencing process. It recognized that individual culpability is not always measured by the category of the crime committed. This change in sentencing practice was greeted by the Court as a humanizing development. See *Winston* v. *United States,* 172 U. S. 303 (1899); cf. *Calton* v. *Utah,* 130 U. S. 83 (1889). See also *Andres* v. *United States,* 333 U. S. 740, 753 (1948) (Frankfurter, J., concurring). I do not see how this history can be ignored and how it can be suggested that the Eighth Amendment demands the elimination of the most sensitive feature of the sentencing system.

As a general matter, the evolution of penal concepts in this country has not been marked by great progress, nor have the results up to now been crowned with significant success. If anywhere in the whole spectrum of criminal justice fresh ideas deserve sober analysis, the sentencing and correctional area ranks high on the list. But it has been widely accepted that mandatory sentences for

crimes do not best serve the ends of the criminal justice system. Now, after the long process of drawing away from the blind imposition of uniform sentences for every person convicted of a particular offense, we are confronted with an argument perhaps implying that only the legislatures may determine that a sentence of death is appropriate, without the intervening evaluation of jurors or judges. This approach threatens to turn back the progress of penal reform, which has moved until recently at too slow a rate to absorb significant setbacks.

## VI

Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo. Rather than providing a final and unambiguous answer on the basic constitutional question, the collective impact of the majority's ruling is to demand an undetermined measure of change from the various state legislatures and the Congress. While I cannot endorse the process of decisionmaking that has yielded today's result and the restraints that that result imposes on legislative action, I am not altogether displeased that legislative bodies have been given the opportunity, and indeed unavoidable responsibility, to make a thorough re-evaluation of the entire subject of capital punishment. If today's opinions demonstrate nothing else, they starkly show that this is an area where legislatures can act far more effectively than courts.

The legislatures are free to eliminate capital punishment for specific crimes or to carve out limited exceptions to a general abolition of the penalty, without adherence to the conceptual strictures of the Eighth Amendment. The legislatures can and should make an assessment of the deterrent influence of capital punishment, both generally and as affecting the commission of specific types of

crimes. If legislatures come to doubt the efficacy of capital punishment, they can abolish it, either completely or on a selective basis. If new evidence persuades them that they have acted unwisely, they can reverse their field and reinstate the penalty to the extent it is thought warranted. An Eighth Amendment ruling by judges cannot be made with such flexibility or discriminating precision.

The world-wide trend toward limiting the use of capital punishment, a phenomenon to which we have been urged to give great weight, hardly points the way to a judicial solution in this country under a written Constitution. Rather, the change has generally come about through legislative action, often on a trial basis and with the retention of the penalty for certain limited classes of crimes.[31] Virtually nowhere has change been wrought by so crude a tool as the Eighth Amendment. The complete and unconditional abolition of capital punishment in this country by judicial fiat would have undermined the careful progress of the legislative trend and foreclosed further inquiry on many as yet unanswered questions in this area.

Quite apart from the limitations of the Eighth Amendment itself, the preference for legislative action is justified by the inability of the courts to participate in the

---

[31] See Patrick, The Status of Capital Punishment: A World Perspective, 56 J. Crim. L. C. & P. S. 397 (1965). In England, for example, 1957 legislation limited capital punishment to murder, treason, piracy with violence, dockyards arson and some military offenses. The Murder (Abolition of Death Penalty) Act 1965 eliminated the penalty for murder on a five-year trial basis. 2 Pub. Gen. Acts, c. 71, p. 1577 (Nov. 8, 1965). This abolition was made permanent in 1969. See 793 Parl. Deb., H. C. (5th ser.) 1294–1298 (1969); 306 Parl. Deb., H. L. (5th ser.) 1317–1322 (1969). Canada has also undertaken limited abolition on a five-year experimental basis. Stats. of Canada 1967–1968, 16 & 17 Eliz. 2, c. 15, p. 145.

debate at the level where the controversy is focused. The case against capital punishment is not the product of legal dialectic, but rests primarily on factual claims, the truth of which cannot be tested by conventional judicial processes. The five opinions in support of the judgments differ in many respects, but they share a willingness to make sweeping factual assertions, unsupported by empirical data, concerning the manner of imposition and effectiveness of capital punishment in this country. Legislatures will have the opportunity to make a more penetrating study of these claims with the familiar and effective tools available to them as they are not to us.

The highest judicial duty is to recognize the limits on judicial power and to permit the democratic processes to deal with matters falling outside of those limits. The "hydraulic pressure[s]" [32] that Holmes spoke of as being generated by cases of great import have propelled the Court to go beyond the limits of judicial power, while fortunately leaving some room for legislative judgment.

MR. JUSTICE BLACKMUN, dissenting.

I join the respective opinions of THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST, and add only the following, somewhat personal, comments.

1. Cases such as these provide for me an excruciating agony of the spirit. I yield to no one in the depth of my distaste, antipathy, and, indeed, abhorrence, for the death penalty, with all its aspects of physical distress and fear and of moral judgment exercised by finite minds. That distaste is buttressed by a belief that capital punishment serves no useful purpose that can be demonstrated. For me, it violates childhood's training and life's experiences, and is not compatible

---

[32] *Northern Securities Co.* v. *United States,* 193 U. S. 197, 401 (1904) (dissenting opinion).

with the philosophical convictions I have been able to develop. It is antagonistic to any sense of "reverence for life." Were I a legislator, I would vote against the death penalty for the policy reasons argued by counsel for the respective petitioners and expressed and adopted in the several opinions filed by the Justices who vote to reverse these judgments.

2. Having lived for many years in a State that does not have the death penalty,[1] that effectively abolished it in 1911,[2] and that carried out its last execution on February 13, 1906,[3] capital punishment had never been a part of life for me. In my State, it just did not exist. So far as I can determine, the State, purely from a statistical deterrence point of view, was neither the worse nor the better for its abolition, for, as the concurring opinions observe, the statistics prove little, if anything. But the State and its citizens accepted the fact that the death penalty was not to be in the arsenal of possible punishments for any crime.

3. I, perhaps alone among the present members of the Court, am on judicial record as to this. As a member of the United States Court of Appeals, I first struggled silently with the issue of capital punishment in *Feguer* v. *United States,* 302 F. 2d 214 (CA8 1962), cert. denied, 371 U. S. 872 (1962). The defendant in that case may have been one of the last to be executed under federal auspices. I struggled again with the issue, and once more refrained from comment, in my writing for an *en banc* court in *Pope* v. *United States,* 372 F. 2d 710 (CA8 1967), vacated (upon acknowledgment by the Solicitor General of error revealed by the subsequently decided *United States* v. *Jackson,* 390 U. S. 570 (1968)) and remanded, 392 U. S. 651 (1968). Finally, in *Max-*

---

[1] Minn. Stat. § 609.10 (1971).

[2] Minn. Laws 1911, c. 387.

[3] See W. Trenerry, Murder in Minnesota 163–167 (1962).

*well* v. *Bishop,* 398 F. 2d 138 (CA8 1968), vacated and remanded, *sua sponte,* by the Court on grounds not raised below, 398 U. S. 262 (1970), I revealed, solitarily and not for the panel, my distress and concern. 398 F. 2d, at 153–154.[4] And in *Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968), I had no hesitancy in writing a panel opinion that held the use of the strap by trusties upon fellow Arkansas prisoners to be a violation of the Eighth Amendment. That, however, was in-prison punishment imposed by inmate-foremen.

4. The several concurring opinions acknowledge, as they must, that until today capital punishment was accepted and assumed as not unconstitutional *per se* under the Eighth Amendment or the Fourteenth Amendment. This is either the flat or the implicit holding of a unanimous Court in *Wilkerson* v. *Utah,* 99 U. S. 130, 134–135, in 1879; of a unanimous Court in *In re Kemmler,* 136 U. S. 436, 447, in 1890; of the Court in *Weems* v. *United States,* 217 U. S. 349, in 1910; of all those members of the Court, a majority, who addressed the issue in *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 463–464, 471–472, in 1947; of Mr. Chief Justice Warren, speaking for himself and three others (Justices Black, Doug-

---

[4] "It is obvious, we think, that the efforts on behalf of Maxwell would not thus be continuing, and his case reappearing in this court were it not for the fact that it is the death penalty, rather than life imprisonment, which he received on his rape conviction. This fact makes the decisional process in a case of this kind particularly excruciating for the author of this opinion [11] who is not personally convinced of the rightness of capital punishment and who questions it as an effective deterrent. But the advisability of capital punishment is a policy matter ordinarily to be resolved by the legislature or through executive clemency and not by the judiciary. We note, for what that notice may be worth, that the death penalty for rape remains available under federal statutes. 18 U. S. C. § 2031; 10 U. S. C. § 920 (a)."

The designated footnote observed that my fellow judges did not join in my comment.

LAS, and Whittaker) in *Trop* v. *Dulles,* 356 U. S. 86, 99, in 1958; [5] in the denial of certiorari in *Rudolph* v. *Alabama,* 375 U. S. 889, in 1963 (where, however, JUSTICES DOUGLAS, BRENNAN, and Goldberg would have heard argument with respect to the imposition of the ultimate penalty on a convicted rapist who had "neither taken nor endangered human life"); and of Mr. Justice Black in *McGautha* v. *California,* 402 U. S. 183, 226, decided only last Term on May 3, 1971.[6]

Suddenly, however, the course of decision is now the opposite way, with the Court evidently persuaded that somehow the passage of time has taken us to a place of greater maturity and outlook. The argument, plausible and high-sounding as it may be, is not persuasive, for it is only one year since *McGautha,* only eight and one-half years since *Rudolph,* 14 years since *Trop,* and 25 years since *Francis,* and we have been presented with nothing that demonstrates a significant movement of any kind in these brief periods. The Court has just decided that it is time to strike down the death penalty. There would have been as much reason to do this

---

[5] "At the outset, let us put to one side the death penalty as an index of the constitutional limit on punishment. Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty. . . ."

[6] "The Eighth Amendment forbids 'cruel and unusual punishments.' In my view, these words cannot be read to outlaw capital punishment because that penalty was in common use and authorized by law here and in the countries from which our ancestors came at the time the Amendment was adopted. It is inconceivable to me that the framers intended to end capital punishment by the Amendment. Although some people have urged that this Court should amend the Constitution by interpretation to keep it abreast of modern ideas, I have never believed that lifetime judges in our system have any such legislative power."

when any of the cited cases were decided. But the Court refrained from that action on each of those occasions.

The Court has recognized, and I certainly subscribe to the proposition, that the Cruel and Unusual Punishments Clause "may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States,* 217 U. S., at 378. And Mr. Chief Justice Warren, for a plurality of the Court, referred to "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S., at 101. Mr. Jefferson expressed the same thought well.[7]

---

[7] "Some men look at constitutions with sanctimonious reverence, and deem them like the ark of the covenant, too sacred to be touched. They ascribe to the men of the preceding age a wisdom more than human, and suppose what they did to be beyond amendment. I knew that age well; I belonged to it, and labored with it. It deserved well of its country. It was very like the present, but without the experience of the present; and forty years of experience in government is worth a century of book-reading; and this they would say themselves, were they to rise from the dead. . . . I know . . . that laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths disclosed, and manners and opinions change with the change of circumstances, institutions must advance also, and keep pace with the times. We might as well require a man to wear still the coat which fitted him when a boy, as civilized society to remain ever under the regimen of their barbarous ancestors. . . . Let us follow no such examples, nor weakly believe that one generation is not as capable as another of taking care of itself, and of ordering its own affairs. Let us, as our sister States have done, avail ourselves of our reason and experience, to correct the crude essays of our first and unexperienced, although wise, virtuous, and well-meaning councils. And lastly, let us provide in our Constitution for its revision at stated periods." Letter to Samuel Kercheval, July 12, 1816, 15 The Writings of Thomas Jefferson 40–42 (Memorial ed. 1904).

My problem, however, as I have indicated, is the suddenness of the Court's perception of progress in the human attitude since decisions of only a short while ago.

5. To reverse the judgments in these cases is, of course, the easy choice. It is easier to strike the balance in favor of life and against death. It is comforting to relax in the thoughts—perhaps the rationalizations— that this is the compassionate decision for a maturing society; that this is the moral and the "right" thing to do; that thereby we convince ourselves that we are moving down the road toward human decency; that we value life even though that life has taken another or others or has grievously scarred another or others and their families; and that we are less barbaric than we were in 1879, or in 1890, or in 1910, or in 1947, or in 1958, or in 1963, or a year ago, in 1971, when *Wilkerson, Kemmler, Weems, Francis, Trop, Rudolph,* and *Mc-Gautha* were respectively decided.

This, for me, is good argument, and it makes some sense. But it is good argument and it makes sense only in a legislative and executive way and not as a judicial expedient. As I have said above, were I a legislator, I would do all I could to sponsor and to vote for legislation abolishing the death penalty. And were I the chief executive of a sovereign State, I would be sorely tempted to exercise executive clemency as Governor Rockefeller of Arkansas did recently just before he departed from office. There—on the Legislative Branch of the State or Federal Government, and secondarily, on the Executive Branch—is where the authority and responsibility for this kind of action lies. The authority should not be taken over by the judiciary in the modern guise of an Eighth Amendment issue.

I do not sit on these cases, however, as a legislator, responsive, at least in part, to the will of constituents.

Our task here, as must so frequently be emphasized and re-emphasized, is to pass upon the constitutionality of legislation that has been enacted and that is challenged. This is the sole task for judges. We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great. In fact, as today's decision reveals, they are almost irresistible.

6. The Court, in my view, is somewhat propelled toward its result by the interim decision of the California Supreme Court, with one justice dissenting, that the death penalty is violative of that State's constitution. *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880 (Feb. 18, 1972). So far as I am aware, that was the first time the death penalty in its entirety has been nullified by judicial decision. Cf. *Ralph* v. *Warden,* 438 F. 2d 786, 793 (CA4 1970), cert. denied, *post,* p. 942. California's moral problem was a profound one, for more prisoners were on death row there than in any other State. California, of course, has the right to construe its constitution as it will. Its construction, however, is hardly a precedent for federal adjudication.

7. I trust the Court fully appreciates what it is doing when it decides these cases the way it does today. Not only are the capital punishment laws of 39 States and the District of Columbia struck down, but also all those provisions of the federal statutory structure that permit the death penalty apparently are voided. No longer is capital punishment possible, I suspect, for, among other crimes, treason, 18 U. S. C. § 2381; or assassination of the President, the Vice President, or those who stand elected to those positions, 18 U. S. C. § 1751; or assassination of a Member or member-elect of Congress, 18 U. S. C. § 351; or espionage, 18 U. S. C. § 794;

412

or rape within the special maritime jurisdiction, 18 U. S. C. § 2031; or aircraft or motor vehicle destruction where death occurs, 18 U. S. C. § 34; or explosives offenses where death results, 18 U. S. C. §§ 844 (d) and (f); or train wrecking, 18 U. S. C. § 1992; or aircraft piracy, 49 U. S. C. § 1472 (i). Also in jeopardy, perhaps, are the death penalty provisions in various Articles of the Uniform Code of Military Justice. 10 U. S. C. §§ 885, 890, 894, 899, 901, 904, 906, 913, 918, and 920. All these seem now to be discarded without a passing reference to the reasons, or the circumstances, that prompted their enactment, some very recent, and their retention in the face of efforts to repeal them.

8. It is of passing interest to note a few voting facts with respect to recent federal death penalty legislation:

A. The aircraft piracy statute, 49 U. S. C. § 1472 (i), was enacted September 5, 1961. The Senate vote on August 10 was 92–0. It was announced that Senators Chavez, Fulbright, Neuberger, and Symington were absent but that, if present, all four would vote yea. It was also announced, on the other side of the aisle, that Senator Butler was ill and that Senators Beall, Carlson, and Morton were absent or detained, but that those four, if present, would vote in the affirmative. These announcements, therefore, indicate that the true vote was 100–0. 107 Cong. Rec. 15440. The House passed the bill without recorded vote. 107 Cong. Rec. 16849.

B. The presidential assassination statute, 18 U. S. C. § 1751, was approved August 28, 1965, without recorded votes. 111 Cong. Rec. 14103, 18026, and 20239.

C. The Omnibus Crime Control Act of 1970 was approved January 2, 1971. Title IV thereof added the congressional assassination statute that is now 18 U. S. C. § 351. The recorded House vote on October 7, 1970, was 341–26, with 63 not voting and 62 of those paired. 116 Cong. Rec. 35363–35364. The Senate vote on October 8

was 59–0, with 41 not voting, but with 21 of these announced as favoring the bill. 116 Cong. Rec. 35743. Final votes after conference were not recorded. 116 Cong. Rec. 42150, 42199.

It is impossible for me to believe that the many lawyer-members of the House and Senate—including, I might add, outstanding leaders and prominent candidates for higher office—were callously unaware and insensitive of constitutional overtones in legislation of this type. The answer, of course, is that in 1961, in 1965, and in 1970 these elected representatives of the' people—far more conscious of the temper of the times, of the maturing of society, and of the contemporary demands for man's dignity, than are we who sit cloistered on this Court—took it as settled that the death penalty then, as it always had been, was not in itself unconstitutional. Some of those Members of Congress, I suspect, will be surprised at this Court's giant stride today.

9. If the reservations expressed by my Brother STEWART (which, as I read his opinion, my Brother WHITE shares) were to command support, namely, that capital punishment may not be unconstitutional so long as it be mandatorily imposed, the result, I fear, will be that statutes struck down today will be re-enacted by state legislatures to prescribe the death penalty for specified crimes without any alternative for the imposition of a lesser punishment in the discretion of the judge or jury, as the case may be. This approach, it seems to me, encourages legislation that is regressive and of an antique mold, for it eliminates the element of mercy in the imposition of punishment. I thought we had passed beyond that point in our criminology long ago.

10. It is not without interest, also, to note that, although the several concurring opinions acknowledge the heinous and atrocious character of the offenses committed by the petitioners, none of those opinions makes

reference to the misery the petitioners' crimes occasioned
to the victims, to the families of the victims, and to the
communities where the offenses took place. The argu-
ments for the respective petitioners, particularly the oral
arguments, were similarly and curiously devoid of refer-
ence to the victims. There is risk, of course, in a com-
ment such as this, for it opens one to the charge of
emphasizing the retributive. But see *Williams* v. *New
York*, 337 U. S. 241, 248 (1949). Nevertheless, these
cases are here because offenses to innocent victims were
perpetrated. This fact, and the terror that occasioned it,
and the fear that stalks the streets of many of our cities
today perhaps deserve not to be entirely overlooked.
Let us hope that, with the Court's decision, the terror
imposed will be forgotten by those upon whom it was
visited, and that our society will reap the hoped-for ben-
efits of magnanimity.

Although personally I may rejoice at the Court's result,
I find it difficult to accept or to justify as a matter of his-
tory, of law, or of constitutional pronouncement. I fear
the Court has overstepped. It has sought and has
achieved an end.

MR. JUSTICE POWELL, with whom THE CHIEF JUS-
TICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHN-
QUIST join, dissenting.

The Court granted certiorari in these cases to con-
sider whether the death penalty is any longer a permis-
sible form of punishment. 403 U. S. 952 (1971). It is
the judgment of five Justices that the death penalty, as
customarily prescribed and implemented in this coun-
try today, offends the constitutional prohibition against
cruel and unusual punishments. The reasons for that
judgment are stated in five separate opinions, express-
ing as many separate rationales. In my view, none of
these opinions provides a constitutionally adequate foun-
dation for the Court's decision.

MR. JUSTICE DOUGLAS concludes that capital punishment is incompatible with notions of "equal protection" that he finds to be "implicit" in the Eighth Amendment. *Ante,* at 257. MR. JUSTICE BRENNAN bases his judgment primarily on the thesis that the penalty "does not comport with human dignity." *Ante,* at 270. MR. JUSTICE STEWART concludes that the penalty is applied in a "wanton" and "freakish" manner. *Ante,* at 310. For MR. JUSTICE WHITE it is the "infrequency" with which the penalty is imposed that renders its use unconstitutional. *Ante,* at 313. MR. JUSTICE MARSHALL finds that capital punishment is an impermissible form of punishment because it is "morally unacceptable" and "excessive." *Ante,* at 360, 358.

Although the central theme of petitioners' presentations in these cases is that the imposition of the death penalty is *per se* unconstitutional, only two of today's opinions explicitly conclude that so sweeping a determination is mandated by the Constitution. Both MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL call for the abolition of all existing state and federal capital punishment statutes. They intimate as well that no capital statute could be devised in the future that might comport with the Eighth Amendment. While the practical consequences of the other three opinions are less certain, they at least do not purport to render impermissible every possible statutory scheme for the use of capital punishment that legislatures might hereafter devise.[1] Insofar as these latter opinions fail, at least ex-

---

[1] MR. JUSTICE DOUGLAS holds only that "the Eighth Amendment [requires] legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and [requires] judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Ante,* at 256. The import of this rationale is that while all existing laws must fall, it remains theoretically possible for a State or Congress to devise a statute capable of withstanding a claim of discriminatory application. MR. JUSTICE STEWART, in

plicitly, to go as far as petitioners' contentions would carry them, their reservations are attributable to a willingness to accept only a portion of petitioners' thesis. For the reasons cogently set out in the CHIEF JUSTICE's dissenting opinion (*ante,* at 396–403), and for reasons stated elsewhere in this opinion, I find my Brothers' less-than-absolute-abolition judgments unpersuasive. Because those judgments are, for me, not dispositive, I shall focus primarily on the broader ground upon which the petitions in these cases are premised. The foundations of my disagreement with that broader thesis are equally applicable to each of the concurring opinions. I will, therefore, not endeavor to treat each one separately. Nor will I attempt to predict what forms of capital statutes, if any, may avoid condemnation in the future under the variety of views expressed by the collective majority today. That difficult task, not performed in any of the controlling opinions, must go unanswered until other cases presenting these more limited inquiries arise.

Whatever uncertainties may hereafter surface, several of the consequences of today's decision are unmistakably clear. The decision is plainly one of the greatest im-

---

addition to reserving judgment on at least four presently existing statutes (*ante,* at 307), indicates that statutes making capital punishment mandatory for any category of crime, or providing some other means of assuring against "wanton" and "freakish" application (*ante,* at 310), would present a difficult question that he does not reach today. MR. JUSTICE WHITE, for somewhat different reasons, appears to come to the conclusion that a mandatory system of punishment might prove acceptable. *Ante,* p. 310.

The brief and selective references, in my opinion above and in this note, to the opinions of other Justices obviously do not adequately summarize the thoughtful and scholarly views set forth in their full opinions. I have tried merely to select what seem to me to be the respective points of primary emphasis in each of the majority's opinions.

portance. The Court's judgment removes the death sentences previously imposed on some 600 persons awaiting punishment in state and federal prisons throughout the country. At least for the present, it also bars the States and the Federal Government from seeking sentences of death for defendants awaiting trial on charges for which capital punishment was heretofore a potential alternative. The happy event for these countable few constitutes, however, only the most visible consequence of this decision. Less measurable, but certainly of no less significance, is the shattering effect this collection of views has on the root principles of *stare decisis*, federalism, judicial restraint and—most importantly—separation of powers.

The Court rejects as not decisive the clearest evidence that the Framers of the Constitution and the authors of the Fourteenth Amendment believed that those documents posed no barrier to the death penalty. The Court also brushes aside an unbroken line of precedent reaffirming the heretofore virtually unquestioned constitutionality of capital punishment. Because of the pervasiveness of the constitutional ruling sought by petitioners, and accepted in varying degrees by five members of the Court, today's departure from established precedent invalidates a staggering number of state and federal laws. The capital punishment laws of no less than 39 States [2] and the District of Columbia are nullified. In addition, numerous provisions of the Criminal Code of the United States and of the Uniform Code of Mili-

---

[2] While statutes in 40 States permit capital punishment for a variety of crimes, the constitutionality of a very few mandatory statutes remains undecided. See concurring opinions by MR. JUSTICE STEWART and MR. JUSTICE WHITE. Since Rhode Island's only capital statute—murder by a life term prisoner—is mandatory, no law in that State is struck down by virtue of the Court's decision today.

tary Justice also are voided. The Court's judgment not only wipes out laws presently in existence, but denies to Congress and to the legislatures of the 50 States the power to adopt new policies contrary to the policy selected by the Court. Indeed, it is the view of two of my Brothers that the people of each State must be denied the prerogative to amend their constitutions to provide for capital punishment even selectively for the most heinous crime.

In terms of the constitutional role of this Court, the impact of the majority's ruling is all the greater because the decision encroaches upon an area squarely within the historic prerogative of the legislative branch—both state and federal—to protect the citizenry through the designation of penalties for prohibitable conduct. It is the very sort of judgment that the legislative branch is competent to make and for which the judiciary is ill-equipped. Throughout our history, Justices of this Court have emphasized the gravity of decisions invalidating legislative judgments, admonishing the nine men who sit on this bench of the duty of self-restraint, especially when called upon to apply the expansive due process and cruel and unusual punishment rubrics. I can recall no case in which, in the name of deciding constitutional questions, this Court has subordinated national and local democratic processes to such an extent. Before turning to address the thesis of petitioners' case against capital punishment—a thesis that has proved, at least in large measure, persuasive to a majority of this Court— I first will set out the principles that counsel against the Court's sweeping decision.

## I

The Constitution itself poses the first obstacle to petitioners' argument that capital punishment is *per se* unconstitutional. The relevant provisions are the Fifth,

Eighth, and Fourteenth Amendments. The first of these provides in part:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; . . . nor be deprived of life, liberty, or property, without due process of law . . . ."

Thus, the Federal Government's power was restricted in order to guarantee those charged with crimes that the prosecution would have only a single opportunity to seek imposition of the death penalty and that the death penalty could not be exacted without due process and a grand jury indictment. The Fourteenth Amendment, adopted about 77 years after the Bill of Rights, imposed the due process limitation of the Fifth Amendment upon the States' power to authorize capital punishment.

The Eighth Amendment, adopted at the same time as the Fifth, proscribes "cruel and unusual" punishments. In an effort to discern its meaning, much has been written about its history in the opinions of this Court and elsewhere.[3] That history need not be restated here since, whatever punishments the Framers of the Constitution may have intended to prohibit under the "cruel and unusual" language, there cannot be the slightest doubt that they intended no absolute bar on the Government's authority to impose the death penalty. *McGautha* v.

---

[3] For a thorough presentation of the history of the Cruel and Unusual Punishment Clause see MR. JUSTICE MARSHALL's opinion today, *ante*, at 316–328. See also *Weems* v. *United States*, 217 U. S. 349, 389–409 (1910) (White, J., dissenting); *O'Neil* v. *Vermont*, 144 U. S. 323, 337 (1892) (Field, J., dissenting); Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839 (1969).

*California,* 402 U. S. 183, 226 (1971) (separate opinion of Black, J.). As much is made clear by the three references to capital punishment in the Fifth Amendment. Indeed, the same body that proposed the Eighth Amendment also provided, in the first Crimes Act of 1790, for the death penalty for a number of offenses. 1 Stat. 112.

Of course, the specific prohibitions within the Bill of Rights are limitations on the exercise of power; they are not an affirmative grant of power to the Government. I, therefore, do not read the several references to capital punishment as foreclosing this Court from considering whether the death penalty in a particular case offends the Eighth and Fourteenth Amendments. Nor are "cruel and unusual punishments" and "due process of law" static concepts whose meaning and scope were sealed at the time of their writing. They were designed to be dynamic and to gain meaning through application to specific circumstances, many of which were not contemplated by their authors. While flexibility in the application of these broad concepts is one of the hallmarks of our system of government, the Court is not free to read into the Constitution a meaning that is plainly at variance with its language. Both the language of the Fifth and Fourteenth Amendments and the history of the Eighth Amendment confirm beyond doubt that the death penalty was considered to be a constitutionally permissible punishment. It is, however, within the historic process of constitutional adjudication to challenge the imposition of the death penalty in some barbaric manner or as a penalty wholly disproportionate to a particular criminal act. And in making such a judgment in a case before it, a court may consider contemporary standards to the extent they are relevant. While this weighing of a punishment against the Eighth Amendment standard on a case-by-case basis is consonant with history and precedent, it is not what

petitioners demand in these cases. They seek nothing less than the total abolition of capital punishment by judicial fiat.

## II

Petitioners assert that the constitutional issue is an open one uncontrolled by prior decisions of this Court. They view the several cases decided under the Eighth Amendment as assuming the constitutionality of the death penalty without focusing squarely upon the issue. I do not believe that the case law can be so easily cast aside. The Court on numerous occasions has both assumed and asserted the constitutionality of capital punishment. In several cases that assumption provided a necessary foundation for the decision, as the issue was whether a particular means of carrying out a capital sentence would be allowed to stand. Each of those decisions necessarily was premised on the assumption that some method of exacting the penalty was permissible.

The issue in the first capital case in which the Eighth Amendment was invoked, *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), was whether carrying out a death sentence by public shooting was cruel and unusual punishment. A unanimous Court upheld that form of execution, noting first that the punishment itself, as distinguished from the mode of its infliction, was "not pretended by the counsel of the prisoner" (*id.,* at 137) to be cruel and unusual. The Court went on to hold that:

> "Cruel and unusual punishments are forbidden by the Constitution, but the authorities . . . are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that category . . . ." *Id.,* at 134–135.

Eleven years later, in *In re Kemmler,* 136 U. S. 436 (1890), the Court again faced a question involving the

method of carrying out a capital sentence. On review of a denial of habeas corpus relief by the Supreme Court of New York, this Court was called on to decide whether electrocution, which only very recently had been adopted by the New York Legislature as a means of execution, was impermissibly cruel and unusual in violation of the Fourteenth Amendment.[4] Chief Justice Fuller, speaking for the entire Court, ruled in favor of the State. Electrocution had been selected by the legislature, after careful investigation, as "the most humane and practical method known to modern science of carrying into effect the sentence of death." *Id.,* at 444. The Court drew a clear line between the penalty itself and the mode of its execution:

> "Punishments are cruel when they involve torture or a lingering death; but the punishment of death

---

[4] The Court pointed out that the Eighth Amendment applied only to the Federal Government and not to the States. The Court's power in relation to state action was limited to protecting privileges and immunities and to assuring due process of law, both within the Fourteenth Amendment. The standard—for purposes of due process— was held to be whether the State had exerted its authority, "within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." 136 U. S., at 448. The State of Georgia, in No. 69–5003 and No. 69–5030, has placed great emphasis on this discussion in *In re Kemmler,* 136 U. S. 436 (1890), and has urged that the instant cases should all be decided under the more expansive tests of due process rather than under the Cruel and Unusual Punishments Clause *per se.* Irrespective whether the decisions of this Court are viewed as "incorporating" the Eighth Amendment (see *Robinson* v. *California,* 370 U. S. 660 (1962); *Powell* v. *Texas,* 392 U. S. 514 (1968)), it seems clear that the tests for applying these two provisions are fundamentally identical. Compare Mr. Justice Frankfurter's test in *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 470 (1947) (concurring opinion), with Mr. Chief Justice Warren's test in *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958).

is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life." *Id.*, at 447.

More than 50 years later, in *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947), the Court considered a case in which, due to a mechanical malfunction, Louisiana's initial attempt to electrocute a convicted murderer had failed. Petitioner sought to block a second attempt to execute the sentence on the ground that to do so would constitute cruel and unusual punishment. In the plurality opinion written by Mr. Justice Reed, concurred in by Chief Justice Vinson and Justices Black and Jackson, relief was denied. Again the Court focused on the manner of execution, never questioning the propriety of the death sentence itself.

> "The case before us does not call for an examination into any punishments except that of death. . . . The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence. . . .
>
> ". . . The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." *Id.*, at 463–464.

Mr. Justice Frankfurter, unwilling to dispose of the case under the Eighth Amendment's specific prohibition, approved the second execution attempt under the Due Process Clause. He concluded that "a State may be found to deny a person due process by treating even one guilty of crime in a manner that violates standards of

decency more or less universally accepted though not when it treats him by a mode about which opinion is fairly divided." *Id.,* at 469–470.

The four dissenting Justices, although finding a second attempt at execution to be impermissibly cruel, expressly recognized the validity of capital punishment:

> "In determining whether the proposed procedure is unconstitutional, we must measure it against a lawful electrocution. . . . Electrocution, when instantaneous, *can* be inflicted by a state in conformity with due process of law. . . .
>
> "The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself." *Id.,* at 474 (original emphasis).

Each of these cases involved the affirmance of a death sentence where its validity was attacked as violating the Eighth Amendment. Five opinions were written in these three cases, expressing the views of 23 Justices. While in the narrowest sense it is correct to say that in none was there a frontal attack upon the constitutionality of the death penalty, each opinion went well beyond an unarticulated assumption of validity. The power of the States to impose capital punishment was repeatedly and expressly recognized.

In addition to these cases in which the constitutionality of the death penalty was a necessary foundation for the decision, those who today would have this Court undertake the absolute abolition of the death penalty also must reject the opinions of other cases stipulating or assuming the constitutionality of capital punishment. *Trop* v. *Dulles,* 356 U. S. 86, 99, 100 (1958); *Weems* v. *United States,* 217 U. S. 349, 382, 409 (1910)

(White, J., joined by Holmes, J., dissenting).[5] See also *McGautha* v. *California*, 402 U. S., at 226 (separate opinion of Black, J.); *Robinson* v. *California*, 370 U. S. 660, 676 (1962) (DOUGLAS, J., concurring).

The plurality opinion in *Trop* v. *Dulles, supra,* is of special interest since it is this opinion, in large measure, that provides the foundation for the present attack on the death penalty.[6] It is anomalous that the standard urged by petitioners—"evolving standards of decency that mark the progress of a maturing society" (356 U. S., at 101)—should be derived from an opinion that so unqualifiedly rejects their arguments. Chief Justice Warren, joined by Justices Black, DOUGLAS, and Whittaker, stated flatly:

> "At the outset, let us put to one side the death penalty as an index of the constitutional limit on punishment. Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." *Id.,* at 99.

The issue in *Trop* was whether forfeiture of citizenship was a cruel and unusual punishment when imposed on

---

[5] Mr. Justice White stated:

"Death was a well-known method of punishment prescribed by law, and it was of course painful, and in that sense was cruel. But the infliction of this punishment was clearly not prohibited by the word cruel, although that word manifestly was intended to forbid the resort to barbarous and unnecessary methods of bodily torture, in executing even the penalty of death." 217 U. S., at 409.

[6] See Part III, *infra.*

a wartime deserter who had gone "over the hill" for less than a day and had willingly surrendered. In examining the consequences of the relatively novel punishment of denationalization,[7] Chief Justice Warren drew a line between "traditional" and "unusual" penalties:

> "While the State has the power to punish, the [Eighth] Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect." *Id.*, at 100.

The plurality's repeated disclaimers of any attack on capital punishment itself must be viewed as more than offhand dicta since those views were written in direct response to the strong language in Mr. Justice Frankfurter's dissent arguing that denationalization could not be a disproportionate penalty for a concededly capital offense.[8]

The most recent precedents of this Court—*Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), and *McGautha* v. *California, supra*—are also premised to a significant degree on the constitutionality of the death penalty. While the scope of review in both cases was limited to questions involving the procedures for selecting juries

---

[7] In footnote 32, at 100–101, the plurality opinion indicates that denationalization "was never explicitly sanctioned by this Government until 1940 and never tested against the Constitution until this day."

[8] "It seems scarcely arguable that loss of citizenship is within the Eighth Amendment's prohibition because disproportionate to an offense that is capital and has been so from the first year of Independence. . . . Is constitutional dialectic so empty of reason that it can be seriously urged that loss of citizenship is a fate worse than death?" *Id.*, at 125.

and regulating their deliberations in capital cases,[9] those opinions were "singularly academic exercise[s]"[10] if the members of this Court were prepared at those times to find in the Constitution the complete prohibition of the death penalty. This is especially true of Mr. Justice Harlan's opinion for the Court in *McGautha,* in which, after a full review of the history of capital punishment, he concluded that "we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution." *Id.,* at 207.[11]

---

[9] 398 U. S. 936 (1970); 402 U. S., at 306 (BRENNAN, J., dissenting). While the constitutionality *per se* of capital punishment has been assumed almost without question, recently members of this Court have expressed the desire to consider the constitutionality of the death penalty with respect to its imposition for specific crimes. *Rudolph* v. *Alabama,* 375 U. S. 889 (1963) (dissent from the denial of certiorari).

[10] Brief for Respondent in *Branch* v. *Texas,* No. 69–5031, p. 6.

[11] While the implicit assumption in *McGautha* v. *California,* 402 U. S. 183 (1971), of the acceptability of death as a form of punishment must prove troublesome for those who urge total abolition, it presents an even more severe problem of *stare decisis* for those Justices who treat the Eighth Amendment essentially as a *process* prohibition. MR. JUSTICE DOUGLAS, while stating that the Court is "now imprisoned in . . . *McGautha*" (*ante,* at 248), concludes that capital punishment is unacceptable precisely because the procedure governing its imposition is arbitrary and discriminatory. MR. JUSTICE STEWART, taking a not dissimilar tack on the merits, disposes of *McGautha* in a footnote reference indicating that it is not applicable because the question there arose under the Due Process Clause. *Ante,* at 310 n. 12. MR. JUSTICE WHITE, who also finds the death penalty intolerable because of the process for its implementation, makes no attempt to distinguish *McGautha*'s clear holding. For the reasons expressed in the CHIEF JUSTICE's opinion, *McGautha* simply cannot be distinguished. *Ante,* at 399–403. These various opinions would, in fact, overrule that recent precedent.

Perhaps enough has been said to demonstrate the unswerving position that this Court has taken in opinions spanning the last hundred years. On virtually every occasion that any opinion has touched on the question of the constitutionality of the death penalty, it has been asserted affirmatively, or tacitly assumed, that the Constitution does not prohibit the penalty. No Justice of the Court, until today, has dissented from this consistent reading of the Constitution. The petitioners in these cases now before the Court cannot fairly avoid the weight of this substantial body of precedent merely by asserting that there is no prior decision precisely in point. *Stare decisis,* if it is a doctrine founded on principle, surely applies where there exists a long line of cases endorsing or necessarily assuming the validity of a particular matter of constitutional interpretation. *Green* v. *United States,* 356 U. S. 165, 189–193 (1958) (Frankfurter, J., concurring). While these oft-repeated expressions of unchallenged belief in the constitutionality of capital punishment may not justify a summary disposition of the constitutional question before us, they are views expressed and joined in over the years by no less than 29 Justices of this Court and therefore merit the greatest respect.[12] Those who now resolve to set those views aside indeed have a heavy burden.

## III

Petitioners seek to avoid the authority of the foregoing cases, and the weight of express recognition in the Constitution itself, by reasoning which will not withstand analysis. The thesis of petitioners' case derives from several opinions in which members of this Court

---

[12] This number includes all the Justices who participated in *Wilkerson* v. *Utah,* 99 U. S. 130 (1879), *Kemmler,* and *Louisiana ex rel. Francis* as well as those who joined in the plurality and dissenting opinions in *Trop* and the dissenting opinion in *Weems.*

have recognized the dynamic nature of the pro-
hibition against cruel and unusual punishments. The
final meaning of those words was not set in 1791. Rather,
to use the words of Chief Justice Warren speaking
for a plurality of the Court in *Trop* v. *Dulles,* 356 U. S.,
at 100–101:

> "[T]he words of the Amendment are not precise,
> and . . . their scope is not static. The Amendment
> must draw its meaning from the evolving standards
> of decency that mark the progress of a maturing
> society."

But this was not new doctrine. It was the approach to
the Eighth Amendment taken by Mr. Justice McKenna
in his opinion for the Court in *Weems* v. *United States,*
217 U. S. 349 (1910). Writing for four Justices sitting
as the majority of the six-man Court deciding the case,
he concluded that the clause must be "progressive"; it
is not "fastened to the obsolete but may acquire mean-
ing as public opinion becomes enlightened by a humane
justice." *Id.,* at 378. The same test was offered by Mr.
Justice Frankfurter in his separate concurrence in *Lou-
isiana ex rel. Francis* v. *Resweber,* 329 U. S., at 469.
While he rejected the notion that the Fourteenth Amend-
ment made the Eighth Amendment fully applicable to
the States, he nonetheless found as a matter of due
process that the States were prohibited from "treating
even one guilty of crime in a manner that violates stand-
ards of decency more or less universally accepted."

Whether one views the question as one of due process
or of cruel and unusual punishment, as I do for con-
venience in this case, the issue is essentially the
same.[13] The fundamental premise upon which either
standard is based is that notions of what constitutes
cruel and unusual punishment or due process do evolve.

---

[13] See n. 4, *supra.*

Neither the Congress nor any state legislature would today tolerate pillorying, branding, or cropping or nailing of the ears—punishments that were in existence during our colonial era.[14] Should, however, any such punishment be prescribed, the courts would certainly enjoin its execution. See *Jackson* v. *Bishop,* 404 F. 2d 571 (CA8 1968). Likewise, no court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives. Similarly, there may well be a process of evolving attitude with respect to the application of the death sentence for particular crimes.[15] See *McGautha* v. *California,* 402 U. S., at 242 (DOUGLAS, J., dissenting).

But we are not asked to consider the permissibility of any of the several methods employed in carrying out the death sentence. Nor are we asked, at least as part of the core submission in these cases, to determine whether the penalty might be a grossly excessive punishment for some specific criminal conduct. Either inquiry would call for a discriminating evaluation of particular means, or of the relationship between particular conduct and its punishment. Petitioners' principal argument goes far beyond the traditional process of case-by-case inclusion and exclusion. Instead the argument insists on an unprecedented constitutional rule of absolute prohibition of capital punishment for any crime, regardless of its depravity and impact on society. In calling for a precipitate and final judicial end to this form of penalty as offensive to evolving standards of decency, petitioners would have this Court abandon the traditional and more refined approach consistently followed in its prior Eighth Amendment precedents. What they are saying, in effect, is that the evolutionary

---

[14] See, *e. g., Ex parte Wilson,* 114 U. S. 417, 427–428 (1885).

[15] See Part VII, *infra.*

process has come suddenly to an end; that the ultimate wisdom as to the appropriateness of capital punishment under all circumstances, and for all future generations, has somehow been revealed.

The prior opinions of this Court point with great clarity to reasons why those of us who sit on this Court at a particular time should act with restraint before assuming, contrary to a century of precedent, that we now know the answer for all time to come. First, where as here, the language of the applicable provision provides great leeway and where the underlying social policies are felt to be of vital importance, the temptation to read personal preference into the Constitution is understandably great. It is too easy to propound our subjective standards of wise policy under the rubric of more or less universally held standards of decency. See *Trop* v. *Dulles,* 356 U. S., at 103 (Warren, C. J.), 119–120 (Frankfurter, J., dissenting); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 470–471 (Frankfurter, J., concurring); *Weems* v. *United States,* 217 U. S., at 378–379 (McKenna, J.).

The second consideration dictating judicial self-restraint arises from a proper recognition of the respective roles of the legislative and judicial branches. The designation of punishments for crimes is a matter peculiarly within the sphere of the state and federal legislative bodies. See, *e. g., In re Kemmler,* 136 U. S., at 447; *Trop* v. *Dulles,* 356 U. S., at 103. When asked to encroach on the legislative prerogative we are well counseled to proceed with the utmost reticence. The review of legislative choices, in the performance of our duty to enforce the Constitution, has been characterized most appropriately by Mr. Justice Holmes as "the gravest and most delicate duty that this Court is called on to perform." *Blodgett* v. *Holden,* 275 U. S. 142, 147–148 (1927) (separate opinion).

How much graver is that duty when we are not asked to pass on the constitutionality of a single penalty under the facts of a single case but instead are urged to overturn the legislative judgments of 40 state legislatures as well as those of Congress. In so doing is the majority able to claim, as did the Court in *Weems,* that it appreciates "to the fullest the wide range of power that the legislature possesses to adapt its penal laws to conditions as they may exist and punish the crimes of men according to their forms and frequency"? 217 U. S., at 379. I think not. No more eloquent statement of the essential separation of powers limitation on our prerogative can be found than the admonition of Mr. Justice Frankfurter, dissenting in *Trop.* His articulation of the traditional view takes on added significance where the Court undertakes to nullify the legislative judgments of the Congress and four-fifths of the States.

> "What is always basic when the power of Congress to enact legislation is challenged is the appropriate approach to judicial review of congressional legislation . . . . When the power of Congress to pass a statute is challenged, the function of this Court is to determine whether legislative action lies clearly outside the constitutional grant of power to which it has been, or may fairly be, referred. In making this determination, the Court sits in judgment on the action of a co-ordinate branch of the Government while keeping unto itself—as it must under our constitutional system—the final determination of its own power to act. . . .

> "Rigorous observance of the difference between limits of power and wise exercise of power—between questions of authority and questions of prudence—requires the most alert appreciation of this decisive but subtle relationship of two concepts that too easily coalesce. No less does it require a

disciplined will to adhere to the difference. It is not easy to stand aloof and allow want of wisdom to prevail, to disregard one's own strongly held view of what is wise in the conduct of affairs. But it is not the business of this Court to pronounce policy. It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic. That self-restraint is of the essence in the observance of the judicial oath, for the Constitution has not authorized the judges to sit in judgment on the wisdom of what Congress and the Executive Branch do." 356 U. S., at 119–120.

See also Mr. Justice White's dissenting opinion in *Weems* v. *United States,* 217 U. S., at 382.

## IV

Although determining the range of available punishments for a particular crime is a legislative function, the very presence of the Cruel and Unusual Punishments Clause within the Bill of Rights requires, in the context of a specific case, that courts decide whether particular acts of the Congress offend that Amendment. The Due Process Clause of the Fourteenth Amendment imposes on the judiciary a similar obligation to scrutinize state legislation. But the proper exercise of that constitutional obligation in the cases before us today must be founded on a full recognition of the several considerations set forth above—the affirmative references to capital punishment in the Constitution, the prevailing precedents of this Court, the limitations on the exercise of our power imposed by tested principles of judicial self-restraint, and the duty to avoid encroachment on the powers conferred upon state and federal legislatures. In the face of these considerations, only the most con-

clusive of objective demonstrations could warrant this Court in holding capital punishment *per se* unconstitutional. The burden of seeking so sweeping a decision against such formidable obstacles is almost insuperable. Viewed from this perspective, as I believe it must be, the case against the death penalty falls far short.

Petitioners' contentions are premised, as indicated above, on the long-accepted view that concepts embodied in the Eighth and Fourteenth Amendments evolve. They present, with skill and persistence, a list of "objective indicators" which are said to demonstrate that prevailing standards of human decency have progressed to the final point of requiring the Court to hold, for all cases and for all time, that capital punishment is unconstitutional.

Briefly summarized, these proffered indicia of contemporary standards of decency include the following: (i) a worldwide trend toward the disuse of the death penalty; [16] (ii) the reflection in the scholarly literature of a progressive rejection of capital punishment founded essentially on moral opposition to such treatment; [17] (iii) the decreasing numbers of executions over the last 40 years and especially over the last decade; [18] (iv) the

---

[16] See, *e. g.*, T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute (1959); United Nations, Department of Economic and Social Affairs, Capital Punishment (1968); 2 National Commission on Reform of Federal Criminal Laws, Working Papers, 1351 n. 13 (1970).

[17] The literature on the moral question is legion. Representative collections of the strongly held views on both sides may be found in H. Bedau, The Death Penalty in America (1967 rev. ed.), and in Royal Commission on Capital Punishment, Minutes of Evidence (1949–1953).

[18] Department of Justice, National Prisoner Statistics No. 46, Capital Punishment 1930–1970 (Aug. 1971) (191 executions during the 1960's; no executions since June 2, 1967); President's Commission on Law Enforcement and Administration of Justice, The Chal-

small number of death sentences rendered in relation to the number of cases in which they might have been imposed;[19] and (v) the indication of public abhorrence of

lenge of Crime in a Free Society 143 (1967) ("[t]he most salient characteristic of capital punishment is that it is infrequently applied").

Petitioners concede, as they must, that little weight can be given to the lack of executions in recent years. A *de facto* moratorium has existed for five years now while cases challenging the procedures for implementing the capital sentence have been re-examined by this Court. *McGautha* v. *California,* 402 U. S. 183 (1971); *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968). The infrequency of executions during the years before the moratorium became fully effective may be attributable in part to decisions of this Court giving expanded scope to the criminal procedural protections of the Bill of Rights, especially under the Fourth and Fifth Amendments. *E. g., Miranda* v. *Arizona,* 384 U. S. 436 (1966); *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Additionally, decisions of the early 1960's amplifying the scope of the federal habeas corpus remedy also may help account for a reduction in the number of executions. *E. g., Fay* v. *Noia,* 372 U. S. 391 (1963); *Townsend* v. *Sain,* 372 U. S. 293 (1963). The major effect of either expanded procedural protections or extended collateral remedies may well have been simply to postpone the date of execution for some capital offenders, thereby leaving them ultimately in the moratorium limbo.

[19] An exact figure for the number of death sentences imposed by the sentencing authorities—judge or jury—in the various jurisdictions is difficult to determine. But the National Prisoner Statistics (hereafter NPS) show the numbers of persons received at the state and federal prisons under sentence of death. This number, however, does not account for those who may have been sentenced and retained in local facilities during the pendency of their appeals. Accepting with this reservation the NPS figures as a minimum, the most recent statistics show that at least 1,057 persons were sentenced to death during the decade of the 1960's. NPS, *supra,* n. 18, at 9.

No fully reliable statistics are available on the nationwide ratio of death sentences to cases in which death was a statutorily permissible punishment. At oral argument, counsel for petitioner in No. 69–5003 estimated that the ratio is 12 or 13 to one. Tr. of Oral Arg. in *Furman* v. *Georgia,* No. 69–5003, p. 11. Others have found a higher correlation. See McGee, Capital Punishment as

the penalty reflected in the circumstance that executions are no longer public affairs.[20] The foregoing is an incomplete summary but it touches the major bases of petitioners' presentation. Although they are not appropriate for consideration as objective evidence, petitioners strongly urge two additional propositions. They contend, first, that the penalty survives public condemnation only through the infrequency, arbitrariness, and discriminatory nature of its application, and, second, that there no longer exists any legitimate justification for the utilization of the ultimate penalty. These contentions, which have proved persuasive to several of the Justices constituting the majority, deserve separate consideration and will be considered in the ensuing sections. Before turning to those arguments, I first address the argument based on "objective" factors.

Any attempt to discern contemporary standards of decency through the review of objective factors must take into account several overriding considerations which petitioners choose to discount or ignore. In a democracy

Seen by a Correctional Administrator, 28 Fed. Prob., No. 2, pp. 11, 12 (1964) (one out of every five, or 20%, of persons convicted of murder received the death penalty in California); Bedau, Death Sentences in New Jersey 1907–1960, 19 Rutgers L. Rev. 1 (1964) (between 1916 and 1955, 157 out of 652 persons charged with murder received the death sentence in New Jersey—about 20%; between 1956 and 1960, 13 out of 61 received the death sentence—also about 20%); H. Kalven & H. Ziesel, The American Jury 435–436 (1966) (21 of 111 murder cases resulted in death sentences during three representative years during the mid-1950's); see also Koeninger, Capital Punishment in Texas, 1924–1968, 15 Crime & Delin. 132 (1969).

[20] See, e. g., People v. Anderson, 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972); Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1783 (1970). But see F. Frankfurter, Of Law and Men 97–98 (1956) (reprint of testimony before the Royal Commission on Capital Punishment).

the first indicator of the public's attitude must always be found in the legislative judgments of the people's chosen representatives. MR. JUSTICE MARSHALL's opinion today catalogues the salient statistics. Forty States,[21] the District of Columbia, and the Federal Government still authorize the death penalty for a wide variety of crimes. That number has remained relatively static since the end of World War I. *Ante,* at 339–341. That does not mean, however, that capital punishment has become a forgotten issue in the legislative arena. As recently as January, 1971, Congress approved the death penalty for congressional assassination. 18 U. S. C. § 351. In 1965 Congress added the death penalty for presidential and vice presidential assassinations. 18 U. S. C. § 1751. Additionally, the aircraft piracy statute passed in 1961 also carries the death penalty. 49 U. S. C. § 1472 (i). MR. JUSTICE BLACKMUN's dissenting opinion catalogues the impressive ease with which each of these statutes was approved. *Ante,* at 412–413. On the converse side, a bill proposing the abolition of capital punishment for all federal crimes was introduced in 1967 but failed to reach the Senate floor.[22]

At the state level, New York, among other States, has recently undertaken reconsideration of its capital crimes. A law passed in 1965 restricted the use of capital punishment to the crimes of murder of a police officer and murder by a person serving a sentence of life imprisonment. N. Y. Penal Code § 125.30 (1967).

I pause here to state that I am at a loss to under-

---

[21] Nine States have abolished capital punishment without resort to the courts. See H. Bedau, *supra,* n. 17, at 39. California has been the only State to abolish capital punishment judicially. *People* v. *Anderson, supra.*

[22] Hearings on S. 1760 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess. (1968).

stand how those urging this Court to pursue a course of *absolute* abolition as a matter of constitutional judgment can draw any support from the New York experience. As is also the case with respect to recent legislative activity in Canada [23] and Great Britain,[24] New York's decision to restrict the availability of the death penalty is a product of refined and discriminating legislative judgment, reflecting, not the total rejection of capital punishment as inherently cruel, but a desire to limit it to those circumstances in which legislative judgment deems retention to be in the public interest. No such legislative flexibility is permitted by the contrary course petitioners urge this Court to follow.[25]

In addition to the New York experience, a number of other States have undertaken reconsideration of capital punishment in recent years. In four States the penalty has been put to a vote of the people through public referenda—a means likely to supply objective evidence of community standards. In Oregon a referendum seeking abolition of capital punishment failed in 1958 but was subsequently approved in 1964.[26] Two years later the penalty was approved in Colorado by a wide margin.[27]

---

[23] Canada has recently undertaken a five-year experiment—similar to that conducted in England—abolishing the death penalty for most crimes. Stats. of Canada 1967–1968, 16 & 17 Eliz. 2, c. 15, p. 145. However, capital punishment is still prescribed for some crimes, including murder of a police officer or corrections official, treason, and piracy.

[24] Great Britain, after many years of controversy over the death penalty, undertook a five-year experiment in abolition in 1965. Murder (Abolition of Death Penalty) Act 1965, 2 Pub. Gen. Acts, c. 71, p. 1577. Although abolition for murder became final in 1969, the penalty was retained for several crimes, including treason, piracy, and dockyards arson.

[25] See n. 62, *infra.*

[26] See Bedau, *supra,* n. 17, at 233.

[27] *Ibid.* (approximately 65% of the voters approved the death penalty).

In Massachusetts in 1968, in an advisory referendum, the voters there likewise recommended retention of the penalty. In 1970, approximately 64% of the voters in Illinois approved the penalty.[28] In addition, the National Commission on Reform of Federal Criminal Laws reports that legislative committees in Massachusetts, Pennsylvania, and Maryland recommended abolition, while committees in New Jersey and Florida recommended retention.[29] The legislative views of other States have been summarized by Professor Hugo Bedau in his compilation of sources on capital punishment entitled The Death Penalty in America:

"What our legislative representatives think in the two score states which still have the death penalty may be inferred from the fate of the bills to repeal or modify the death penalty filed during recent years in the legislatures of more than half of these states. In about a dozen instances, the bills emerged from committee for a vote. But in none except Delaware did they become law. In those states where these bills were brought to the floor of the legislatures, the vote in most instances wasn't even close." [30]

This recent history of activity with respect to legislation concerning the death penalty abundantly refutes the abolitionist position.

The second and even more direct source of information

---

[28] See Bedau, The Death Penalty in America, 35 Fed. Prob., No. 2, pp. 32, 34 (1971).

[29] National Commission, supra, n. 16, at 1365.

[30] Bedau, supra, n. 17, at 232. See, e. g., State v. Davis, 158 Conn. 341, 356–359, 260 A. 2d 587, 595–596 (1969), in which the Connecticut Supreme Court pointed out that the state legislature had considered the question of abolition during the 1961, 1963, 1965, 1967, and 1969 sessions and had "specifically declined to abolish the death penalty" every time.

reflecting the public's attitude toward capital punishment is the jury. In *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), MR. JUSTICE STEWART, joined by JUSTICES BRENNAN and MARSHALL, characterized the jury's historic function in the sentencing process in the following terms:

> "[T]he jury is given broad discretion to decide whether or not death *is* 'the proper penalty' in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision.
>
> "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. . . . Guided by neither rule nor standard, . . . a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death."
>
> "[O]ne of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' *Trop* v. *Dulles,* . . ." [31]

Any attempt to discern, therefore, where the prevailing standards of decency lie must take careful account of

---

[31] 391 U. S., at 519 and n. 15. See also *McGautha* v. *California,* 402 U. S., at 201–202; *Williams* v. *New York,* 337 U. S. 241, 253 (1949) (Murphy, J., dissenting) ("[i]n our criminal courts the jury sits as the representative of the community"); W. Douglas, We the Judges 389 (1956); Holmes, Law in Science and Science in Law, 12 Harv. L. Rev. 443, 460 (1899).

the jury's response to the question of capital punishment. During the 1960's juries returned in excess of a thousand death sentences, a rate of approximately two per week. Whether it is true that death sentences were returned in less than 10% of the cases as petitioners estimate or whether some higher percentage is more accurate,[32] these totals simply do not support petitioners' assertion at oral argument that "the death penalty is virtually unanimously repudiated and condemned by the conscience of contemporary society."[33] It is also worthy of note that the annual rate of death sentences has remained relatively constant over the last 10 years and that the figure for 1970—127 sentences—is the highest annual total since 1961.[34] It is true that the sentencing rate might be expected to rise, rather than remain constant, when the number of violent crimes increases as it has in this country.[35] And it may be conceded that the constancy in these statistics indicates the unwillingness of juries to demand the ultimate penalty in many cases where it might be imposed. But these considerations fall short of indicating that juries are imposing the death penalty with such rarity as to justify this Court in reading into this circumstance a public rejection of capital punishment.[36]

---

[32] See n. 19, *supra*.

[33] Tr. of Oral Arg. in *Aikens* v. *California*, No. 68–5027, p. 21. Although the petition for certiorari in this case was dismissed after oral argument, *Aikens* v. *California*, 406 U. S. 813 (1972), the same counsel argued both this case and *Furman*. He stated at the outset that his argument was equally applicable to each case.

[34] National Prisoner Statistics, *supra*, n. 18.

[35] FBI, Uniform Crime Reports—1970, pp. 7–14 (1971).

[36] Public opinion polls, while of little probative relevance, corroborate substantially the conclusion derived from examining legislative activity and jury sentencing—opinion on capital punishment is "fairly divided." *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S., at 470 (Frankfurter, J., concurring). See, *e. g., Witherspoon* v.

One must conclude, contrary to petitioners' submission, that the indicators most likely to reflect the public's view—legislative bodies, state referenda and the juries which have the actual responsibility—do not support the contention that evolving standards of decency require total abolition of capital punishment.[37] Indeed,

*Illinois,* 391 U. S., at 520 n. 16 (1966 poll finding 42% in favor of the death penalty and 47% opposed); Goldberg & Dershowitz, *supra,* n. 20, at 1781 n. 39 (1969 poll shows 51% in favor of retention—the same percentage as in 1960); H. Bedau, The Death Penalty in America 231–241 (1967 rev. ed.); Bedau, The Death Penalty in America, 35 Fed. Prob., No. 2, pp. 32, 34–35 (1971).

[37] If, as petitioners suggest, the judicial branch itself reflects the prevailing standards of human decency in our society, it may be relevant to note the conclusion reached by state courts in recent years on the question of the acceptability of capital punishment. In the last five years alone, since the *de facto* "moratorium" on executions began (see n. 18, *supra*), the appellate courts of 26 States have passed on the constitutionality of the death penalty under the Eighth Amendment and under similar provisions of most state constitutions. Every court, except the California Supreme Court, *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972), has found the penalty to be constitutional. Those States, and the year of the most recent decision on the issue, are: Alabama (1971); Arizona (1969); Colorado (1967); Connecticut (1969); Delaware (1971); Florida (1969); Georgia (1971); Illinois (1970); Kansas (1968); Kentucky (1971); Louisiana (1971); Maryland (1971); Missouri (1971); Nebraska (1967); Nevada (1970); New Jersey (1971); New Mexico (1969); North Carolina (1972); Ohio (1971); Oklahoma (1971); South Carolina (1970); Texas (1971); Utah (1969); Virginia (1971); Washington (1971). While the majority of these state court opinions do not give the issue more than summary exposition, many have considered the question at some length, and, indeed, some have considered the issue under the "evolving standards" rubric. See, *e. g., State* v. *Davis,* 158 Conn. 341, 356–359, 260 A. 2d 587, 595–596 (1969); *State* v. *Crook,* 253 La. 961, 967–970, 221 So. 2d 473, 475–476 (1969); *Bartholomey* v. *State,* 260 Md. 504, 273 A. 2d 164 (1971); *State* v. *Alvarez,* 182 Neb. 358, 366–367, 154 N. W. 2d 746, 751–752 (1967); *State* v. *Pace,* 80 N. M. 364, 371–372, 456 P. 2d 197,

the weight of the evidence indicates that the public generally has not accepted either the morality or the social merit of the views so passionately advocated by the articulate spokesmen for abolition. But however one may assess the amorphous ebb and flow of public opinion generally on this volatile issue, this type of inquiry lies at the periphery—not the core—of the judicial process in constitutional cases. The assessment of popular opinion is essentially a legislative, not a judicial, function.

## V

Petitioners seek to salvage their thesis by arguing that the infrequency and discriminatory nature of the actual resort to the ultimate penalty tend to diffuse public opposition. We are told that the penalty is imposed exclusively on uninfluential minorities—"the poor and powerless, personally ugly and socially unacceptable."[38] It is urged that this pattern of application assures that large segments of the public will be either uninformed or unconcerned and will have no reason to measure the punishment against prevailing moral standards.

Implicitly, this argument concedes the unsoundness of petitioners' contention, examined above under Part IV, that objective evidence shows a present and widespread community rejection of the death penalty. It is now said,

---

204–205 (1969). Every federal court that has passed on the issue has ruled that the death penalty is not *per se* unconstitutional. See, *e. g., Ralph* v. *Warden*, 438 F. 2d 786, 793 (CA4 1970); *Jackson* v. *Dickson*, 325 F. 2d 573, 575 (CA9 1963), cert. denied, 377 U. S. 957 (1964).

[38] Brief for Petitioner in No. 68–5027, p. 51. Although the *Aikens* case is no longer before us (see n. 33, *supra*), the petitioners in *Furman* and *Jackson* have incorporated petitioner's brief in *Aikens* by reference. See Brief for Petitioner in No. 69–5003, pp. 11–12; Brief for Petitioner in No. 69–5030, pp. 11–12.

in effect, not that capital punishment presently offends our citizenry, but that the public *would* be offended *if* the penalty were enforced in a nondiscriminatory manner against a significant percentage of those charged with capital crimes, and *if* the public were thereby made aware of the moral issues surrounding capital punishment. Rather than merely registering the objective indicators on a judicial balance, we are asked ultimately to rest a far-reaching constitutional determination on a prediction regarding the subjective judgments of the mass of our people under hypothetical assumptions that may or may not be realistic.

Apart from the impermissibility of basing a constitutional judgment of this magnitude on such speculative assumptions, the argument suffers from other defects. If, as petitioners urge, we are to engage in speculation, it is not at all certain that the public would experience deep-felt revulsion if the States were to execute as many sentenced capital offenders this year as they executed in the mid-1930's.[39] It seems more likely that public reaction, rather than being characterized by undifferentiated rejection, would depend upon the facts and circumstances surrounding each particular case.

Members of this Court know, from the petitions and appeals that come before us regularly, that brutish and revolting murders continue to occur with disquieting frequency. Indeed, murders are so commonplace

---

[39] In 1935 available statistics indicate that 184 convicted murderers were executed. That is the highest annual total for any year since statistics have become available. NPS, *supra*, n. 18. The year 1935 is chosen by petitioners in stating their thesis:

"If, in fact, 184 murderers were to be executed in this year 1971, we submit it is palpable that the public conscience of the Nation would be profoundly and fundamentally revolted, and that the death penalty for murder would be abolished forthwith as the atavistic horror that it is." Brief for Petitioner in No. 68–5027, p. 26 (see n. 38, *supra*).

in our society that only the most sensational receive significant and sustained publicity. It could hardly be suggested that in any of these highly publicized murder cases—the several senseless assassinations or the too numerous shocking multiple murders that have stained this country's recent history—the public has exhibited any signs of "revulsion" at the thought of executing the convicted murderers. The public outcry, as we all know, has been quite to the contrary. Furthermore, there is little reason to suspect that the public's reaction would differ significantly in response to other less publicized murders. It is certainly arguable that many such murders, because of their senselessness or barbarousness, would evoke a public demand for the death penalty rather than a public rejection of that alternative. Nor is there any rational basis for arguing that the public reaction to any of these crimes would be muted if the murderer were "rich and powerful." The demand for the ultimate sanction might well be greater, as a wealthy killer is hardly a sympathetic figure. While there might be specific cases in which capital punishment would be regarded as excessive and shocking to the conscience of the community, it can hardly be argued that the public's dissatisfaction with the penalty in particular cases would translate into a demand for absolute abolition.

In pursuing the foregoing speculation, I do not suggest that it is relevant to the appropriate disposition of these cases. The purpose of the digression is to indicate that judicial decisions cannot be founded on such speculations and assumptions, however appealing they may seem.

But the discrimination argument does not rest alone on a projection of the assumed effect on public opinion of more frequent executions. Much also is made of the undeniable fact that the death penalty has a greater impact on the lower economic strata of society, which

include a relatively higher percentage of persons of minority racial and ethnic group backgrounds. The argument drawn from this fact is two-pronged. In part it is merely an extension of the speculative approach pursued by petitioners, *i. e.,* that public revulsion is suppressed in callous apathy because the penalty does not affect persons from the white middle class which constitutes the majority in this country. This aspect, however, adds little to the infrequency rationalization for public apathy which I have found unpersuasive.

As MR. JUSTICE MARSHALL's opinion today demonstrates, the argument does have a more troubling aspect. It is his contention that if the average citizen were aware of the disproportionate burden of capital punishment borne by the "poor, the ignorant, and the underprivileged," he would find the penalty "shocking to his conscience and sense of justice" and would not stand for its further use. *Ante,* at 365–366, 369. This argument, like the apathy rationale, calls for further speculation on the part of the Court. It also illuminates the quicksands upon which we are asked to base this decision. Indeed, the two contentions seem to require contradictory assumptions regarding the public's moral attitude toward capital punishment. The apathy argument is predicated on the assumption that the penalty is used against the less influential elements of society, that the public is fully aware of this, and that it tolerates use of capital punishment only because of a callous indifference to the offenders who are sentenced. MR. JUSTICE MARSHALL's argument, on the other hand, rests on the contrary assumption that the public does not know against whom the penalty is enforced and that if the public were educated to this fact it would find the punishment intolerable. *Ante,* at 369. Neither assumption can claim to be an entirely accurate portrayal of public attitude; for some acceptance of capital punishment might be a conse-

quence of hardened apathy based on the knowledge of infrequent and uneven application, while for others acceptance may grow only out of ignorance. More significantly, however, neither supposition acknowledges what, for me, is a more basic flaw.

Certainly the claim is justified that this criminal sanction falls more heavily on the relatively impoverished and underprivileged elements of society. The "have-nots" in every society always have been subject to greater pressure to commit crimes and to fewer constraints than their more affluent fellow citizens. This is, indeed, a tragic byproduct of social and economic deprivation, but it is not an argument of constitutional proportions under the Eighth or Fourteenth Amendment. The same discriminatory impact argument could be made with equal force and logic with respect to those sentenced to prison terms. The Due Process Clause admits of no distinction between the deprivation of "life" and the deprivation of "liberty." If discriminatory impact renders capital punishment cruel and unusual, it likewise renders invalid most of the prescribed penalties for crimes of violence. The root causes of the higher incidence of criminal penalties on "minorities and the poor" will not be cured by abolishing the system of penalties. Nor, indeed, could any society have a viable system of criminal justice if sanctions were abolished or ameliorated because most of those who commit crimes happen to be underprivileged. The basic problem results not from the penalties imposed for criminal conduct but from social and economic factors that have plagued humanity since the beginning of recorded history, frustrating all efforts to create in any country at any time the perfect society in which there are no "poor," no "minorities" and no "underprivileged." [40]

[40] Not all murders, and certainly not all crimes, are committed by persons classifiable as "underprivileged." Many crimes of violence

448

The causes underlying this problem are unrelated to the constitutional issue before the Court.

Finally, yet another theory for abolishing the death penalty—reflected in varying degrees in each of the concurring opinions today—is predicated on the discriminatory impact argument. Quite apart from measuring the public's acceptance or rejection of the death penalty under the "standards of decency" rationale, MR. JUSTICE DOUGLAS finds the punishment cruel and unusual because it is "arbitrarily" invoked. He finds that "the basic theme of equal protection is implicit" in the Eighth Amendment, and that the Amendment is violated when jury sentencing may be characterized as arbitrary or discriminatory. *Ante*, at 249. While MR. JUSTICE STEWART does not purport to rely on notions of equal protection, he also rests primarily on what he views to be a history of arbitrariness. *Ante*, at 309–310.[41] Whatever may be the facts with respect to jury sentencing, this argument calls for a reconsideration of the "standards" aspects of the Court's decision in *McGautha* v. *California*, 402 U. S. 183 (1971). Although that is the unmistakable thrust of these opinions today, I see no reason to reassess the standards question considered so carefully in Mr. Justice Harlan's opinion for the Court

are committed by professional criminals who willingly choose to prey upon society as an easy and remunerative way of life. Moreover, the terms "underprivileged," the "poor" and the "powerless" are relative and inexact, often conveying subjective connotations which vary widely depending upon the viewpoint and purpose of the user.

[41] Similarly, MR. JUSTICE WHITE exhibits concern for a lack of any "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Ante*, at 313. MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL treat the arbitrariness question in the same manner that it is handled by petitioners—as an element of the approach calling for total abolition.

last Term. Having so recently reaffirmed our historic dedication to entrusting the sentencing function to the jury's "untrammeled discretion" (id., at 207), it is difficult to see how the Court can now hold the entire process constitutionally defective under the Eighth Amendment. For all of these reasons I find little merit in the various discrimination arguments, at least in the several lights in which they have been cast in these cases.

Although not presented by any of the petitioners today, a different argument, premised on the Equal Protection Clause, might well be made. If a Negro defendant, for instance, could demonstrate that members of his race were being singled out for more severe punishment than others charged with the same offense, a constitutional violation might be established. This was the contention made in *Maxwell* v. *Bishop*, 398 F. 2d 138 (CA8 1968), vacated and remanded on other grounds, 398 U. S. 262 (1970), in which the Eighth Circuit was asked to issue a writ of habeas corpus setting aside a death sentence imposed on a Negro defendant convicted of rape. In that case substantial statistical evidence was introduced tending to show a pronounced disproportion in the number of Negroes receiving death sentences for rape in parts of Arkansas and elsewhere in the South. That evidence was not excluded but was found to be insufficient to show discrimination in sentencing in Maxwell's trial. MR. JUSTICE BLACKMUN, then sitting on the Court of Appeals for the Eighth Circuit, concluded:

> "The petitioner's argument is an interesting one and we are not disposed to say that it could not have some validity and weight in certain situations. Like the trial court, however . . . we feel that the argument does not have validity and pertinent application to Maxwell's case.
>
> . . . .

> "We are not yet ready to condemn and upset the result reached in every case of a Negro rape defendant in the State of Arkansas on the basis of broad theories of social and statistical injustice. . . .
>
> . . . . .
>
> "We do not say that there is no ground for suspicion that the death penalty for rape may have been discriminatorily applied over the decades in that large area of states whose statutes provide for it. There are recognizable indicators of this. But . . . improper state practice of the past does not automatically invalidate a procedure of the present. . . ." *Id.,* at 146–148.

I agree that discriminatory application of the death penalty in the past, admittedly indefensible, is no justification for holding today that capital punishment is invalid in all cases in which sentences were handed out to members of the class discriminated against. But *Maxwell* does point the way to a means of raising the equal protection challenge that is more consonant with precedent and the Constitution's mandates than the several courses pursued by today's concurring opinions.

A final comment on the racial discrimination problem seems appropriate. The possibility of racial bias in the trial and sentencing process has diminished in recent years. The segregation of our society in decades past, which contributed substantially to the severity of punishment for interracial crimes, is now no longer prevalent in this country. Likewise, the day is past when juries do not represent the minority group elements of the community. The assurance of fair trials for all citizens is greater today than at any previous time in our history. Because standards of criminal justice have "evolved" in a manner favorable to the accused, discriminatory imposition of capital punishment is far less likely today than in the past.

## VI

Petitioner in *Branch* v. *Texas,* No. 69–5031, and to a lesser extent the petitioners in the other cases before us today, urge that capital punishment is cruel and unusual because it no longer serves any rational legislative interests. Before turning to consider whether any of the traditional aims of punishment justify the death penalty, I should make clear the context in which I approach this aspect of the cases.

First, I find no support—in the language of the Constitution, in its history, or in the cases arising under it—for the view that this Court may invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology. While the cases affirm our authority to prohibit punishments that are cruelly inhumane (*e. g., Wilkerson* v. *Utah,* 99 U. S., at 135–136; *In re Kemmler,* 136 U. S., at 447), and punishments that are cruelly excessive in that they are disproportionate to particular crimes (see Part VII, *infra*), the precedents of this Court afford no basis for striking down a particular form of punishment because we may be persuaded that means less stringent would be equally efficacious.

Secondly, if we were free to question the justifications for the use of capital punishment, a heavy burden would rest on those who attack the legislatures' judgments to prove the lack of rational justifications. This Court has long held that legislative decisions in this area, which lie within the special competency of that branch, are entitled to a presumption of validity. See, *e. g., Trop* v. *Dulles,* 356 U. S., at 103; *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 470 (Frankfurter, J., concurring); *Weems* v. *United States,* 217 U. S., at 378–379; *In re Kemmler,* 136 U. S., at 449.

I come now to consider, subject to the reservations above expressed, the two justifications most often cited for the retention of capital punishment. The concept of retribution—though popular for centuries—is now criticized as unworthy of a civilized people. Yet this Court has acknowledged the existence of a retributive element in criminal sanctions and has never heretofore found it impermissible. In *Williams* v. *New York*, 337 U. S. 241 (1949), Mr. Justice Black stated that,

> "Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." *Id.*, at 248.

It is clear, however, that the Court did not reject retribution altogether. The record in that case indicated that one of the reasons why the trial judge imposed the death penalty was his sense of revulsion at the "shocking details of the crime." *Id.*, at 244. Although his motivation was clearly retributive, the Court upheld the trial judge's sentence.[42] Similarly, Mr. Justice Marshall noted in his plurality opinion in *Powell* v. *Texas*, 392 U. S. 514, 530 (1968), that this Court "has never held that anything in the Constitution requires that penal sanctions be designed solely to achieve therapeutic or rehabilitative effects."[43]

---

[42] In *Morissette* v. *United States*, 342 U. S. 246 (1952), Mr. Justice Jackson spoke of the "tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution." *Id.*, at 251. He also noted that the penalties for invasions of the rights of property are high as a consequence of the "public demand for retribution." *Id.*, at 260.

[43] See also *Massiah* v. *United States*, 377 U. S. 201, 207 (1964) (White, J., dissenting) (noting the existence of a "profound dispute about whether we should punish, deter, rehabilitate or cure"); *Robinson* v. *California*, 370 U. S., at 674 (Douglas, J., concurring);

While retribution alone may seem an unworthy justification in a moral sense, its utility in a system of criminal justice requiring public support has long been recognized. Lord Justice Denning, now Master of the Rolls of the Court of Appeal in England, testified on this subject before the British Royal Commission on Capital Punishment:

"Many are inclined to test the efficacy of punishment solely by its value as a deterrent: but this is too narrow a view. Punishment is the way in which society expresses its denunciation of wrong doing: and, in order to maintain respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else. If this were so, we should not send to prison a man who was guilty of motor manslaughter, but only disqualify him from driving; but would public opinion be content with this? The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not." [44]

The view expressed by Lord Denning was cited approvingly in the Royal Commission's Report, recognizing "a

*Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 470–471 (Mr. Justice Frankfurter's admonition that the Court is not empowered to act simply because of a "feeling of revulsion against a State's insistence on its pound of flesh"); *United States* v. *Lovett,* 328 U. S. 303, 324 (1946) (Frankfurter, J., concurring) ("[p]unishment presupposes an offense, not necessarily an act previously declared criminal, but an act for which retribution is exacted").

[44] Royal Commission on Capital Punishment, Minutes of Evidence 207 (1949–1953).

454

strong and widespread demand for retribution."[45] Mr. Justice Stewart makes much the same point in his opinion today when he concludes that expression of man's retributive instincts in the sentencing process "serves an important purpose in promoting the stability of a society governed by law." *Ante,* at 308. The view, moreover, is not without respectable support in the jurisprudential literature in this country,[46] despite a substantial body of opinion to the contrary.[47] And it is conceded on all sides that, not infrequently, cases arise that are so shocking or offensive that the public demands the ultimate penalty for the transgressor.

Deterrence is a more appealing justification, although opinions again differ widely. Indeed, the deterrence issue lies at the heart of much of the debate between the abolitionists and retentionists.[48] Statistical studies, based primarily on trends in States that have abolished the penalty, tend to support the view that the death penalty has not been proved to be a superior deterrent.[49] Some dispute the validity of this conclusion,[50] pointing

[45] Report of Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 53, p. 18.

[46] M. Cohen, Reason and Law 50 (1950); H. Packer, The Limits of the Criminal Sanction 11–12 (1968); Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401 (1958).

[47] The authorities are collected in Comment, The Death Penalty Cases, 56 Calif. L. Rev. 1268, 1297–1301 (1968). The competing contentions are summarized in the Working Papers of the National Commission on Reform of Federal Criminal Laws, *supra,* n. 16, at 1358–1359. See also the persuasive treatment of this issue by Dr. Karl Menninger in The Crime of Punishment 190–218 (1966).

[48] See, *e. g.,* H. Bedau, The Death Penalty in America 260 (1967 rev. ed.); National Commission, *supra,* n. 16, at 1352.

[49] See Sellin, *supra,* n. 16, at 19–52.

[50] The countervailing considerations, tending to undercut the force of Professor Sellin's statistical studies, are collected in National Commission, *supra,* n. 16, at 1354; Bedau, *supra,* n. 48, at 265–266; Hart, Murder and the Principles of Punishment: England and the United States, 52 Nw. U. L. Rev. 433, 455–460 (1957).

out that the studies do not show that the death penalty has no deterrent effect on any categories of crimes. On the basis of the literature and studies currently available, I find myself in agreement with the conclusions drawn by the Royal Commission following its exhaustive study of this issue:

"The general conclusion which we reach, after careful review of all the evidence we have been able to obtain as to the deterrent effect of capital punishment, may be stated as follows. *Prima facie* the penalty of death is likely to have a stronger effect as a deterrent to normal human beings than any other form of punishment, and there is some evidence (though no convincing statistical evidence) that this is in fact so. But this effect does not operate universally or uniformly, and there are many offenders on whom it is limited and may often be negligible. It is accordingly important to view this question in a just perspective and not base a penal policy in relation to murder on exaggerated estimates of the uniquely deterrent force of the death penalty." [51]

Only recently this Court was called on to consider the deterrence argument in relation to punishment by fines for public drunkenness. *Powell* v. *Texas,* 392 U. S. 514 (1968). The Court was unwilling to strike down the Texas statute on grounds that it lacked a rational foundation. What MR. JUSTICE MARSHALL said there would seem to have equal applicability in this case:

"The long-standing and still raging debate over the validity of the deterrence justification for penal sanctions has not reached any sufficiently clear conclusions to permit it to be said that such sanctions are ineffective in any particular context or for any

---

[51] Report of the Royal Commission, *supra,* n. 45, ¶ 68, at 24.

particular group of people who are able to appreciate
the consequences of their acts. . . ." *Id.,* at 531.

As I noted at the outset of this section, legislative
judgments as to the efficacy of particular punishments
are presumptively rational and may not be struck down
under the Eighth Amendment because this Court may
think that some alternative sanction would be more ap-
propriate. Even if such judgments were within the judi-
cial prerogative, petitioners have failed to show that
there exist no justifications for the legislative enactments
challenged in these cases.[52] While the evidence and argu-
ments advanced by petitioners might have proved pro-
foundly persuasive if addressed to a legislative body,
they do not approach the showing traditionally required
before a court declares that the legislature has acted
irrationally.

## VII

In two of the cases before us today juries imposed
sentences of death after convictions for rape.[53] In these
cases we are urged to hold that even if capital punish-
ment is permissible for some crimes, it is a cruel and
unusual punishment for this crime. Petitioners in these
cases rely on the Court's opinions holding that the Eighth
Amendment, in addition to prohibiting punishments

---

[52] It is worthy of note that the heart of the argument here—that
there are no legitimate justifications—was impliedly repudiated
last Term by both the majority and dissenting opinions in *McGautha*
v. *California,* 402 U. S. 183 (1971). The argument in that case
centered on the proposition that due process requires that the stand-
ards governing the jury's exercise of its sentencing function be
elucidated. As Mr. Justice Brennan's dissent made clear, what-
ever standards might be thought to exist arise out of the list of justi-
fications for the death penalty—retribution, deterrence, etc. *Id.,*
at 284. If no such standards exist, the controversy last Term was
a hollow one indeed.

[53] *Jackson* v. *Georgia,* No. 69–5030; *Branch* v. *Texas,* No. 69–5031.

deemed barbarous and inhumane, also condemns punishments that are greatly disproportionate to the crime charged. This reading of the Amendment was first expressed by Mr. Justice Field in his dissenting opinion in . *O'Neil* v. *Vermont,* 144 U. S. 323, 337 (1892), a case in which a defendant charged with a large number of violations of Vermont's liquor laws received a fine in excess of $6,600, or a 54-year jail sentence if the fine was not paid. The majority refused to consider the question on the ground that the Eighth Amendment did not apply to the States. The dissent, after carefully examining the history of that Amendment and the Fourteenth, concluded that its prohibition was binding on Vermont and that it was directed against "all punishments which by their excessive length or severity are greatly disproportioned to the offences charged." *Id.,* at 339–340.[54]

The Court, in *Weems* v. *United States,* 217 U. S. 349 (1910), adopted Mr. Justice Field's view. The defendant, in *Weems,* charged with falsifying Government documents, had been sentenced to serve 15 years in *cadena temporal,* a punishment which included carrying chains at the wrists and ankles and the perpetual loss of the right to vote and hold office. Finding the sentence grossly excessive in length and condition of imprisonment, the Court struck it down. This notion of disproportionality—that particular sentences may be cruelly excessive for particular crimes—has been cited with approval in more recent decisions of this Court. See *Robinson* v. *California,* 370 U. S., at 667; *Trop* v. *Dulles,* 356 U. S., at 100; see also *Howard* v. *Fleming,* 191 U. S. 126, 135–136 (1903).

These cases, while providing a rationale for gauging the constitutionality of capital sentences imposed for rape,

---

[54] Mr. Justice Harlan, joined by Mr. Justice Brewer, dissented separately but agreed that the State had inflicted a cruel and unusual punishment. *Id.,* at 371.

also indicate the existence of necessary limitations on the judicial function. The use of limiting terms in the various expressions of this test found in the opinions—*grossly* excessive, *greatly* disproportionate—emphasizes that the Court's power to strike down punishments as excessive must be exercised with the greatest circumspection. As I have noted earlier, nothing in the history of the Cruel and Unusual Punishments Clause indicates that it may properly be utilized by the judiciary to strike down punishments—authorized by legislatures and imposed by juries—in any but the extraordinary case. This Court is not empowered to sit as a court of sentencing review, implementing the personal views of its members on the proper role of penology. To do so is to usurp a function committed to the Legislative Branch and beyond the power and competency of this Court.

Operating within these narrow limits, I find it quite impossible to declare the death sentence grossly excessive for all rapes. Rape is widely recognized as among the most serious of violent crimes, as witnessed by the very fact that it is punishable by death in 16 States and by life imprisonment in most other States.[55] The several reasons why rape stands so high on the list of serious crimes are well known: It is widely viewed as the most atrocious of intrusions upon the privacy and dignity of the victim; never is the crime committed accidentally; rarely can it be said to be unpremeditated;

---

[55] In addition to the States in which rape is a capital offense, statutes in 28 States prescribe life imprisonment as a permissible punishment for at least some category of rape. Also indicative of the seriousness with which the crime of rape is viewed, is the fact that in nine of the 10 States that have abolished death as a punishment for any crime, the maximum term of years for rape is the same as for first-degree murder. Statistical studies have shown that the average prison term served by rapists is longer than for any category of offense other than murder. J. MacDonald, Rape—Offenders and Their Victims 298 (1971).

often the victim suffers serious physical injury; the psychological impact can often be as great as the physical consequences; in a real sense, the threat of both types of injury is always present.[56] For these reasons, and for the reasons arguing against abolition of the death penalty altogether, the excessiveness rationale provides no basis for rejection of the penalty for rape in all cases.

The argument that the death penalty for rape lacks rational justification because less severe punishments might be viewed as accomplishing the proper goals of penology is as inapposite here as it was in considering *per se* abolition. See Part VI *supra*. The state of knowledge with respect to the deterrent value of the sentence for this crime is inconclusive.[57] Moreover, what has been said about the concept of retribution applies with equal force where the crime is rape. There are many cases in which the sordid, heinous nature of a particular crime, demeaning, humiliating, and often physically or psychologically traumatic, will call for public condemnation. In a period in our country's history when the frequency of this crime is increasing alarmingly,[58] it is indeed a grave event for the Court to take from the States whatever deterrent and retributive weight the death penalty retains.

Other less sweeping applications of the disproportionality concept have been suggested. Recently the Fourth Circuit struck down a death sentence in *Ralph v. Warden*, 438 F. 2d 786 (1970), holding that the death penalty was an appropriate punishment for rape

---

[56] *Id.*, at 63–64; Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1077 (1964).

[57] See MacDonald, *supra*, n. 55, at 314; Chambliss, Types of Deviance and the Effectiveness of Legal Sanctions, 1967 Wis. L. Rev. 703.

[58] FBI, Uniform Crime Reports—1970, p. 14 (1971) (during the 1960's the incidence of rape rose 121%).

only where life is "endangered." Chief Judge Hayns-
worth, who joined in the panel's opinion, wrote separately
in denying the State of Maryland's petition for rehearing
in order to make clear the basis for his joinder. He stated
that, for him, the appropriate test was not whether life
was endangered, but whether the victim in fact suffered
"grievous physical or psychological harm." *Id.*, at 794.
See *Rudolph* v. *Alabama*, 375 U. S. 889 (1963) (dissent
from the denial of certiorari).

It seems to me that both of these tests depart from
established principles and also raise serious practical
problems. How are those cases in which the victim's
life is endangered to be distinguished from those in
which no danger is found? The threat of serious injury
is implicit in the definition of rape; the victim is either
forced into submission by physical violence or by the
threat of violence. Certainly that test would provide
little comfort for either of the rape defendants in the
cases presently before us. Both criminal acts were ac-
complished only after a violent struggle. Petitioner Jack-
son held a scissors blade against his victim's neck. Peti-
tioner Branch had less difficulty subduing his 65-year-old
victim. Both assailants threatened to kill their vic-
tims. See MR. JUSTICE DOUGLAS' opinion, *ante*, at 252–
253. The alternate test, limiting the penalty to cases in
which the victim suffers physical or emotional harm,
might present even greater problems of application.
While most physical effects may be seen and objectively
measured, the emotional impact may be impossible to
gauge at any particular point in time. The extent and
duration of psychological trauma may not be known or
ascertainable prior to the date of trial.

While I reject each of these attempts to establish
specific categories of cases in which the death penalty
may be deemed excessive, I view them as groping

toward what is for me the appropriate application of the Eighth Amendment. While in my view the disproportionality test may not be used either to strike down the death penalty for rape altogether or to install the Court as a tribunal for sentencing review, that test may find its application in the peculiar circumstances of specific cases. Its utilization should be limited to the rare case in which the death penalty is rendered for a crime technically falling within the legislatively defined class but factually falling outside the likely legislative intent in creating the category. Specific rape cases (and specific homicides as well) can be imagined in which the conduct of the accused would render the ultimate penalty a grossly excessive punishment. Although this case-by-case approach may seem painfully slow and inadequate to those who wish the Court to assume an activist legislative role in reforming criminal punishments, it is the approach dictated both by our prior opinions and by a due recognition of the limitations of judicial power. This approach, rather than the majority's more pervasive and less refined judgment, marks for me the appropriate course under the Eighth Amendment.

## VIII

I now return to the overriding question in these cases: whether this Court, acting in conformity with the Constitution, can justify its judgment to abolish capital punishment as heretofore known in this country. It is important to keep in focus the enormity of the step undertaken by the Court today. Not only does it invalidate hundreds of state and federal laws, it deprives those jurisdictions of the power to legislate with respect to capital punishment in the future, except in a manner consistent with the cloudily outlined views of those Justices who do not purport to undertake total abolition.

Nothing short of an amendment to the United States Constitution can reverse the Court's judgments. Meanwhile, all flexibility is foreclosed. The normal democratic process, as well as the opportunities for the several States to respond to the will of their people expressed through ballot referenda (as in Massachusetts, Illinois, and Colorado),[59] is now shut off.

The sobering disadvantage of constitutional adjudication of this magnitude is the universality and permanence of the judgment. The enduring merit of legislative action is its responsiveness to the democratic process, and to revision and change: mistaken judgments may be corrected and refinements perfected. In England[60] and Canada[61] critical choices were made after studies canvassing all competing views, and in those countries revisions may be made in light of experience.[62]

As recently as 1967 a presidential commission did consider, as part of an overall study of crime in this country, whether the death penalty should be abolished.

---

[59] See text accompanying nn. 27 & 28, *supra*.

[60] See n. 24, *supra*.

[61] See n. 23, *supra*.

[62] Recent legislative activity in New York State serves to underline the preferability of legislative action over constitutional adjudication. New York abolished the death penalty for murder in 1965, leaving only a few crimes for which the penalty is still available. See text accompanying n. 25, *supra*. On April 27, 1972, a bill that would have restored the death penalty was considered by the State Assembly. After several hours of heated debate, the bill was narrowly defeated by a vote of 65 to 59. N. Y. Times, Apr. 28, 1972, p. 1, col. 1. After seven years of disuse of the death penalty the representatives of the people in that State had not come finally to rest on the question of capital punishment. Because the 1965 decision had been the product of the popular will it could have been undone by an exercise of the same democratic process. No such flexibility is permitted when abolition, even though not absolute, flows from constitutional adjudication.

The commission's unanimous recommendation was as follows:

"The question whether capital punishment is an appropriate sanction is a policy decision to be made by each State. Where it is retained, the types of offenses for which it is available should be strictly limited, and the law should be enforced in an even-handed and nondiscriminatory manner, with procedures for review of death sentences that are fair and expeditious. When a State finds that it cannot administer the penalty in such a manner, or that the death penalty is being imposed but not carried into effect, the penalty should be abandoned." [63]

The thrust of the Commission's recommendation, as presently relevant, is that this question "is a policy-decision to be made by each State." There is no hint that this decision could or should be made by the judicial branch.

The National Commission on Reform of Federal Criminal Laws also considered the capital punishment issue. The introductory commentary of its final report states that "a sharp division [existed] within the Commission on the subject of capital punishment," although a

---

[63] President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 143 (1967) (chaired by Nicholas Katzenbach, then Attorney General of the United States). The text of the Report stated, among other things, that the abolition of the death penalty "is being widely debated in the States"; that it is "impossible to say with certainty whether capital punishment significantly reduces the incidence of heinous crimes"; that "[w]hatever views one may have on the efficacy of the death penalty as a deterrent, it clearly has an undesirable impact on the administration of criminal justice"; and that "[a]ll members of the Commission agree that the present situation in the administration of the death penalty in many States is intolerable." *Ibid.* As a member of this Presidential Commission I subscribed then, and do now, to the recommendations and views above quoted.

majority favored its abolition.[64]　Again, consideration of the question was directed to the propriety of retention or abolition as a legislative matter.　There was no suggestion that the difference of opinion existing among commission members, and generally across the country, could or should be resolved in one stroke by a decision of this Court.[65]　Similar activity was, before today, evident at the state level with re-evaluation having been undertaken by special legislative committees in some States and by public ballot in others.[66]

With deference and respect for the views of the Justices who differ, it seems to me that all these studies—both in this country and elsewhere—suggest that, as a matter of policy and precedent, this is a classic case for the exercise of our oft-announced allegiance to judicial restraint.　I know of no case in which greater gravity and delicacy have attached to the duty that this Court is called on to perform whenever legislation—state or federal—is challenged on constitutional grounds.[67]　It seems to me that the sweeping judicial action undertaken today reflects a

[64] Final Report of the National Commission on Reform of Federal Criminal Laws 310 (1971).

[65] The American Law Institute, after years of study, decided not to take an official position on the question of capital punishment, although the Advisory Committee favored abolition by a vote of 18–2. The Council was more evenly divided but all were in agreement that many States would undoubtedly retain the punishment and that, therefore, the Institute's efforts should be directed toward providing standards for its implementation. ALI, Model Penal Code 65 (Tent. draft No. 9, 1959).

[66] See text accompanying nn. 26 through 30, *supra*.

[67] *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (separate opinion of Holmes, J.).　See also *Trop* v. *Dulles*, 356 U. S., at 128 (Frankfurter, J., dissenting):

"The awesome power of this Court to invalidate . . . legislation, because in practice it is bounded only by our own prudence in discerning the limits of the Court's constitutional function, must be exercised with the utmost restraint."

basic lack of faith and confidence in the democratic process. Many may regret, as I do, the failure of some legislative bodies to address the capital punishment issue with greater frankness or effectiveness. Many might decry their failure either to abolish the penalty entirely or selectively, or to establish standards for its enforcement. But impatience with the slowness, and even the unresponsiveness, of legislatures is no justification for judicial intrusion upon their historic powers. Rarely has there been a more appropriate opportunity for this Court to heed the philosophy of Mr. Justice Oliver Wendell Holmes. As Mr. Justice Frankfurter reminded the Court in *Trop:*

> "[T]he whole of [Mr. Justice Holmes'] work during his thirty years of service on this Court should be a constant reminder that the power to invalidate legislation must not be exercised as if, either in constitutional theory or in the art of government, it stood as the sole bulwark against unwisdom or excesses of the moment." 356 U. S., at 128.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE POWELL join, dissenting.

The Court's judgments today strike down a penalty that our Nation's legislators have thought necessary since our country was founded. My Brothers DOUGLAS, BRENNAN, and MARSHALL would at one fell swoop invalidate laws enacted by Congress and 40 of the 50 state legislatures, and would consign to the limbo of unconstitutionality under a single rubric penalties for offenses as varied and unique as murder, piracy, mutiny, highjacking, and desertion in the face of the enemy. My Brothers STEWART and WHITE, asserting reliance on a more limited rationale—the reluctance of judges and juries actually to impose the death penalty in the majority of capital

cases—join in the judgments in these cases. Whatever its precise rationale, today's holding necessarily brings into sharp relief the fundamental question of the role of judicial review in a democratic society. How can government by the elected representatives of the people co-exist with the power of the federal judiciary, whose members are constitutionally insulated from responsiveness to the popular will, to declare invalid laws duly enacted by the popular branches of government?

The answer, of course, is found in Hamilton's Federalist Paper No. 78 and in Chief Justice Marshall's classic opinion in *Marbury* v. *Madison,* 1 Cranch 137 (1803). An oft-told story since then, it bears summarization once more. Sovereignty resides ultimately in the people as a whole and, by adopting through their States a written Constitution for the Nation and subsequently adding amendments to that instrument, they have both granted certain powers to the National Government, and denied other powers to the National and the State Governments. Courts are exercising no more than the judicial function conferred upon them by Art. III of the Constitution when they assess, in a case before them, whether or not a particular legislative enactment is within the authority granted by the Constitution to the enacting body, and whether it runs afoul of some limitation placed by the Constitution on the authority of that body. For the theory is that the people themselves have spoken in the Constitution, and therefore its commands are superior to the commands of the legislature, which is merely an agent of the people.

The Founding Fathers thus wisely sought to have the best of both worlds, the undeniable benefits of both democratic self-government and individual rights protected against possible excesses of that form of government.

The courts in cases properly before them have been entrusted under the Constitution with the last word, short of constitutional amendment, as to whether a law passed

by the legislature conforms to the Constitution. But just because courts in general, and this Court in particular, do have the last word, the admonition of Mr. Justice Stone dissenting in *United States* v. *Butler* must be constantly borne in mind:

> "[W]hile unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint." 297 U. S. 1, 78–79 (1936).

Rigorous attention to the limits of this Court's authority is likewise enjoined because of the natural desire that beguiles judges along with other human beings into imposing their own views of goodness, truth, and justice upon others. Judges differ only in that they have the power, if not the authority, to enforce their desires. This is doubtless why nearly two centuries of judicial precedent from this Court counsel the sparing use of that power. The most expansive reading of the leading constitutional cases does not remotely suggest that this Court has been granted a roving commission, either by the Founding Fathers or by the framers of the Fourteenth Amendment, to strike down laws that are based upon notions of policy or morality suddenly found unacceptable by a majority of this Court. The Framers of the Constitution would doubtless have agreed with the great English political philosopher John Stuart Mill when he observed:

> "The disposition of mankind, whether as rulers or as fellow-citizens, to impose their own opinions and inclinations as a rule of conduct on others, is so energetically supported by some of the best and by some of the worst feelings incident to human nature, that it is hardly ever kept under restraint by anything but want of power." On Liberty 28 (1885).

A separate reason for deference to the legislative judgment is the consequence of human error on the part of the judiciary with respect to the constitutional issue before it. Human error there is bound to be, judges being men and women, and men and women being what they are. But an error in mistakenly sustaining the constitutionality of a particular enactment, while wrongfully depriving the individual of a right secured to him by the Constitution, nonetheless does so by simply letting stand a duly enacted law of a democratically chosen legislative body. The error resulting from a mistaken upholding of an individual's constitutional claim against the validity of a legislative enactment is a good deal more serious. For the result in such a case is not to leave standing a law duly enacted by a representative assembly, but to impose upon the Nation the judicial fiat of a majority of a court of judges whose connection with the popular will is remote at best.

The task of judging constitutional cases imposed by Art. III cannot for this reason be avoided, but it must surely be approached with the deepest humility and genuine deference to legislative judgment. Today's decision to invalidate capital punishment is, I respectfully submit, significantly lacking in those attributes. For the reasons well stated in the opinions of THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE POWELL, I conclude that this decision holding unconstitutional capital punishment is not an act of judgment, but rather an act of will. It completely ignores the strictures of Mr. Justice Holmes, writing more than 40 years ago in *Baldwin* v. *Missouri:*

> "I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly

any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions. Yet I can think of no narrower reason that seems to me to justify the present and the earlier decisions to which I have referred. Of course the words 'due process of law,' if taken in their literal meaning, have no application to this case; and while it is too late to deny that they have been given a much more extended and artificial signification, still we ought to remember the great caution shown by the Constitution in limiting the power of the States, and should be slow to construe the clause in the Fourteenth Amendment as committing to the Court, with no guide but the Court's own discretion, the validity of whatever laws the States may pass." 281 U. S. 586, 595 (1930) (dissenting opinion).

More than 20 years ago, Justice Jackson made a similar observation with respect to this Court's restriction of the States in the enforcement of their own criminal laws:

"The use of the due process clause to disable the States in protection of society from crime is quite as dangerous and delicate a use of federal judicial power as to use it to disable them from social or economic experimentation." *Ashcraft* v. *Tennessee,* 322 U. S. 143, 174 (1944) (dissenting opinion).

If there can be said to be one dominant theme in the Constitution, perhaps more fully articulated in the Federalist Papers than in the instrument itself, it is the notion of checks and balances. The Framers were well aware of the natural desire of office holders as well as others to seek to expand the scope and authority of their

particular office at the expense of others. They sought to provide against success in such efforts by erecting adequate checks and balances in the form of grants of authority to each branch of the government in order to counteract and prevent usurpation on the part of the others.

This philosophy of the Framers is best described by one of the ablest and greatest of their number, James Madison, in Federalist No. 51:

> "In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to controul the governed; and in the next place, oblige it to controul itself."

Madison's observation applies to the Judicial Branch with at least as much force as to the Legislative and Executive Branches. While overreaching by the Legislative and Executive Branches may result in the sacrifice of individual protections that the Constitution was designed to secure against action of the State, judicial overreaching may result in sacrifice of the equally important right of the people to govern themselves. The Due Process and Equal Protection Clauses of the Fourteenth Amendment were "never intended to destroy the States' power to govern themselves." Black, J., in *Oregon* v. *Mitchell*, 400 U. S. 112, 126 (1970).

The very nature of judicial review, as pointed out by Justice Stone in his dissent in the *Butler* case, makes the courts the least subject to Madisonian check in the event that they shall, for the best of motives, expand judicial authority beyond the limits contemplated by the Framers. It is for this reason that judicial self-restraint is surely an implied, if not an expressed, condition of the grant of authority of judicial review. The Court's holding in these cases has been reached, I believe, in complete disregard of that implied condition.